*12 cv 175-S*

R.O. Marshall III
3700 Fast 18th Street
Casper, Wyoming 82609

# ORIGINAL

**IN UNITED STATES DISTRICT COURT**
**FOR DISTRICT OF WYOMING**

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2012 AUG 16  AM 11 14

STEPHAN HARRIS, CLERK
CASPER

....................................................x

| | |
|---|---|
| Robert Owen Marshall III | ) |
| *Plaintiff, pro se* | ) |
| | ) |
| vs. | ) |
| | ) |

**CIVIL RIGHTS COMPLAINT**

Jury Trial Demand

**Civil Action No.** _____

..................................................x

Wyoming Dep't. Of Corrections,  )
PHS/Corizon Health, Inc.,  )
Robert O. Lampert,  )
Steve Lindley, Brian Farmer  )
Dan Shannon, Donna Sheen,  )
John Ordiway, Sam Borbely,  )
Debbie Leonard, Eddie Wilson,  )
Tod Martin, Michael J. Murphy,  )
Ruby Dickey-Ziegler, Janelle Thayer,  )
Kya Gallo, Harriett Carlson,  )
Melody Norris, Lana Culver,  )
Shawna Rettinghouse, Kathy Long,  )
Carrie Caruthers, Burt Prindle,  )
Jason Wadsworth, James Valier,  )
Andrew Aldrich, J. May,  )
Jay Owren, Dennis Jones,  )
Ron Schmitz, Joe Tiffany,  )
James Markum, Kristy Brooks,  )
Pam Nichols, Francis Foster,  )
Vicki Smith, Dan Pillion,  )
Steve Hargett, Michael David,  )
Richard Lorenz, Jon Martin,  )

Robert Custard, Rob Branham,  )
Shawn Sitzman, Curtis Moffat,  )
Amber Davidson, Richard Bishop,  )
Barbara Tuttle, Heather Berglund,  )
Marlena Miller, Neicole Molden,  )
Richard Hallworth, Konne Rife,  )
Anne Cybulski-Sandlian, James Allen,  )
Jeff Shahan, Dr. John Coyle,  )
Dr. Kurt Johnson, Dr. Jon Wakamatsu,  )
Shirley Haley, Susie Pillon,  )
Nichole Taylor, M. Dahlke,  )
Charlene Holtzman, Leslie Briggs,  )
Dr. Robert Byrd, Jacquie Probst,  )
Wyoming Board of Parole,  )
Patrick Anderson, Daniel Fetsco,  )
Antonio Escamilla, Melvin Hamilton,  )
James Wiesbeck, Brad Vercimak,  )
Barbara LeMaitre, Brian Kafsa,  )

*Defendants*  )
)

..................................................x

# CIVIL RIGHTS COMPLAINT
## PURSUANT TO 42 U.S.C. § 1983,
## § 2000cc, § 12101, *et. alii.*

### JURY TRIAL DEMAND

---

**THIS IS A CIVIL ACTION** arising under 42 U.S.C. § 1983 which permits the institution of a Federal Civil Action for deprivation of rights, privileges and immunities secured by the Constitution and Laws of the United States where such deprivation occurs under color of any

state statute, ordinance, regulation, custom or usage, and is applied to the states through the Fourteenth Amendment. This action seeks Declaratory Relief, Compensatory, Punitive and Presumptive Damages, where applicable, and is brought before the court within four years of the first alleged injury pursuant to Wyo. Stat. Ann. § 1-3-105(a)(iv)(C).

**FURTHER,** this suit is brought pursuant to 28 U.S.C. § 2201, (Declaratory Judgment Act); 42 U.S.C. §§ 2000cc *et seq*, (Religious Land Use and Institutionalized Persons Act); 29 U.S.C.S. § 701 *et seq.*, as amended - § 794(a); (Rehabilitation Act - § 504); and 42 U.S.C. §§ 12101 *et seq.* as amended, which encompasses 12131 *et seq.*, and § 12181 *et seq.*, (Title II and III -Americans with Disabilities Act). Said act incorporates 42 U.S.C.S. § 12203(a),(b) (Prohibition against retaliation and coercion), referenced and incorporated by 29 U.S.C.S. § 794 (Nondiscrimination under Federal Grants and Programs). This suit is also brought pursuant to applicable pendent state law claims as the court finds Plaintiff may allege herein.

## I. JURISDICTION AND VENUE

**THIS COURT HAS JURISDICTION** under 28 U.S.C. § 1331, § 1332 and § 1343 which places original jurisdiction in the federal district court for civil actions commenced by any person to redress the deprivation of rights. Under the Supremacy Clause of the United States Constitution, this Court has jurisdiction and authority to review this civil rights complaint under 42 U.S.C. § 1983. Plaintiff Robert Owen Marshall III invokes the supplemental jurisdiction of this court to decide any asserted statutory and common-law tort claims. The court has Ancillary Jurisdiction over applicable State claims under 28 U.S.C. § 1367.

**THE DISTRICT OF WYOMING IS AN APPROPRIATE VENUE** under 28 U.S.C. § 1391(b)(2); Venue lies in this district under 27 U.S.C. § 1191(b), which provides that venue is proper where the defendants reside or where the claim arose. The District of Wyoming is a proper venue because Wyoming is the judicial district in which all claims arose. Venue in this district is also proper under 42 U.S.C. § 2000e–f (f)(3), which applies to claims brought under the Americans with Disabilities Act by virtue of 42 U.S.C. § 12117(a).

## II.   PLAINTIFF

1.    **Plaintiff Robert Owen Marshall III,** was at all times mentioned herein a prisoner of the State of Wyoming in the custody of the Wyoming Department of Corrections (WDOC), WDOC #25225. At all times mentioned herein Plaintiff was confined at the Wyoming State Penitentiary (WSP), Rawlins, Wyoming; the Wyoming Honor Conservation Camp (WHCC), Newcastle Wyoming; or the Wyoming Medium Correctional Institution (WMCI), Torrington, Wyoming. Plaintiff is an adult citizen of the United States and a resident of the State of Wyoming, is a Qualified Individual with a Disability, and has multiple physical impairments: Cervical Spondylosis/Degenerative Disk disease; Osteoarthritis; Severe Chronic Pain Syndrome; Anterior Clavicle Resection; Chronic Obstruction Pulmonary Disease; Gastro-esophageal Reflux Disease/Barrett's Esophagus, Traumatic Tenosynovitis (DeQuervain disease) in both wrists.

Plaintiff requests leave to file this § 1983 action alleging violation's of his constitutional and statutory rights, seeking declaratory judgment and money damages, and demands trial by jury. 3700 East 18th Street Casper, Wyoming 82609.

## III.   DEFENDANTS

1.    **Wyoming Department of Corrections** is a Public Entity under Title II of the ADA and a Department within the Wyoming State Government established under Wyo. § 9-2-2012 to be responsible for the pro-active management of the Wyoming felony offender population in a safe, secure and humane fashion with openness, honesty, and integrity. The WDOC has authority over all Wyoming penal facilities, community corrections facilities and all related facilities through a Type 1 transfer under Wyo. §§ 9-2-1701 through 9-2-1707 - Wyoming Government Reorganization Act of 1989. WDOC incorporates the Central Services Division that is responsible for the administration of the department. Plaintiff alleges that the WDOC receives federal financial assistance for residential substance abuse treatment programs, education, and re-entry services, et al. 1934 Wyott Drive, Ste. 100 Cheyenne, Wyoming 82002.

3

2.     **Defendant Prison Health Services, Inc.** (2008-10) **/ Corizon Health** (2010-present), **Richard Hallworth President,** (herein after **Corizon),** is a Private Entity under Title III of the ADA. and at all relevant times was contract health care provider for the State of Wyoming DOC. Corizon was responsible for the control and operation of public accommodations (professional offices of health care providers and pharmacies) and providing health care services for inmates in the State of Wyoming as provided by contract under state law Wyo. § 25-1-104. On June 3, 2011, Correctional Medical Services (CMS) and Prison Health Services, Inc. merged to provide medical services under contract in the name of PHS, /dba/ Corizon Health. 105 West Park Dr., Ste. 200 Brentwood, Tennessee 37027, c/o Anne Cybulski-Sandlian, Wyoming Department of Corrections, 1934 Wyott Drive, Ste. 100, Cheyenne, WY 82002

3.     **Defendant Robert O. Lampert** is the Director of Wyoming Department of Corrections. He is legally responsible for the overall operation of the department and policies and procedures governing each institution and state prisoners imprisoned at those facilities under its jurisdiction as well as oversight of all operations and training of staff. WDOC 1934 Wyott Drive, Ste. 100 Cheyenne, Wyoming 82002.

4.     **Defendant Steve Lindley** was the Deputy Director of WDOC. Mr. Lindley is responsible for answering grievances in R.O. Lampert's stead and assisting with the overall operation of the Department and each institution under its jurisdiction. 1934 Wyott Drive, Ste. 100 Cheyenne, Wyoming 82002.

5.     **Defendant Brian Farmer** was the Policy and Planning Manager for the WDOC and at all times mentioned in this complaint was responsible for the development of department wide policies and procedures in accordance with state and federal law. 1934 Wyott Drive, Ste. 100 Cheyenne, Wyoming 82002.

6.     **Defendant Dan Shannon** was the Administrator of Prisons for the WDOC. He was responsible for the supervision, control, safety, work and custody of incarcerated felons located in the five state-operated correctional facilities and private community corrections facilities. He is charged with overseeing all prison treatment programs and medical and

mental health services. 1934 Wyott Drive, Ste. 100 Cheyenne, Wyoming 82002.

7.   **Defendant Donna Sheen** was the Administrator of Support Services for the WDOC. She was responsible for the consistency of interpretation and application of WDOC Policy and Procedures regarding inmate religious exercise and religious programming. 1934 Wyott Drive, Ste. 100 Cheyenne, Wyoming 82002.

8.   **Defendant John Ordiway** was an employee with the WDOC as the WDOC/CEC Contract Monitor. He was responsible for interviewing and recommending inmates for placement in therapeutic Community program at the Casper Re-entry Center. 1934 Wyott Drive, Ste. 100 Cheyenne, Wyoming 82002.

9.   **Defendant Sam Borbely** was the Treatment Program Manager for the WDOC. He was responsible for insuring the proper implementation and quality of offender treatment programs at WMCI, WSP and CRC/TC. 1934 Wyott Drive, Ste. 100 Cheyenne, Wyoming 82002.

10.  **Defendant Debbie Leonard** was the Records Coordinator for the WDOC, Division of Central Services. She was responsible for the coordination and accuracy assurance of all WDOC inmate records. 1934 Wyott Drive, Ste. 100 Cheyenne, Wyoming 82002.

11.  **Defendant Eddie Wilson** was a Warden of WSP at Rawlins, Wyoming prior to and/or during the period of time that the alleged events occurred. He is legally responsible for the operation of WSP and for the welfare of all the inmates of that prison. Wyoming Department of Corrections, 1934 Wyott Drive, Ste. 100, Cheyenne, WY 82002.

12.  **Defendant Tod Martin** was Deputy Warden or acting warden at WSP at Rawlins, Wyoming prior to and/or during the period of time that the alleged events occurred. He was legally responsible for the operation of WSP and for the welfare of all the inmates of that prison. Wyoming Department of Corrections, 1934 Wyott Drive, Ste. 100, Cheyenne, WY 82002.

13.  **Defendant Michael J. Murphy** was the Warden of WSP at Rawlins, Wyoming, and the WMCI at Torrington, Wyoming prior to and/or during the period(s) of time that the alleged events occurred. He was legally responsible for the operation of those facilities

and for the welfare of all the inmates in those prisons. Wyoming Department of Corrections, 1934 Wyott Drive, Ste. 100, Cheyenne, WY 82002.

14. **Defendant Ruby (Dickie) Ziegler** was Housing Manager at WSP. She was responsible for the placement of inmates in various housing and bunk assignments at that facility, and later was the Deputy Warden at WMCI. Wyoming Department of Corrections, 1934 Wyott Drive, Ste. 100, Cheyenne, WY 82002.

15. **Defendant Janelle Thayer** was Housing Manager at WSP. She was responsible for the placement of inmates in various housing and bunk assignments at that facility. Wyoming Department of Corrections, 1934 Wyott Drive, Ste. 100, Cheyenne, WY 82002.

16. **Defendant Kya Gallo** was an employee with the WDOC at the intake facility, WSP in Rawlins, Wyoming. She responsible for maintaining accurate and complete inmate records. Wyoming Department of Corrections, 1934 Wyott Drive, Ste. 100, Cheyenne, WY 82002.

17. **Defendant Harriett Carlson** was the business manager at WSP and was responsible for control and accounting of inmates' personal funds, including the deduction and payment of court ordered assessments. Wyoming Department of Corrections, 1934 Wyott Drive, Ste. 100, Cheyenne, WY 82002.

18. **Defendant Melody Norris** was a Records & Data Management Specialist with the WDOC at WMCI in Torrington, Wyoming. She was responsible for inmate records administration at that facility. Wyoming Department of Corrections, 1934 Wyott Drive, Ste. 100, Cheyenne, WY 82002.

19. **Defendant Lana Culver** was the business manager at WHCC and was responsible for control and accounting of inmates' personal funds, including the deduction and payment of court ordered assessments. Wyoming Department of Corrections, 1934 Wyott Drive, Ste. 100, Cheyenne, WY 82002.

20. **Defendant Shawna Rettinghouse** was the Records & Data Management Specialist at WHCC and was responsible for the upkeep of complete and accurate inmate records. Wyoming Department of Corrections, 1934 Wyott Drive, Ste. 100, Cheyenne, WY

82002.

21. **Defendant Kathy Long** was the business manager at WMCI and was responsible for control and accounting of inmates' personal funds, including the deduction and payment of court ordered assessments. Wyoming Department of Corrections, 1934 Wyott Drive, Ste. 100, Cheyenne, WY 82002.

22. **Defendant Carrie Caruthers** was Correctional Officer with the WDOC who at all times mentioned in this complaint held the rank of Captain and was assigned to the WSP at Rawlins Wyoming, and the Wyoming Medium Correctional Institution at Torrington, Wyoming prior to and/or during the period(s) of time the alleged events occurred. She is legally responsible for supervision of the operation and training of officers at both facilities, and for the welfare of all inmates in those prisons. Wyoming Department of Corrections, 1934 Wyott Drive, Ste. 100, Cheyenne, WY 82002.

23. **Defendant Burt Prindle** was a Correctional Officer with the WDOC who, at all times mentioned in this complaint, held the rank of Lieutenant assigned to WSP. Wyoming Department of Corrections, 1934 Wyott Drive, Ste. 100, Cheyenne, WY 82002.

24. **Defendants Jason Wadsworth and James Valier** were a Correctional Officers with the WDOC who, at all times mentioned in this complaint, held the rank of Sergeant assigned to WSP. Wyoming Department of Corrections, 1934 Wyott Drive, Ste. 100, Cheyenne, WY 82002.

25. **Defendant Andrew Aldrich** was a Correctional Officer with the WDOC who, at all times mentioned in this complaint, held the rank of Corporal assigned to G-Unit, WSP. Wyoming Department of Corrections, 1934 Wyott Drive, Ste. 100, Cheyenne, WY 82002.

26. **Defendants J. May and Jay Owren** were Correctional Officers with the WDOC who at all times mentioned in this complaint were assigned to WSP. Wyoming Department of Corrections, 1934 Wyott Drive, Ste. 100, Cheyenne, WY 82002.

27. **Defendants Dennis Jones, Ron Schmitz, and Joe Tiffany** were Unit Managers for with the WDOC who, at all times mentioned in this complaint were assigned to WSP. They

7

were responsible for the overall operation of their respective housing Units, and along with Caseworkers, the compilation of complete and accurate information contained in inmate parole plans and records presented to the Wyoming Board of Parole. Wyoming Department of Corrections, 1934 Wyott Drive, Ste. 100, Cheyenne, WY 82002.

28.   **Defendants Jim Markum, Kristy Brooks, Pam Nichols, and Francis Foster** were Caseworkers with the WDOC who, at all times mentioned in this complaint were assigned to WSP. Each was responsible for the development of Plaintiff's individual case plan with a goal toward rehabilitation and parole, insuring that complete and accurate information was conveyed to the Wyoming Board of Parole to facilitate the Board in making parole decisions. Wyoming Department of Corrections, 1934 Wyott Drive, Ste. 100, Cheyenne, WY 82002.

29.   **Defendant Vicki Smith** was employed with the WDOC who at all relevant times mentioned in this complaint was a Grievance Manager at WSP. She was responsible for assessing the validity and nature (emergency/non-emergent) of inmate grievances and resolving inmate grievances at the first step in the grievance process. Wyoming Department of Corrections, 1934 Wyott Drive, Ste. 100, Cheyenne, WY 82002.

30.   **Defendant Dan Pillion** was a Corrections Officer with the WDOC and at all times mentioned held the rank of Sergeant at WHCC. Wyoming Department of Corrections, 1934 Wyott Drive, Ste. 100, Cheyenne, WY 82002.

31.   **Defendant Steve Hargett** was Warden of WHCC at Newcastle, WY, and WMCI at Torrington, WY during the periods of time that the alleged events occurred. He was legally responsible for the operation of those facilities and for the welfare of all the inmates of that prison. Wyoming Department of Corrections, 1934 Wyott Drive, Ste. 100, Cheyenne, WY 82002.

32.   **Defendant Michael David** was Deputy Warden of WHCC at Newcastle, WY during the period of time that the alleged events occurred. Wyoming Department of Corrections, 1934 Wyott Drive, Ste. 100, Cheyenne, WY 82002.

33.   **Defendant Richard Lorenz** was a Corrections Officer with the WDOC and held the

rank of Sergeant at WHCC. Wyoming Department of Corrections, 1934 Wyott Drive, Ste. 100, Cheyenne, WY 82002.

34. **Defendant Jon Martin** was a Corrections Officer with the WDOC and held the rank of Lieutenant at WHCC. Wyoming Department of Corrections, 1934 Wyott Drive, Ste. 100, Cheyenne, WY 82002.

35. **Defendant Robert Custard** was a Corrections Officer with the WDOC and assigned to WHCC. Wyoming Department of Corrections, 1934 Wyott Drive, Ste. 100, Cheyenne, WY 82002.

36. **Defendant Rob Branham** was a Case Team Leader/Caseworker Supervisor at WMCI and was responsible for the direction of case planning supervision including placement of inmates in the ITU in accordance with WDOC standards and policy. Wyoming Department of Corrections, 1934 Wyott Drive, Ste. 100, Cheyenne, WY 82002.

37. **Defendant Shawn Sitzman** was a Caseworker with the WDOC who, at all times mentioned in this complaint were assigned to the Wyoming Medium Correctional Institution. He was responsible for the development of Plaintiff's individual case plan with a goal toward rehabilitation and parole, insuring that complete and accurate information is conveyed to the Wyoming Board of Parole to facilitate the Board in making parole decisions and proper placement of Plaintiff in the ITU. Wyoming Department of Corrections, 1934 Wyott Drive, Ste. 100, Cheyenne, WY 82002.

38. **Defendant Curtis Moffat** was the A-Unit Manager with the WDOC who, at all times mentioned in this complaint was assigned to A-Unit (segregation) at Wyoming Medium Correctional Institution. He is responsible for the general operation of that unit. Wyoming Department of Corrections, 1934 Wyott Drive, Ste. 100, Cheyenne, WY 82002.

39. **Defendant Amber Davison** was a Caseworker with the WDOC who, at all times mentioned in this complaint was assigned to the Wyoming Medium Correctional Institution. She was responsible for the development of Plaintiff's individual case plan with a goal toward rehabilitation and parole, insuring that complete and accurate information is conveyed to the Wyoming Board of Parole to facilitate the Board in

9

making parole decisions and was a member of the Multi-Disciplinary Team. Wyoming Department of Corrections, 1934 Wyott Drive, Ste. 100, Cheyenne, WY 82002.

40. **Defendant Richard Bishop** was a Caseworker with the WDOC, assigned to A-Unit who, at all times mentioned in this complaint were assigned to the Wyoming Medium Correctional Institution. He was responsible for the development of Plaintiff's individual case plan with a goal toward rehabilitation and parole, insuring that complete and accurate information is conveyed to the Wyoming Board of Parole to facilitate the Board in making parole decisions and placement of Plaintiff in the ITU. Wyoming Department of Corrections, 1934 Wyott Drive, Ste. 100, Cheyenne, WY 82002.

41. **Defendant Barbara Tuttle** was the grievance manager and/or housing manager with the WDOC, and third in the chain of command at WMCI, who at all times mentioned in this complaint was responsible for the overall supervision of Caseworkers, and was a member of the Multi-Disciplinary Team (MDT). Wyoming Department of Corrections, 1934 Wyott Drive, Ste. 100, Cheyenne, WY 82002.

42. **Defendant Heather Berglund** was a Case Team Leader (CTL) and member of the Multi-Disciplinary Team (MDT) at WMCI and was responsible for the oversight of case manager functions. Wyoming Department of Corrections, 1934 Wyott Drive, Ste. 100, Cheyenne, WY 82002.

43. **Defendant Marlena Miller** was an Acting Unit manager, Case Team Leader and a member of the Multi-Disciplinary Team at WMCI. Wyoming Department of Corrections, 1934 Wyott Drive, Ste. 100, Cheyenne, WY 82002.

44. **Defendant Neicole Molden** was a Unit Manager (UM) and fourth in the chain of command at WMCI, was responsible for the overall operation of Units D1, 2, & 3 and was part of the Multi-Disciplinary Team (MDT) at WMCI. Wyoming Department of Corrections, 1934 Wyott Drive, Ste. 100, Cheyenne, WY 82002.

45. **Defendant Konne Rife** was Director of Education at WMCI. She was responsible for the overall direction of the Library, Legal Library and Educational Services in general at WMCI. Wyoming Department of Corrections, 1934 Wyott Drive, Ste. 100, Cheyenne,

WY 82002.

46.   **Defendant Anne Cybulski-Sandlian** was the Health Services Manager and liaison for PHS, Inc. /Corizon Health and WDOC. She was responsible for the overall coordination of medical services, for answering inmate medical grievances for the director of the WDOC and was the ADA Coordinator/Grievance Manager for the WDOC/Corizon in Cheyenne. WDOC, 1934 Wyott Drive, Ste. 100 Cheyenne, Wyoming 82002.

47.   **Defendant James Allen** was Regional Health Services, Inc. Administrator for Prison Health Services, Inc. at WSP. Mr. Allen possessed sole decision-making authority in administrative medical capacity. Wyoming Department of Corrections, 1934 Wyott Drive, Ste. 100, Cheyenne, WY 82002.

48.   **Defendant Jeff Shahan** was the Health Services, Inc. Administrator for Corizon Health, Inc. at WMCI and was responsible for the overall operation for medical services, and possessed sole decision-making authority in administrative capacity over medical issues at that facility. Wyoming Department of Corrections, 1934 Wyott Drive, Ste. 100, Cheyenne, WY 82002.

49.   **Defendant Dr. John Coyle, OD** was a Medical Provider under Prison Health Services, Inc., and provided contract health services under license of Dr. Kurt Samuel Johnson to inmates in WDOC facilities. Wyoming Department of Corrections, 1934 Wyott Drive, Ste. 100, Cheyenne, WY 82002.

50.   **Defendant Dr. Samuel Kurt Johnson** was the Regional Medical Director for Prison Health Services, Inc./Corizon Health, and provided contract services to inmates in WDOC facilities. Dr. Johnson possessed sole medical care decision-making authority Wyoming Department of Corrections, 1934 Wyott Drive, Ste. 100, Cheyenne, WY 82002.

51.   **Defendant Jon Wakamatsu** was a Medical Provider at WMCI for Corizon Health (Dec 3, 2012-present), and provided contract health services for inmates at that facility from January until the date of Plaintiff's discharge from the institution. 1934 Wyott Drive, Ste. 100, Cheyenne, WY 82002.

11

52. **Defendant Shirley Haley, NP** is/was Physician's Assistant at Wyoming Honor Conservation Camp and provided for the daily health services of inmates at the direction of the doctor at that facility; Wyoming Department of Corrections, 1934 Wyott Drive, Ste. 100, Cheyenne, WY 82002.

53. **Defendant Susie Pillon** is/was the Site Administrator for Prison Health Services at the Wyoming Honor Conservation Camp, and is/was responsible for the daily operation of the medical services division; Wyoming Department of Corrections, 1934 Wyott Drive, Ste. 100, Cheyenne, WY 82002.

54. **Defendants Nichole Taylor, RN and M. Dahlke, RN, Charlene Holtzman, RN** at the times mentioned in this complaint were Directors of Nursing for Prison Health Services, Inc. at WSP. They were responsible for over all administration of the medical office including the maintenance of complete and accurate inmate medical records at that facility. Wyoming Department of Corrections, 1934 Wyott Drive, Ste. 100, Cheyenne, WY 82002.

55. **Defendant Leslie Briggs, RN** was at all relevant times mentioned in this complaint a Nurse employed by Prison Health Services, Inc. at WMCI. She was responsible for over all administration of the medical office and the maintenance of complete and accurate inmate medical records at that facility. Wyoming Department of Corrections, 1934 Wyott Drive, Ste. 100, Cheyenne, WY 82002.

56. **Defendant Doctor Robert Byrd, DDS** was the dentist and an oral surgeon, at WMCI and was responsible for the provision of dental care and oral surgery and oversight of scheduling at that institution. Wyoming Department of Corrections, 1934 Wyott Drive, Ste. 100, Cheyenne, WY 82002.

57. **Defendant Nurse Jacquie Probst, RN** was the dental assistant for Dr. Byrd. She was responsible for assisting during dental procedures and scheduling dental appointments at WMCI. Wyoming Department of Corrections, 1934 Wyott Drive, Ste. 100, Cheyenne, WY 82002.

58. **Defendant Wyoming Board of Parole** is a public entity created by virtue of W.S §§ 28-

12-101 through 28-12-103. Board members are empowered by virtue of W.S. § 7-13-401 to review applications for parole, grant or revoke paroles. 3120 Old Faithful Road, Ste.300 Cheyenne, Wyoming 82002.

59. **Defendant Patrick Anderson** was Executive Director of the Wyoming Board of Probation and Parole, "Parole Board", whose position is created by virtue of W.S. 7-13-401. Among his duties are management, supervision and training of Board staff. In addition, the Executive Director acts on behalf of the board in responding to correspondence to the Board. 3120 Old Faithful Road, Ste. 300 Cheyenne, Wyoming 82002.

60. **Defendant Daniel M. Fetsco** was Assistant Director, Parole Board member, and WDOC attorney. He was responsible for assisting with administrative duties, legal advise to the Board and WDOC, conducting interviews and making determinations regarding parole grants/revocations, removing/restoring good time credits and gubernatorial commutation recommendations for inmates in the custody of the WDOC. Wyoming Department of Corrections, 1934 Wyott Drive, Ste. 100, Cheyenne, WY 82002.

61. **Defendants Antonio Escamilla, Melvin Hamilton, James F. Wiesbeck, Brad Vercimak, Barbara LeMaitre, Brian Kafsa (*collectively herein* "parole board")** were members of the Wyoming Board of Parole with the Department of Probation and Parole. Each were responsible for conducting interviews and making determinations regarding parole grants/revocations, removing/restoring good-time credits and gubernatorial commutation recommendations for inmates in the custody of the WDOC. Each Parole Board member mentioned within sat at various times on Parole hearings regarding Plaintiff. Each is sued collectively along with Anderson and Fetsco as the public entity "Parole Board". 3120 Old Faithful Road, Ste. 300 Cheyenne, Wyoming 82002.

## V. ACTIONS DONE UNDER COLOR OF STATE LAW

Each defendant mentioned in this complaint is a "person" and is sued in his/her individual capacity for purpose of 42 U.S.C. § 1983 Constitutional violations; official capacity for purposes

of the ADA, and Rehabilitation Act; individual capacity for ADA anti-retaliation claims; and individual and official capacity for claims brought under RLUIPA. At all relevant times, defendants acted within the scope of their employment, contract, and/or their duties Under the Authority and Color of State Law to deprive Plaintiff of rights guaranteed him by the Constitution and statutes of the United States of America and State of Wyoming. Each is sued individually and/or collectively, and/or in his/her official capacity, jointly, severally, or in the alternative for claims arising out of the Americans with Disabilities Act, Rehabilitation Act, and Religious Land Use and Institutionalized Persons Act. Plaintiff alleges that the Wyoming Department Of Corrections receives federal financial assistance for its programs or activities, including Probation and Parole.

## VI.   PLAINTIFF'S PREVIOUS LAWSUITS

Plaintiff, Robert O. Marshall III has filed no other lawsuits dealing with the same facts involved in this action or otherwise relating to his imprisonment.

## VII.   JOINDER AND TIME LIMITS

Plaintiff requests leave of the court for joinder of claims and parties under Rule 18 and, 20 Fed.R.Civ.P., respectively, as arising out of the same transaction, occurrence, or series of transactions or occurrences; and any question of law or fact common to all defendants will arise in this action. Plaintiff alleges continuing violations as to abuses and violations of Federal Civil Rights relating back and subsequent to original complaints and grievances as set forth in Claim Five. Said subsequent abuses set forth a sweeping pattern of Federal Constitutional and statutory violations, as well as state civil rights and Tort violations that continued virtually without cessation for the succeeding 4 years.

## VIII.   STATEMENT OF CLAIMS

The following claims, brought under 42 U.S.C. § 1983 and applicable statutes, allege continuing violations of the First, Fourth, Eighth, Ninth and Fourteenth Amendments of the United States Constitution, and continued over a period From February 6, 2008 until June 30, 2012. Plaintiff's

claims incorporate violations of 42 U.S.C. §§ 2000cc - 2000cc-5, (Religious Land Use and Institutionalized Persons Act); 42 U.S.C. §§ 12101, et seq., as amended, (The Americans with Disabilities Act of 1990), and 29 U.S.C. §§ 701 et seq. as amended, (The Rehabilitation Act of 1973). All rights are applied to the State of Wyoming by and through the U.S. Constitution Fourteenth Amendment.

**COMES NOW THE PLAINTIFF,** Robert Owen Marshall III in *propria persona,* Stating and alleging:

A.   **CLAIMS BROUGHT PURSUANT TO UNITED STATES CONSTITUTION FIRST, EIGHTH and FOURTEENTH AMENDMENT and 42 U.S.C. § 2000cc *et. seq.*, and Wyo. Const. Article 1, § 18; Wyo. Ordinance § 25 Religious Liberty:**

**CLAIM ONE:**   **Molestation and Discrimination on Account of Plaintiff's Mode of Religious Expression, Conspiracy to Interfere with Civil Rights, Denial of Due Process of Law and Intentional Infliction of Emotional Distress.**

### SPECIFIC INSTANCES

1.   When Plaintiff was very young, he fell backward out of a swing and the zipper of his hood went into the lower back of his skull. Plaintiff's hair has thereafter grown somewhat faster in that area than the rest of his hair.

2.   Plaintiff believes that an angel/protective spirit assisted to protect his life in this situation. In later life, the longer growth of hair, which the Cherokee people of Plaintiff's blood-line call a "*Kouplock*" (a lock of hair growing from the base of Plaintiff's scalp longer than the rest of his hair), became spiritually significant to him; signifying grace and power imparted to Plaintiff by the Great Spirit Creator/God and Plaintiff's devotion to Him.

3.   Plaintiff was raised Catholic and attended Catholic school when young. His patriarchal lineage is Cherokee Indian. Plaintiff and his granddad would share stories about life on

the "ranch", the life, killing and relocation of the Cherokee to Oklahoma. The Christian and Native spiritual ideals that Plaintiff adopts as his dual religious belief system, Christian/Native American, integrates deep and sincere reverence for "Those who live in the mountains," the natural world, and life that God has created. It is a memorial to the resilience of life and those who suffer oppression or addiction to rebound from despair.

4.    Plaintiff wore his Kouplock for years prior to his incarceration, and for at least one and a half years while in the custody of the WDOC prior to this incident, without any interference or molestation whatsoever. Other than the events alleged in Claims 1 & 2, he never again suffered abuse from anyone on account of his mode of religious expression.

5.    **Plaintiff arrived at the intake facility,** Wyoming State Penitentiary, February 6, 2008.

6.    On arrival at WSP, prison officials made an identification photograph in accordance with WDOC Policy and Procedure #4.201- Inmate Grooming, Hygiene and Sanitation, Effective 2/1/06. Plaintiff's photo clearly shows his Kouplock on his right shoulder.

7.    On February 7, 2008, Plaintiff as requested filed a Declaration of Faith document, WDOC Form #500, declaring Christian/Native American as his chosen religious belief.

8.    Plaintiff's WDOC Form #500 was witnessed, approved and signed by Chaplain Raymond Spray on February 7, 2008.

9.    On or about June 16 2009, while in the Admission and Orientation unit at WSP, after returning from CRRC/TC, Plaintiff was forced by Corporal Andrew Aldrich, Sergeant Jason Wadsworth and Lieutenant Burt Prindle to shave off his Native American Kouplock or face punishment in violation of his mode of religious expression.

10.   Plaintiff had trimmed his hair with a razor when he could not get a haircut otherwise, and while exiting the cell to get his dinner tray at about 15:00, Cpl. Andrew Aldrich said to Plaintiff, "You missed a spot" indicating Plaintiff's Kouplock. Plaintiff thought Aldrich was just making a joke as often others did. Aldrich ordered Plaintiff, "shave it off."

11.   Plaintiff told Corporal Aldrich, "Sir, my hair is religiously protected. Corporal Aldrich said, "Cut it off or I'll segregate you until you do."

12.   While Plaintiff and his cellmate, Mr. Brian Baldivia and were eating, Aldrich spoke over

16

the intercom and taunted, "How's that haircut coming?" Plaintiff replied, "We're eating!" Plaintiff then went to the intercom and told Aldrich, "Sir, you need to look at my records on the computer and check my religious declaration document" Aldrich cut him off saying, "I'm not going to go through that bull shit. I told you how it's going to be."

13. Plaintiff could see Cpl. Aldrich, Sgt Wadsworth and Lt. Prindle in the control bubble engaged in lively discussion.

14. When Plaintiff exited his cell to put back his dinner tray, Aldrich said, "I told you to cut that thing off." Plaintiff responded, "Aldrich, that's not right. I'm not going to do that."

15. Cpl. Aldrich immediately segregated Plaintiff in the cell, and cell-mate Brian Irvin Baldivia #26089 on the bare floor in a small room off the dayroom with no mattress, chair, blanket, nothing.

16. This event was witnessed by Shawn Pulley #26067 in the neighboring cell, as well other inmates in orientation unit at the time.

17. At about 17:30, Sgt. Wadsworth and Cpl. Aldrich took Plaintiff into a small room outside the pod. Lt. Prindle observed from the control bubble scrutinizing Plaintiff's hair as he passed by. Wadsworth said, "Look Marshall, it's almost quitting time, you could save us a whole lot of paperwork if you just cut it off.

18. Plaintiff showed the officers his I.D. photo and Cpl. Aldrich said, "We know Marshall, we looked at it. But there is a difference between one this long and one this long" (indicating with his fingers a difference of about an inch of years' growth.)

19. Plaintiff's spiritual walk encourages that he not leave another person to be punished on his account. So Plaintiff said, "Look, I'll do it. But this is wrong and I'm really pissed." Aldrich replied, "Yea, we know, thanks"

20. So as to get Mr. Baldivia out from off the floor, Plaintiff told the officers that he would have to get his cellmate cut it off. Aldrich said, "Yea, O.K."

21. Soon afterword, Plaintiff spoke with Chaplain Raymond Spray and told him what had taken place. The chaplain looked Plaintiff in the eye and said, "Marshall, sue them. This is a really big deal." Plaintiff began the grievance process.

**CLAIM TWO:**    <u>Molestation and Discrimination on Account of Plaintiff's Mode of</u>
<u>Religious Expression, Attempt to Establish a Particular Mode of</u>
<u>Religious Expression, Conspiracy To Interfere With Civil Rights and</u>
<u>Intentional Infliction Of Emotional Distress.</u>

<u>SPECIFIC INSTANCES</u>

22.    Plaintiff was transferred to the Wyoming Honor Conservation Camp for the second time on October 29, 2009.

23.    Soon after Plaintiff's arrival, Warden Steve Hargett, Deputy Warden Michael David, Lieutenant Jon Martin, Sergeant Dan Pillion, Sergeant Richard Lorenz, and Officer Robert Custard began harassing Plaintiff about his Kouplock. These defendants approached him on several different occasions telling him repeatedly to cut off his Kouplock or get a write-up. These same officials never said a word about Plaintiff's hairstyle the first time he was at this facility in April through August, 2008.

24.    The defendants kept harassing Plaintiff and Plaintiff felt belittled, very much oppressed and frightened. Plaintiff felt intimidated as he did at WSP in June of '08.

25.    On or about November 09, 2009, Plaintiff was in the chow hall when Warden Hargett and Lieutenant Martin told Plaintiff, "Sit down by us." Plaintiff complied and Warden Hargett said, "That thing on the back of your head, it's got to go." Plaintiff explained that he is part Cherokee Indian and his Kouplock is important to his religious beliefs. Warden Hargett asked, "is it documented? You've got to be documented." Plaintiff said that he did not think that was correct, but these defendants persisted in harassing him.

26.    Because Plaintiff was again being harassed about his Kouplock, he had copies of WDOC Policy & Procedure #4.201 and Form #500 in his pocket. Plaintiff showed the documents to the officers explaining, "I am approved to declare Christian/Native American religion by the WDOC" and presented the documents to the defendants. Warden Hargett told Plaintiff that he would "do some checking" and the encounter ended.

27.    On 11/16, Plaintiff was told to sit down with Sgt. Lorenz at his table in the chow hall. Sgt

Lorenz said, "The warden, (who was off site), told me to tell you to cut your hair." Plaintiff felt that Sgt. Lorenz was not being truthful so Plaintiff said, "I'll speak further with the warden when he gets back." This seemed to aggravate Sgt. Lorenz, but nothing more was said at that time.

28. Warden Hargett again approached Plaintiff in the chow hall on 11/17/09 and said, "We spoke to Willie LeClair (Native American Spiritual Advisor), and he said that that is not a Native American haircut." Plaintiff replied, "No Sir, you didn't, I spoke with Willie LeClair a week ago at WSP, and he told me that in his spiritual walk, he would not discuss political issues such as this." Warden Hargett turned and walked out.

29. On 11/18, Warden Hargett again approached Plaintiff while he was eating lunch and handed him a copy of an article he had taken from the internet at: (www.yvwiiusdinvnohii.net/cherokee/WendellCochrin/CCNotes-ClothingAdornment). He had highlighted the following statement, "The only description of how hair was worn is by Timberlake who said (p.75) that the men shaved it off or plucked it out except for a small patch on *the _crown_ of the head* about twice the size of a British crown piece. This patch was ornamented with beads, feathers wampum, stained deer hair, etc." This is exactly what the defendants in Claim One at one point said was the issue with Plaintiff's Kouplock, (that Plaintiff appeared to have shaved or plucked out my hair except for his Kouplock).

30. Warden Hargett insinuated that Plaintiff wasn't wearing his Kouplock from the correct area, and attempted to establish that Plaintiff was to wear his Kouplock as described.

31. Later Plaintiff received a message via Communication Form #320 from Sgt. Lorenz telling Plaintiff, "either move your "*tail*" to the top of your head, if you wanted to claim Native American, or cut it off.

32. On 11/19, Sgt. Lorenz this time with Lt. Martin again addressed Plaintiff. Martin said, "Marshall, sit down, we're going to have a serious conversation. You are either going to move that tail to the top of your head, cut it off, or get a write up." Plaintiff showed the Declaration of Faith documents again to the officers and did not comply. Plaintiff did not

receive a write-up at that time.

33. On Sunday 11/22/09, Plaintiff saw Spiritual Advisor, Willie LeClair in the chow hall. Plaintiff asked him, "Did these people talk to you about my hairstyle?" He answered, "I spoke to the chaplain this morning and told him, In cases like this, I refer them to the chaplain at WSP. Like I said when we talked before, I don't get involved with political issues."

34. Plaintiff explained that Warden Hargett had told him on 11/16, "We contacted Willie LeClair, and he said, 'Cherokee men do not wear their hair that way.'" Mr. LeClair responded, "No, they did not speak to me." Plaintiff told Mr. LeClair that he understood his position, but that it was important that he be able to say he discussed the matter with the Native American Spiritual Advisor.

35. During his incarceration, Plaintiff did not attend Native American services such as smudge or sweat lodge because of his difficulty breathing with C.O.P.D., and past problematic interactions with some other inmates. Plaintiff explained, "It's difficult to share spirituality with guys who won't let me sit at their table with them."

36. On 11/25/09 Assistant Warden David called Plaintiff over to himself and Officer Washburn outside the chow hall and said, "I don't know if you've been talked to about this, but you get that hair cut or I will take you over to the program building myself and show you the barber shop." Plaintiff told him that Warden Hargett had said he'd put out an e-mail telling staff to "lay off Mr. Marshall until he could investigate the issue further", and they turned and walked away.

### IN GENERAL

37. The First Amendment to the U.S. Constitution, the Religious Land Use and Institutional Persons Act, and the Constitution and statutes of the State of Wyoming protect plaintiff's mode of religious expression.

38. Defendants disregarded the Declaration of Faith record and disrespected Plaintiff's religious beliefs and mode of expressing those beliefs. Defendants violated clearly established Constitutional and statutory law of the United States and the State of

20

Wyoming, and failed to follow the WDOC's own rules.

39. Plaintiff defends a dual Christian-Native American belief system that is sincere and religious in nature. Plaintiff did not participate in Smudge or Sweat-lodge ceremonies, however, due to COPD and conflicts he had with other inmates early on. Plaintiff explained to officials, "I am not comfortable and cannot share spirituality with those who won't let me sit at their table with them."

40. Plaintiff is of Cherokee Indian heritage, and as for many Native American men, Plaintiff's Kouplock has deep historical roots in the religious beliefs of the faith, is a symbol of his spiritual power bestowed by, and his dedication to, the Great Father, the Great Holy Spirit and Jesus Christ who are one Almighty God. The Kouplock is significant in representing for Plaintiff the saving grace of his Higher Power, and he significance of Plaintiff's Kouplock is of ethereal and infinite value.

41. Defendants in their individual and official capacity engaged in conduct that deprived Plaintiff, a United States citizen, of his Right to Freedom of his Mode of Religious Expression, Equal Protection, and right to Due Process of Law.

42. WDOC Policy and Procedure #4.201 - *Inmate Grooming, Hygiene and Sanitation* states: **1.** A new identification photograph will be taken upon intake of an inmate into the WDOC. **i.** Inmates will be told upon intake that they will be expected to maintain an appearance similar to that on their identification photograph or will be required to pay for a new identification photograph and identification card if they voluntarily change their appearance during their incarceration. Plaintiff's I.D. photo, taken at admission, clearly reveals his Kouplock lying on his right shoulder.

43. Plaintiff's dual faith was declared, documented, witnessed and approved by the prison chaplain on "WDOC Form #500, Declaration of Faith" as per "Policy and Procedure #5.600 - *Inmate Religious Activities*" on February 07, 2008 and re-affirmed again on February 21, 2009. Plaintiff's records clearly reflect his religious preference.

44. WDOC Policy and Procedure # 5.600 - *Inmate Religious Activities,* Effective February 1, 2006 **§ 8,i,b**. reads: [An inmate may be authorized to overtly express his/her religious

45.   customs and beliefs] "Observing religious requirements relating to head, body and/or facial hair in styles consistent with their religious tradition provided reasonable hygiene is also maintained and as consistent with WDOC Policy & Procedure # 4.201, Inmate Hygiene and Grooming." [Allowed].

46.   Policy and Procedure # 5.600 - *Inmate Religious Activities*, Effective February 1, 2006 § K. <u>Religious Exercise Dispute Resolution</u> 1. "Issues of a religious nature (e.g., whether a requested religious item or activity is central to the practice of a particular religion or eligibility under religious law or custom for an offender to participate in a particular religious activity, etc.) will be resolved by the facility chaplain or designee whenever possible, in <u>consultation with the Support Services Division Administrator</u>[…]

47.   The defendants named in these allegations did not consult with *anyone*, yet alone <u>Deputy Administrator for Support Services, Heather Babbitt</u>, they did not follow their own rules, or attempt any other form of providing Plaintiff due process of law.

48.   Further, Policy 5.600, approved by R.O. Lampert on 12/14/05, dictates that a religious activity be "<u>Central to</u>" a religious practice; a requisite that is contrary to clearly established law.

49.   Plaintiff's hairstyle complies with WDOC Policy and Procedure #4.201 - Inmate Grooming, Hygiene and Sanitation, Effective 2/1/06. "Head and facial hair may be kept at any natural length provided that it is kept clean and neat in appearance at all times, does not present an undue risk to health, is able to be searched, and does not call any extraordinary attention to the inmate."

50.   WDOC Policy and Procedure #4.201 - *Inmate Hygiene and Grooming* states: D, 3, "Haircuts and styles which <u>draw undue attention to an individual inmate</u> or group will not be allowed." This statement is subjective and ambiguous leaving it up the whimsy and personal prejudice of any official to decide what "draws undo attention."

51.   WDOC Policy and Procedure #4.201 was amended September 1, 2010 to add, "<u>Mohawks and other similar styles are acceptable</u> as long as they do not draw undue attention to the inmate or create an undue security risk."

Civil Rights Complaint

52. Plaintiff's hairstyle and his behavior demonstrate no affiliation with any "gang or security threat group" whatsoever, and Plaintiff's hair is not obtrusive and does not draw any extraordinary attention in relation to other inmates similarly situated.

53. Many inmates and staff members alike maintain Mohawks, pony tails, shaved heads, even "doggy ears" in the case of one transsexual inmate, Linda Thompson. Plaintiff was treated differently.

54. Plaintiff knows of no other inmates that were singled out, harassed or similarly violated portending a WDOC policy by practice of general toleration of individual freedom of expression, religious or secular, and evinces discrimination toward Plaintiff.

55. The defendants subjected Plaintiff to humiliation and mental abuse. The Admissions unit is a foul and degrading place. As it was, Plaintiff was forced to sleep on the floor under his cellmate's bunk, in a plastic "boat", in a cell intended for a single occupant. He was terrified to think of what worse "segregation" the defendants had in store for him should he refuse their unlawful order to cut off his religiously protected Kouplock. Plaintiff still has nightmares often that include reliving the bullying without avenue of escape.

56. Brian Irvin Baldivia #26089 was likewise segregated, punished and suffered discrimination and humiliation without due process on account of Plaintiff's particular mode of religious worship at WSP. No other inmates similarly situated were segregated in bleak conditions because of another's mode of religious expression.

57. Plaintiff made no special or burdensome demands for accommodation of his religious beliefs such as special facilities, meals, clothing, etc.

58. Confinement in Admission/Orientation unit is segregated from the general prison population so significantly as to eliminate the importance of any imagined penological interests that forcing Plaintiff to abandon his spiritual beliefs serves no valid penological purpose. The forced cutting of Plaintiff's Kouplock was greater than necessary to protect any imagined governmental interest, and inflicted irreparable harm in the form of physical and emotional injury.

59. The Wyoming Honor Conservation Camp is a minimum-security facility; plaintiff's

Kouplock was likewise no threat to security and good order at that institution.

60. Defendants failed to explore and consider any less restrictive alternatives other than to violate Plaintiff's religious beliefs.

61. Incessant molestation, harassment and coercion of Plaintiff by prison staff on account of his Native American Kouplock rose to the level of a violation of his rights under the Constitutions Statutes of both the United States and Wyoming.

62. Defendants, Corporal Andrew Aldrich, Sergeant Jason Wadsworth and Lieutenant Burt Prindle conspired together at WSP, and with Warden Hargett, A.W. Michael David, Lt. Jon Martin, Sgt. Lorenz, Sgt. Dan Pillion, conspired together months after Plaintiff entered the prison system to discriminate and harm Plaintiff and violate his right to Freedom of Religious Expression. Defendants presented Plaintiff with only an illusory choice where the only realistically possible course of action trenched upon his sincerely-held religious belief, to remove his Kouplock or be punished.

63. The vicarious assault on Plaintiff by defendants, forcing him, through Plaintiff's cell mate, under duress, to cut off his Kouplock was an injury that created harm that is immeasurable and has caused Plaintiff great and irreparable emotional distress by belittlement of staff and other inmates, a feeling of spiritual insult and mental suffering, nightmares, sleeplessness, fear and anxiety, depression, and PTSD.

64. Lieutenant Burt Prindle could have and should have stopped Sgt. Wadsworth and Cpl. Aldrich, but just looked on from the control bubble and directly supervised the abuse which was unreasonable and malicious. R.O. Lampert upheld these illegal acts.

65. The Defendants are State Actors, and their actions implicated a conspiracy in furtherance of the State to violate Plaintiff's Religious Freedoms, which at the time of the alleged violations were clearly established by the Constitutions and statutes of the State of Wyoming. The Defendants are State Actors, and their actions implicated a conspiracy in furtherance of the State to violate Plaintiff's Religious Freedoms, which at the time of the alleged violations were clearly established by the Constitutions and statutes of the United States and the State of Wyoming, clearly established in the 10th Circuit.

24

**B.**   **CLAIMS BROUGHT UNDER UNITED STATES CONSTITUTION FOURTH, EIGHTH and FOURTEENTH AMENDMENT; 29 U.S.C. § 794(a); 42 U.S.C. § 12132; and applicable state statutes.**

**CLAIM THREE:**   **Excessive Force, Cruel and Unusual Conditions Of Confinement and Wrongful Retention of Personal Property.**

**SPECIFIC INSTANCES**

66.   On October 22, 2008, Plaintiff was physically assaulted by inmate Brandon Herd.

67.   At the time of the assault, despite the fact that Plaintiff offered no resistance to orders to lock down, Officer J. May sprayed Plaintiff heavily in the face and upper body with Oleo Capsaicin Spray (OCS) without warning.

68.   Sergeant Jay Owren, Officer Handa and a couple of unknown officers took Plaintiff to a small shower closet in E-Unit, turned on the cold water and said, "Rinse your eyes." Plaintiff let some water run on his face and reached backward for a towel and change of clothes. Plaintiff was handed a towel and he patted his eyes.

69.   Plaintiff expected that the officers would allow him to remove his OCS saturated shirt, shower off all the remaining spray and give him a yellow segregation outfit to change into. Instead, officers hastily pulled Plaintiff out of the shower and forthwith took him to the maximum security Unit (C-Unit).

70.   Defendants did not allow Plaintiff to rinse the burning pepper spray off his body, nor did they give him a yellow segregation outfit as required by operational procedure.

71.   Plaintiff was confined for the next twelve days locked in segregation, was not allowed a shower, change of clothes, hygiene items or linens. The only water was a small, intermittent stream in the sink insufficient to wash his chest that was red and burning with rash from the OCS.

72.   Occasionally, an unknown officer would come by at about three in the morning and ask Plaintiff if he wanted a "Flag" (shower and recreate). Plaintiff said, "Yes, I need to

shower off the pepper spray, but I don't have a shirt to put on. My shirt is covered with pepper spray and burns when I touch it." Each time the officer(s) would say, "You either put that shirt on or you're not coming out of that cell." When Plaintiff asked for a change of clothes, they just walked away.

73.  On 10/25, *someone* made a cursory peek in Plaintiff's window and said, "How ya doin'?" and just that quick they were gone. Plaintiff had no idea who spoke or time to say or ask anything. Plaintiff later asked the officer who it was that came by and looked in the window and he replied, "I have no idea."

74.  C.W. James Markum spoke with Plaintiff on a couple occasions, but did not take steps to get him the needed items because, "We don't have any."

75.  Plaintiff's neck and chest is permanently burnt/discolored red and painful and when Plaintiff showers. Dr. Coyle verified this when he visited a few days later at the cell door in C-Unit, and he recommended Hydrocortisone ointment. Subsequently, through the years, doctors and nurses at sick call have made ongoing notations in Plaintiff's record of the observation that his neck is still red with rash and sore.

76.  On 10/26, Sergeant Doreen Garrison came to the unit and Plaintiff called and asked to speak to her. We spoke about what was happening and she said, "You should put in a Form #320 to Caseworker Dennis Jones." Plaintiff did as she said, but Dennis Jones did not respond to the communication.

77.  On 10/27, at 09:30 Sergeant Rice came and told Plaintiff, "You're being sent to Virginia tomorrow. The next day officers took all of what Plaintiff *did* have in the cell, including linens, etc. They said, "You're being packed out to go to Virginia." CNA Rosa came, took Plaintiff's blood pressure a few hours later, (128/100), and said, "I thought the Virginia people already left!"

78.  Four hours later, Sergeant Valier returned and said to Plaintiff, "You're not going anywhere." Plaintiff asked him for his property, but it was never brought. Plaintiff's property, medication and records had been sent to Virginia, and defendants retained the property for the next 17 months.

79. Plaintiff filed grievances that were dismissed by way of frivolous answers and denied.

80. As Plaintiff was now packed out, he had no property whatsoever. For the next nine days Plaintiff was without linens, except one sheet, and without towel, washcloth, shampoo, soap, toothpaste or toothbrush, razor, comb, eye glasses, shower, or out-of-cell exercise, writing utensils or personal property, including personal legal and religious material or medications. Plaintiff still had not been allowed out of his cell to shower, exercise or attend religious services.

81. Plaintiff had trouble getting the nurses to provide the prescribed hydrocortisone cream and he was often denied his medications at rounds, and he became very ill with GERD. Plaintiff was also supposed to go for an EGD to examine the damage to his throat, but nurses were unable to locate Plaintiff's <u>medical records as they</u> were sent to Virginia.

82. On 10/31, Officer Umberger brought dinner at 17:00. Plaintiff told him that he had been 10 days without being able to shower. He made a joke of it and said to the inmate in the next cell, "you want to know what ass smells like? Just ask your neighbor." He told Plaintiff that Sgt. Flemming (the unit supervisor) had gone home for an emergency and, "technically the unit should be shut down as it takes three to run it." Officer Umberger denied Plaintiff a shower and the other items.

83. On 11/01/08 at 15:00, Plaintiff asked Officer Moyer and Caseworker Simpkins to "Just get me an intake bag" (bag that contains hygiene items, linens and a yellow segregation outfit), they said that they would ask Sgt. Flemming. Ms. Simpkins asked Plaintiff a little while later if he had heard back from Flemming. Plaintiff told her he had asked again via the intercom for an intake bag, but they said that they didn't have any, C.W. Simpkins said "That's too bad." (Upon information and belief, WSP Operational Procedure Policy says that all units will have extra supplies on hand.)

84. Plaintiff told Ms. Simpkins the whole story and she said that she would make a report of all that Plaintiff had told her. Even so, Plaintiff never received the required items.

85. Sergeant Doreen Garrison came to the unit for the second time after twelve days on 11/2/08 at 14:45, saw Plaintiff still in the same condition and said, "This is bull shit!" She

said, "I'll see what I can do, be patient." At about 17:20 she brought Plaintiff some indigent hygiene items and some linen.

86.    Sgt. Garrison radioed control and told them that she was going to lock down the pod a couple minuets early and let Plaintiff out to shower off the pepper spray. She told Plaintiff that Officer Morrison had written and signed a report about the whole incident that went directly to Warden Murphy. Sgt. Garrison was the only official who was professional and caring enough to intervene and help Plaintiff.

87.    On November 17, '08 at 11:30, Plaintiff met with Lieutenant Stilwell and Sergeant Schneider who told him they were investigating the incident and the possible use of excessive force. Plaintiff told them the entire story about the assault and subsequent conditions of segregation. Lieutenant Stilwell said, "I'm just here to investigate if there was use of excessive force, and there was." Upon information and belief from other officers, Officer J. May received a disciplinary report in his record.

88.    On 11/20, Plaintiff spent about 45 days in unit E2, the "hole", segregated. Upon information and belief, Plaintiff's assailant was released from segregation and charges dropped because officials misspelled his name, "HERD" on the charging document.

89.    Plaintiff wrote to Warden Murphy and asked that he release him from segregation also due to a "Clear showing of prejudice toward [plaintiff]" as stated in Policy 3.302. "H. Procedural Irregularities and Variances 1. Any inadvertent procedural irregularity shall not constitute grounds for the setting aside, vacating or modifying an administrative segregation decision except upon a clear showing of prejudice to the inmate." Officials answered that they did not know what Plaintiff was talking about.

90.    About two weeks after Plaintiff returned to B unit some of the same inmates began harassing him again about where he was allowed to sit. This time Plaintiff wrote a kite to Sergeant Garrison telling her that it was happening again and that if anyone assaulted him again, Plaintiff would defend himself. This time Sgt. Garrison immediately placed Plaintiff on TRO status, which *is* proper per policy.

91.    While Plaintiff was in the segregation unit this time, Captain Caruthers came hurrying

into the pod with a cart piled high with yellow segregation clothes, linens, hygiene items, etc. and passed them out to all the segregated inmates in C unit taking their regular clothes and making sure that they had all the items that were required per policy.

92.   Plaintiff spent until 1/23/09 in administrative segregation. On Thursday 1/8/09, Plaintiff told Caseworker Kristy Brooks about the bullying and territorial behavior rampant in B unit. She responded, "Well, this is prison, that's just the way it is."

**CLAIM FOUR:**   **Unreasonable Search, Denial of Due Process, Denial of Disability Appliances, Discrimination and Cruel and Unusual Conditions of Segregated Confinement.**

**SPECIFIC INSTANCES**

93.   On 3/11/11, Plaintiff transferred From Wyoming Medium Correctional Institution to Wyo. Honor Conservation Camp. The following evening he was served with a general write-up that was issued from WMCI for writing a joke to Carol Riley, the law librarian that she was "Hot" as in a popular Allstate Insurance television commercial. As this charge would result in raising Plaintiff's custody classification, officers put him in segregation to await a disciplinary hearing and return to WMCI.

94.   Plaintiff was subjected to a strip/body cavity search. Officers asked him which medications he was taking, the strength and how often he took them. This, Plaintiff perceived as proper procedure and had no problem complying. Plaintiff remained in segregation until transport.

95.   On 3/15/11, the disciplinary hearing via telephone was held with Lt. Nelson, WHCC and Sgt. Ramirez, WMCI. Sgt. Ramirez found Plaintiff guilty and assessed a $15.00 fine. No disciplinary segregation time was assessed.

96.   On 3/16/11 at about 12:30, Plaintiff was transferred back to WMCI. When transport officers arrived at WHCC, Plaintiff was subjected to a strip/ body cavity search and

shackled, (hands, feet, belly chains). Plaintiff would remain shackled and never out of the officer's view for the entire 2.5-hour trip back to WMCI.

97.  Upon arrival at WMCI at 15:00, Plaintiff was again subjected a strip/body cavity search, required to provide a urine sample and asked what medications he took, the strength and how often he took them. Plaintiff thought this was excessive and felt harassed, but complied.

98.  After a short stay locked in a close-custody holding cell to eat a sandwich, Plaintiff was re-shackled hands, feet, and belly chains, escorted about. 75 yards down the hall to segregation, A-Unit.

99.  Plaintiff was put in a small cage and strip/body cavity-searched yet again. Officers asked him which medications he was taking, the strength and how often he took them. This, Plaintiff deemed to be very excessive and expressed his objection. Plaintiff could not understand why he was being sent to segregation in the first place, in light of the disciplinary findings, yet alone subjected to the multiple body cavity searches when he had never been out of officer's close custody.

100. Plaintiff was then re-shackled hands, feet and belly-chains and escorted by two officers to the "hole". Plaintiff felt that officer's actions in strip-searching him and examining his anus and testicles so many times in such a short period (about 3½ hours) while under extreme close custody was an unreasonable search.

101. There was never reason for suspicion that would warrant such frequent searches when there was a seamless chain of custody. Plaintiff felt humiliated and harassed. Plaintiff expressed that he felt sexually harassed to Captain Carrie Caruthers and Heather Berglund when back into the 3'x 3' cage and lectured about the issue of writing to the Law Librarian before Caruthers would allow his return back to general population.

102. Plaintiff was not given his medically necessary disability appliances or medications, and at 16:00 pill call, the nurse said that all his medications, auxiliary aids for his disabilities (wedge pillow and wrist braces), phone privileges, and personal property had been discontinued by CTL Berglund and Health Services Administrator Jeff Shahan.

103. Plaintiff was not allowed to attend his regular Thursday religious service, but after two days, was given some shampoo, soap and his Bible. Officers told Plaintiff that his disability aids had been confiscated by order of the "CTL team" Plaintiff had taken medication that morning at WHCC, so was O.K. for the time being.

104. Prison officials are or should be aware that without the medical wedge pillow, Plaintiff is in danger of aspirating fluid due esophageal erosion. This can and does cause Plaintiff to choke, suffer pulmonary distress, and lead to aspiration pneumonia for which he was hospitalized on two prior occasions. Without wrist braces to support Plaintiff's wrists, he is severely limited in the use of his hands to write, open jars, condiment packets or lift heavier items, or climb up and down without significant pain. Berglund, Shahan and medical personnel, as well as the other defendants, disregarded the substantial risk of serious harm to Plaintiff by these deprivations.

105. At 20:00, Caseworker Berglund was in the segregation unit and told Plaintiff that they were waiting for housing. Plaintiff complained that the "CTL" had confiscated his wedge pillow and wrist braces and Ms. Berglund just shrugged, but did not offer to further assistance. Plaintiff later discovered that Ms. Berglund *is* the Case Team Leader.

106. On 3/17/11 at 06:00, Plaintiff asked Sgt. Phillips if he could attend his regular Catholic Church service. Phillips replied, "No, you're on lock-down status, they don't know where to put you because they don't know what classification you are." Plaintiff had been re-classified to medium before he left WHCC, but his records had been sent to WSP.

107. That afternoon about 14:00, Plaintiff began to develop heartburn growing so intense that he began to vomit blood, as frequently happens during these episodes of intense vomiting. The only way Plaintiff can stop the burning acid reflux is to keep allowing himself to throw-up the acid out of his system. Plaintiff massages his throat until he continues to vomit all of the acid from his stomach. The ulceration of his esophagus is the cause of the bleeding.

108. At 20:00 pill call, Plaintiff was still throwing up when it was witnessed by an unknown nurse and Officer Greere. They notified Cpl. McManus who also came and witnessed the

blood in the toilet. Omeprazol is carried on the Pill cart, and Plaintiff asked that he be given at least that. The nurse denied Plaintiff's request saying, "I don't have your records."

109. At 21:00, Sgt Reed and the nurse doing pill call also saw Plaintiff throwing up and the blood in the toilet. Plaintiff asked the Sergeant to log the event, and sent a communication to medical asking why he had no medications. Plaintiff pleaded with nurse, "Just please give me a Prilosec!" She denied the request.

110. Plaintiff has Barrett's Esophagus, a serious condition caused by chronic acid reflux disease. It is sufficiently controlled with Omeprazol. Without it, Plaintiff was in pain, vomiting blood, and making himself vomit in an effort to purge the acid from his stomach, and felt extremely stressed because he could not get help. Plaintiff felt as if he were re-living a nightmare, and wrote and asked to see mental health, but did not see anyone until two weeks after these events.

111. Even though Prilosec was by then available from canteen, and all the nurses knew that Plaintiff was prescribed Prilosec, they refused to give even medication for chronic pain syndrome and blood pressure medications.

112. Sergeant Greere told Plaintiff that medical had advised him not to give Plaintiff the wedge pillow because it had not been prescribed by the *latest* new doctor, C.M. Snyder. He said, "All orders by Dr. Church have been rescinded." Dr. Church had recently quit or been fired by Corizon, seemingly because of his desire to provide inmates proper care despite cost.

113. On 3/18/11 at 12:00 pill call, Nurse Misty Graff explained to Plaintiff that his records and medications had been sent to WSP in Rawlins. She said, "Mr. Marshall, I have been raising hell with medical on your behalf; you've been here since the sixteenth, this is crap." Plaintiff was excluded from receiving medical remedy for a serious condition.

114. At 13:30, Nurse Graff and Officer Martinez returned with three test strips and had Plaintiff lay them across the blood in his toilet to be tested.

115. At 14:30, Plaintiff was transported to Banner Health in Torrington and was seen by Dr. Rothberg (sp). Plaintiff told the doctor, "When I have attacks of severe acid reflux, I frequently vomit blood. Often, in order to get all the acid out of my stomach, I have to make myself continue to throw-up." Unfortunately, the diagnosis the doctor wrote in her report indicated only "Self induced vomiting." Plaintiff, fearful that his statements were misconstrued, wrote a letter to medical in an attempt to clarify the statement in the report.

116. At 18:00, Nurse Graff returned with some Keep On Person blood pressure medications and a "consent for treatment" agreement. Plaintiff, of course, had previously signed such consent for treatment and asked why he was signing it now. Nurse Graff said, "Whoever did it the last time really screwed it up." She said that Plaintiff's medication just came in from WSP, but they didn't send the pain medications. Although these medicines were not very effective, at least it was *something*. Plaintiff was left in pain.

117. At 20:00 pill call, Nurse Youngquist had no meds and said, "They (WSP) were supposed to send your medical distribution sheet, and they didn't. Nurse Applegate's working on it." Plaintiff begged, "Can I please at least have one Prilosec, you know that's what I'm supposed to take?" She said, "No, I'll let her work on it."

118. At 20:30, the A-Unit Control officer called on the intercom and said, "Mr. Marshall I talked to medical, *she has your* medication and will bring it soon." At 22:00, Nurse Youngquist brought one of Plaintiff's three prescribed pain pills, one antacid pill and an inhaler, but no Blood Pressure meds.

119. On 3/19/11 at 11:00 pill call, Nurse Linda Oakley told Plaintiff that Nurse Applegate had called WSP repeatedly and told them to send the pain medications, but they didn't do it. Therefore, there were only four Tramadol left for the weekend. (Plaintiff is prescribed two tabs – 50mg of Tramadol three times a day). Plaintiff told her that he had to have the wedge riser pillow to prevent him from aspirating food, she said, "I'm sorry."

120. At 12:30, an officer came to Plaintiff's cell and said, "'Medical' said that your order for wedge pillow has expired, you'll need a new one. I've been ordered to confiscate it," and

33

he had Plaintiff sign a confiscation form. In addition, the officer said, "As far as your wrist braces go, the CTL team says you can't have them either."

121. On 3/19/11, C.W. Berglund came to cell and Plaintiff said, "My punishment has already been decided, segregation time was not part of my punishment." She replied, "We're waiting for housing for you." She turned and left.

122. At 19:00, Nurse Youngquist said, "You have a few Tramadol until probably Monday afternoon, so you'll have to ration them." Plaintiff took one and asked her about the wedge and his wrist braces, Nurse Youngquist said, "You can prop yourself up against the wall." This was too uncomfortable and painful.

123. At 23:30, Officer Scarborough came to cell and said that he had activated Plaintiff's phone account, as he had not been able to call anyone to tell them what was happening. Scarborough said, "There have been seven open cells in unit D1 where you came from since the seventeenth."

124. On 3/20/11, Nurse Oakley said, "I'm trying to ration your pills so they last. I know it's not much help, but that's all there is."

125. At 14:00, C.W. Dibert came and looked in the window. She asked, "Are you in pain, does your head hurt?" Plaintiff told her, "Yes, I'm in a lot of pain." Plaintiff explained everything to her and asked her, "Who or what was the 'CTL Team'?" She answered, "The CTL is the Case Team Leader, Ms. Berglund."

126. On 3/20/11 at 20:35, Plaintiff was finally able to call home.

127. On 3/21/11, Cpl. Walker came to cell and asked if Plaintiff needed anything out of his property. Plaintiff asked where he'd been and told him, "It's too late now, I'm moving today."

128. At 7:45, Cpl. Walker told Plaintiff to pack everything up and officers moved him back to population unit D1, #117.

## IN GENERAL

129. Officer Jay May's excessive use of pepper spray should not have been used, as there was no loss of control by him when Plaintiff was assaulted on 10/22/08. When Officer May

Civil Rights Complaint

shouted, "Lock down", Plaintiff immediately ceased defending himself, stood up, and
went to his door telling another officer on the way, "I've had an accident and need to get
into my cell and use the toilet."

130.   Michael Murphy was the warden in charge of the WSP and the Wyoming Medium
Correctional Institution, and Carrie Caruthers was a captain at both facilities at the times
when the above violations occurred.

131.   Warden Michael Murphy knew of the reign of terror prevalent in B-Unit at WSP because
Plaintiff wrote a letter to him saying that conditions in the unit were dangerous because
of the bullying and claiming territory "tables", and said, in part, "Sir, if you don't have
room for everyone, let some of us go."

132.   Warden Murphy knew of the illegal condition of Plaintiff's confinement in segregation at
WSP. This knowledge and indifference was shown by the frantic effort of Captain
Caruthers to pass out clothing, etc. when they segregated Plaintiff back in the same C-
Unit unit a second time and able to observe those conditions were continuing. Moreover,
knowledge was or should have been obtained by Murphy by reviewing his work file and
the written report in which Sergeant D. Garrison notified Murphy of the abhorrent
conditions Plaintiff was forced to endure. Whereby, Warden Murphy authorized those
conditions by deliberately failing to intervene.

133.   While he was warden at WSP, Murphy issued "Warden's Memorandum #20-2008,
effective 8/12/08 - TRO More than 4 Hours". It stated in attachment "B", "Upon
placement on TRO, the inmate is to be issued 2-sheets; 1-pillow case; 1-wash cloth; 3-
boxers; 1-pr. Sox; 1-pr. Canvas shoes; 1-pr. Shower shoes; 1-T-shirt." This memorandum
also stated, "…immediately property will be inventoried and secured. Inmates placed on
TRO are allowed to immediately retain their personal hygiene items (except razors)…
and items that don't present an immediate threat to the inmate or staff." This was not
done at WSP, and the same type of conditions continued at WMCI under Murphy,
demonstrating complete indifference to inmate welfare and the warden's own rules.

134.   Warden Murphy and Captain Caruthers knew of and allowed an environment that was

degrading, unsafe and inhumane, and pervasive in the WSP and carried that attitude of indifference over to Wyoming Medium Correctional Institute where they were later transferred. This fact alone demonstrates the deliberate intention of these supervisory officials *not* to rectify conditions that are unacceptable to general standards of decency, in accordance with WDOC's own rules, and violated the Eighth Amendment.

135. Many unknown officials including the defendants "walked by" Plaintiff's cell at WSP and looked into the window. They should have seen, as did Sgt. Doreen Garrison, that Plaintiff had not even the minimal necessities of life in the cell.

136. Correctional officers, supervisors, and staff, responsible for B and C Units at WSP: Sergeant Valier, C-Unit Managers, and Housing Managers Ruby Dickie and Janelle Thayer, Caseworkers Christy Brooks, Dennis Jones and James Markum, Wardens Michael Murphy and Eddie Wilson, Captain Carrie Caruthers and the other defendants responsible for C-Unit. WMCI segregation: A-Unit Manager Curtis Moffat, Caseworkers Richard Bishop and Jacquie Judd. Wardens Michael Murphy and Captain Carrie Caruthers as well as other supervisors and Corrections Officers intentionally and maliciously provided and confirmed punishment that was torturous, degrading and inhumane. Moreover, at WMCI, defendants violated Plaintiff's right to Due Process.

137. Plaintiff asked several times via the cell intercom, but could not get anyone to bring him a change of clothes or state issued hygiene items at WSP. Officials would later say that Plaintiff never asked for these things. That is absurd, even *if* the responsibility somehow fell upon Plaintiff to ensure proper segregation procedures were followed.

138. Policy and Procedure was not followed on October 22, 2008 or days following. Nor was policy and procedure followed concerning improper segregation allegations hereafter in this complaint.

139. Not until officials assumed that Plaintiff was "building a case" and he was returned to the segregation unit for the second time in November '08 did Captain Caruthers take corrective measures to comply with the law and WDOC Policy and Procedure to provide the minimal life necessities to all inmates segregated in C unit.

140. Defendants were deliberately indifferent to the health risks to Plaintiff, and showed extremely poor supervision. Plaintiff suffered significant physical and emotional injury from long-term exposure to the effects of pepper spray, and subsequent conditions of segregated confinement at WSP and WMCI.

141. The officers in charge of A Unit at WMCI knew of the deprivation of minimal necessities as Corporal Clayton ordered officers to get Plaintiff the necessary items to which he was entitled by policy and law. Nonetheless, deprivation continued for days demonstrating lack of supervision and deliberate indifference to Plaintiff's conditions of confinement.

142. Over a year previously, Corizon Regional Medical Director, Kurt Johnson, MD prescribed a wedge pillow to elevate Plaintiff's upper body and help reduce episodes of aspiration pneumonia caused by Barrett's Esophagus from the earlier denial of Prilosec. Dr. Johnson also prescribed the use of wrist support braces for both of Plaintiff's wrists that were injured when Natrona County Sheriff's deputies got the key stuck in the handcuffs and had to cut them off with bolt cutters on September 17, 2007.

143. Officials well know from Plaintiff's history that the assistive appliances are necessary accommodations for Plaintiff's disabilities to prevent harm, injury and pain to Plaintiff.

144. The essential assistive devices were deliberately denied Plaintiff without due process of law by officials who were not licensed or qualified to make medical decisions and caused Plaintiff pain and suffering and emotional distress do to confusion as to why defendants would do these things and fear of danger to his health and safety. Plaintiff suffered discrimination in these instances as no other inmates similarly situated were denied their property or any disability prosthesis or aids they required.

145. WMCI Operational Procedure OP #3.006 Effective Feb. 24, 2011- Property: D,9,iii. states, "When an inmate is placed on special status or placed in the infirmary, it is *imperative* that he receive property consistent with his new status to include items such as, **g**. medical KOPs, dentures, prosthesis, wheelchairs, etc." (*emphasis added*)

146.   The frequency of full body cavity searches in the intake unit at WMCI in March 2011 was unreasonable, constituted harassment, and caused Plaintiff embarrassment, belittlement and shame.

147.   Plaintiff notified Captain Caruthers of the unreasonableness of the full body cavity searches of March 16, 2011 during a discussion prior to re-entry into general population on 3/21/11, but she shrugged it off as normal practice, "They were different officers."

148.   Corrections Officers and prison staff knew of the deprivation and conditions of confinement that consequently injured the claimant and propagated the infliction of mental and physical suffering.

149.   Officials train for such incidents and had knowledge of what to do to prevent these kinds of situation as demonstrated by the corrective actions that were taken the second time Plaintiff was placed on TRO at WSP. They deliberately chose, however, to ignore and disregard their training.

150.   WDOC Policy & Procedure #3.305, effective March 1, 2006- Temporary Restriction Order: IV, A, 1. states, "Temporary restrictions are non-punitive." No other inmates in segregation were subjected to similar treatment or conditions. Despite the disclaimer in WDOC TRO policy disavowing a liberty interest (**IV, E.**), this disciplinary segregation amounted to a deprivation egregiously significant and atypical as to give rise to a state created liberty interest, violated Plaintiff's rights as a disabled person.

151.   The conditions of segregation Plaintiff was forced to endure in the above claims were grossly disproportionate to the severity of any crime or imagined action warranting disciplinary or administrative segregation. It involved the wanton and unnecessary infliction of pain and suffering, and deprived Plaintiff of the minimal measure of life's necessities. It was a sharp departure from the habilitative environment the state is required to provide its inmates, and was confinement that was shocking to concepts of dignity and civilized standards of human decency and was cruel and unusual punishment.

**C.    CLAIMS BROUGHT UNDER UNITED STATES CONSTITUTION, EIGHTH**

## AND FOURTEENTH AMENDMENT: RIGHT TO ADEQUATE MEDICAL CARE AND EQUAL TREATMENT UNDER LAW.

**CLAIM FIVE:**       **Deliberate Indifference to Serious Medical Needs.**

### SPECIFIC INSTANCES

152.   When Plaintiff arrived at WSP on February 6, 2008, he had with a prescription for Nexium @ twice per day indefinitely, prescribed by Dr. Took at Natrona County Detention Center (NCDC), for the treatment of chronic Gastro-Esophageal Reflux Disease.

153.   The illness was diagnosed by Dr. Robert A. Schlitz of Wyoming Gastroenterology Associates and was documented in Plaintiff's medical records that were compiled by Plaintiff's regular physician, Teunis Zondag, MD of Central Wyoming Neurosurgery. Plaintiff signed a medical release of information at the request of Dr. John Coyle early on in his incarceration, and at one time witnessed Dr. Coyle reviewing those records.

154.    Plaintiff also had a prescription for Cymbalta and Nortryptaline prescribed by Dr. Cindy Works for chronic pain syndrome due to severe Degenerative Disk Disease (DDD) that was diagnosed by Dr. Noratsky) also with Central Wyoming Neurosurgery. Plaintiff asked NCDC staff for an appointment with Dr. Works because he was certain he would not be afforded pain medication from the WDOC.

155.   Prior to incarceration, Doctor Zondag treated Plaintiff for pain with Morphine Sulphate, acid reflux with Prilosec, and hypertension with various blood pressure medications.

156.   Upon arrival into the prison system, all medications were immediately discontinued by Dr. John Coyle, and Plaintiff fell ill with severe pain, high blood pressure, acid reflux and would frequently vomit blood.

157.   Plaintiff filed grievances, Some "Emergency Grievances", which were deemed "Non-emergent" and were answered by officials as resolved, without merit or Plaintiff was receiving professional medical care. No resolution was attempted or adequate care given.

158.   On March 4, 2008, Plaintiff was seen by Dr. Coyle who convinced him that substituting
       Prilosec for Nexium (due to the expense) would be just as effective. Plaintiff agreed, but
       did not receive the Prilosec until 4/1/08. In the meantime, he continued to be very ill.

159.   The order for Prilosec was finally filled. However, Dr. Coyle discontinued it again after
       only two weeks without informing Plaintiff or consulting Plaintiff's records indicating a
       chronic need for continuous treatment with Omeprazol.

160.   Dr. Coyle put Plaintiff on a so-called "GERD Protocol" consisting of Zantac that he
       knew was ineffective. Upon information and belief imparted to Plaintiff by nurses Kate
       Jones and others, "PHS doesn't want to pay for Prilosec. That's why it's 'non-
       formulary.'" Plaintiff heard this excuse many times. (Prilosec eventually became
       available for sale in the commissary in July of 2009).

161.   When it came time to renew the Prilosec, Plaintiff would be again given Zantac instead.
       Plaintiff told Dr. Coyle and nurses, "Zantac does not work for me, I had an EGD scope in
       2006, Prilosec is needed twice a day. That's why I came into the system with a
       prescription for Nexium." Plaintiff was told, "There is no record of such an EGD." and
       Coyle told Plaintiff, "You need start being truthful." Plaintiff could not understand what
       happened to the record, this would be a re-occurring living nightmare.

162.   Plaintiff submitted to the GERD protocol three more times, each time becoming ill.
       Plaintiff would plead for help and file "emergency" grievances to no avail.

163.   Thus began a continual downward spiral of intentionally negligent medical care for the
       next 4 years- the remainder of Plaintiff's imprisonment,  and a "Twilight Zone" of errors
       in regard to medical (and institutional) records and intentional neglect regarding
       Plaintiff's serious medical and disability needs.

**CLAIM SIX:**       **Failure to administer adequate medical remedy.**

164.   In June 2008, at Wyo. Honor Conservation Camp, Regional Medical Director, Dr. Kirk
       Samuel Johnson, again ordered Prilosec for Plaintiff to be taken twice per day, as had
       been recommended all along by the Gastroenterologist, R.A Schlitz. He ordered the

Omeprazol to be taken along with Zantac, also twice per day. After that visit, Physician's Assistant Shirley Haley deliberately altered Dr. Johnson's orders for Prilosec from twice per day to once per day without asking the doctor or informing the Plaintiff. She left the Zantac order as twice per day, however, but taking the Prilosec told to by Dr. Johnson caused Plaintiff to run out sooner than expected, and consequently request a refill "early."

165.    Nurse Susie Pillon and P.A. Shirley Haley threatened Plaintiff with disciplinary action for "non-compliance" with medication for taking too much, and the medical staff refused to refill the prescription. This time, the withholding of the medication caused Plaintiff to become very ill, vomit blood, and experience severe pain from acid reflux and serious erosion of his larynx and esophagus.

166.    Plaintiff asked to get copies of his Medication Administration Record (MAR) in an attempt to prove that he was not getting medicine as had been ordered all along, Defendants denied Plaintiff copies for lack of immediate funds to pay for them ($.50/page). This was the beginning of a continuing and harmful practice of failure to give prescribed medicine, removal and denial of necessary medical treatment, medication and appliances for Plaintiff's disabilities.

167.    It became necessary to file a grievance about the refusal to refill the Omeprazol prescription.    Plaintiff attended    a grievance conference with Administrative Caseworker/Grievance Manager Ed Beason and Medical Site Administrator Susie Pillon on July 08, 2008. At this grievance meeting, Mr. Beason and Plaintiff sat facing Ms. Pillon. Ms. Pillon expressed frustration that she could not find Plaintiff's medical chart. (Locating and maintaining Plaintiff's inmate records, both medical and institutional, will become a continual problem at all facilities throughout his incarceration.) Ms. Pillon kept waving a white sheet of paper and saying, "I can't find your chart. We just don't know what happened to your chart!"

168.    Plaintiff finally asked, "Susie, what is that paper in your hand?" Ms. Pillon immediately replied, "That's the paper showing where our head medical person changed your doctor's orders." Mr. Beason and Plaintiff looked at one another and Plaintiff said, "Susie, that's

illegal." Ms. Pillon looked taken aback and the meeting abruptly ended. Ms. Pillon obviously had knowledge that PA Haley had altered the Doctor's orders to save money.

169. This time the denial of Prilosec caused permanent damage. Dr. Sridharan now diagnosed Plaintiff's condition as Barrett's Esophagus in December at CCMH when another EGD was finally performed.

170. The doctor exclaimed to Plaintiff while reading the results of the EGD, "Jesus, your esophagus is all ulcerated. You need Prilosec; Zantac's not going to help this!" Plaintiff told the doctor what he had been going through and that a scope done in 2006 had not shown this degree of ulceration, the doctor shook his head in disgust.

171. Plaintiff is now disabled with Barrett's Esophagitis, his throat is often sore; he has difficulty swallowing and eating, and frequently aspirates food matter that occasionally develops into pneumonia. Plaintiff frequently gets laryngitis with difficulty speaking and can no longer sing professionally as he used to. This causes Plaintiff to feel very depressed, frustrated, anxious for the future and hopeless a lot of the time.

**CLAIM SEVEN:     Failure to administer adequate medical remedy.**

172. For approximately three and a half months starting in about May of 2009, Plaintiff sent several Health Service Requests (HSRs) and a letter telling medical staff and Dr. Coyle that he knew he had pneumonia because he had had double pneumonia in the past and could feel it. Nevertheless, medical would not get Plaintiff in to see the doctor for weeks.

173. On 6/26, Plaintiff submitted an HSR asking for assistance to see a nurse. The response was, "You are referred to see the provider. Please discuss these issues at that time." Plaintiff was not seen for two more months and his condition deteriorated.

174. 7/15/09, Plaintiff sent a HSR saying, "Been on doctor's list for 2 weeks. I am extremely weak and am experiencing black out with slightest exertion. It's time! I need to see the doctor." The HSR was answered on 7/21/09 but not returned to Plaintiff until 8/5/09. It read, Mr. Marshall, You have been scheduled."

175. On 7/20/09, Plaintiff sent a HSR saying, "… I'm still having bad pneumonia. I

experience this rather often after having double pneumothorax. I have been choking. I have had a HSR in to see Dr. for 9 weeks now." The answer was, "Nurse sick call." However, Plaintiff was not seen for days still.

176.   On 8/4/09, Plaintiff sent a HSR saying, "Due to damage to my esophagus, I aspirated stomach contents today @ 3:00am. My celly, Mr. Means, called for medical help @ 5:15. I asked officer @ 9:15 to call RN." "Why was my call for help not answered?" The HSR was ignored and not answered.

177.   Plaintiff sent a HSR again on 8/5/09 complaining of the pain in his lungs, etc. and was answered, "You will be rescheduled." Plaintiff felt weak, exhausted and scared, he knew he could die from untreated pneumonia.

178.   Finally, Plaintiff was seen by Dr. Coyle in K unit on August 07, 2009. Even though it had been close to four months waiting to see him, Coyle said, "We're going to talk about three issues and three issues only." Plaintiff reminded him that he hadn't seen him for over three months. Coyle replied, "Neither has anyone else." Plaintiff told the doctor that he was in pain, and that he knew from past experience that he had pneumonia. Dr. Coyle refused to listen to Plaintiff's lungs or otherwise examine him despite the fact he was wearing a stethoscope around his neck. Dr. Coyle just sat there with a smirk on his face. He did not offer any treatment suggestions or otherwise treat Plaintiff. Therefore, Plaintiff said, "Well, I guess we're done here." and left.

179.   After this visit, Plaintiff immediately wrote a letter to Dr. Coyle dated 8/7/09 protesting his deliberate indifference to Plaintiff's medical issues. Plaintiff explained that he was experiencing blackouts with slight exertion and that he had been scheduled for, and waited for over twelve weeks to be seen. Plaintiff wrote that he had pleaded for help, but Dr. Coyle would do nothing. Plaintiff sent copies of the letter to HSA James Allen, WDOC Director R.O. Lampert, Acting Warden Tod Martin, Caseworker Christy Brooks and the Wyoming Board of Medicine. Plaintiff believes upon information that the medical board investigated this issue.

180.   Plaintiff continued to become weak, light headed with blackouts, and wrote in an HSR

that was unable to stand work for more than a few hours. Plaintiff left work early, at pm pill call a couple of days, and supervisor Carla Clapper fired him even though Plaintiff told her that he was very ill.

181.  Defendants sent Plaintiff back to C-Unit, cell 223 and again assigned him to a top bunk despite the fact that the bottom bunk was vacant and his protests that he could not safely climb up on or down from an upper bunk do to the disability of his wrists and neck. Defendants, Coyle, Allen, and all medical and prison officials refused to acknowledge the fact that Plaintiff was disabled, very ill and could not grasp to climb up or down from the top bunk. There was no logical reason for denying Plaintiff his requested accommodation to be assigned to the vacant bottom bunk but for discriminatory animus of the defendants.

182.  On August 22, 2009, Plaintiff fell off the bunk while trying to climb down for lunch, becoming unconscious due to pain and weakness from the pneumonia and his injured wrists that could not support him. Plaintiff was transported by ambulance to Carbon County Memorial Hospital. In the Emergency Room, Dr. Suttisak Chavalithamrong explained, "I'm admitting you because you have severe pneumonia." The fall aggravated Plaintiff's spinal pain, and Plaintiff's pain level has been much worse since and remained inadequately treated. Throughout the years, it was apparent that prison officials are deliberately indifferent pain suffered by inmates.

183.  The next day, prison officials insisted that Plaintiff be returned to the prison from the hospital. Dr. Young was not particularly fond of this idea. Upon return, Plaintiff was charged with a conduct violation for missing work and was found guilty. This affected Plaintiff's classification points and the Parole Board, in January, used this conduct violation to justify flattening Plaintiff's time, eliminating the opportunity for parole.

184.  Plaintiff filed a grievance for being fired and digressed unfairly. He received a caustic answer on from Warden Wilson on October 1, 2009 stating in part, "... as of August 20, Corizon Medical has lifted all medical and work restrictions," Again, denying Plaintiff's disabilities. Wilson wrote that Plaintiff would "soon be scheduled to work at an as yet undetermined job and will be expected to report." If Plaintiff were not able to perform the

duty, due to his physical disabilities, he would receive another write-up and be put in segregation again. Plaintiff wrote back to the warden and told him that the officials were making a terrible mistake, that Plaintiff had presented copious amounts of evidence to show that he is disabled and on Supplemental Security Income. There was no response.

185.   At the end of August, Plaintiff was paid a very unusual visit by Dr. Johnson and Nurse Kate Jones right in the B-Unit multi-purpose room. Dr. Johnson read one of Plaintiff's HSRs in his chart that read, "Dr. Coyle, I've been on the doctor's list again for ten weeks now and still haven't seen you...," He exclaimed, "Is this exaggeration?" Plaintiff replied that it was not, and that it had now been over 14 weeks. He shook his head but did not comment further. When walking out, Dr. Johnson said, "Maybe it's time you just got used to living with the pain."

**CLAIM EIGHT:      <u>Failure to administer adequate medical remedy.</u>**

186.   On October 29, 2009, Plaintiff was transferred to the Wyoming Honor Conservation Camp. While at visit with Dr. Johnson at WHCC in 2009, he injected Cortisone into the tendon of Plaintiff's left wrist. He said he would also inject Cortisone into the right hand and thumb joints at a later time, and that Plaintiff would require additional treatments periodically. However, despite many HSRs to Him and Dr. Coyle as well, Plaintiff received no further treatment for his painful condition for approximately another year. It was not until July 2010 at WMCI Doctor Church provided the needed injections.

187.    In mid November, Plaintiff met with Dr. Lehmitz at WHCC who issued an order for blood pressure medicines, Tramadol for pain, Prilosec and Regulan for Plaintiff's acid reflux. However, after two weeks Plaintiff still had not received the prescribed medications and was again suffering burning pain, acid reflux and stress.

188.   On December 4, 2009, Plaintiff attended "Warden's Call" with Steve Hargett, and Plaintiff explained the situation. Afterward, the warden went directly into the medical office and asked them why Plaintiff hadn't gotten the medication. Dr. Lehmitz was in the office and they called Plaintiff in to see him again. Dr. Lehmitz exclaimed, "Do you

mean to tell me that you still haven't gotten the medication I ordered for you?" Plaintiff replied, "No, and I've been really sick" He said he'd tell medical staff to "get on it."

189. Another four days went by without medicine and Plaintiff was very ill. At about midnight on December 9, Plaintiff aspirated stomach acid, was choking and ran into the bathroom to vomit. While bent over the toilet his nose began to bleed and Plaintiff stuffed toilet paper into his nostril and went into the day room to get some water to drink.

190. While in the day room, Plaintiff was noticed by the dorm officer who asked what had happened. Plaintiff explained that he had not been given the medicine ordered by Dr. Lehmitz, that he was very sick and was unsure if he could make it to work at 4:00 A.M. Plaintiff asked him to e-mail the kitchen and tell them that he was ill and unable to work. The officer told Plaintiff that Lynn Knight-Engles has a policy that states if you are too ill to report to work, you must walk up to the kitchen and tell staff in person. (This was not DOC policy). Plaintiff was bleeding, in pain, and very ill, but he said that he would try to make it. However, he could not as his nose was still bleeding.

191. When Plaintiff could get to the kitchen at about 6:00 am, he started to work. Plaintiff was not there long when Officer Custard noticed that his nose was still bleeding. Officer Custard went into the back and spoke with Kitchen Supervisor Penniston who told him to send Plaintiff home again.

192. Back at the dorm, Plaintiff was contacted again by Custard who told him to go to medical. Plaintiff agreed but before he left the dorm, he heard his name paged to the kitchen. As the kitchen is on the way to medical, Plaintiff stopped there first where he was encountered by supervisor Lynne Knight-Engles who informed him that he was fired. Plaintiff continued to medical and suddenly they had his medication. Plaintiff received a conduct violation for not reporting to work to tell Ms. Engles he was too ill to report to work; Plaintiff plea bargained to a minor charge, but was returned to WSP.

193. Do to the fact that the plea bargain was never signed as required by WDOC policy, Plaintiff appealed. Warden Hargett denied the appeal citing policy that a plea bargain is not appealable, but he seriously departed from WDOC procedure in denying Plaintiff's

appeal because the agreement was not signed, making it of "no force and effect", but this still would later be used by the Parole Board as reason to flatten Plaintiff's time.

194.   During this time, that medical failed to provide Plaintiff with prescribed medication, Plaintiff submitted numerous grievances, all were rejected by Kendra Butler as late when in fact they were dated and submitted quite on time. Warden Hargett claimed he never received Plaintiff's disciplinary appeal due to "postal issues and delays," simply to cover-up Nelson's failure to follow WDOC's own Due Process rules and record the hearing. Warden Hargett simply refused to acknowledge the injurious medical errors.

**CLAIM NINE:**          <u>**Failure to administer adequate medical remedy.**</u>

195.   On the 17th day of February 2010 at 12:00 midnight, Plaintiff was in his cell with cellmate Cory Horacek #26211 when he again aspirated of food, a life-threatening situation.

196.   This was a severe episode and Plaintiff was choking. Inmate Horacek called officer May who was working B-Unit control and asked him to contact the nurse.

197.   At approximately 02:45, Plaintiff was still in distress and Mr. Horacek again called control and asked for medical assistance, but no one ever responded. After a few hours, Plaintiff was coughing and blacking out. Officer May later told Plaintiff that medical had instructed, "Just have him put in an HSR." Nothing further was done and Plaintiff was not able to expel the foreign matter from his lungs and deteriorated.

198.   On or about February 22, Plaintiff finally saw Dr. Johnson who prescribed an antibiotic for pneumonia, which could have been avoided if medical would have responded to what they knew, or should have known, is a serious and chronic medical condition.

199.   Plaintiff suffered pain, fear of death and general emotional suffering from medical's continual disregard for his life threatening and disabling medical condition.

**CLAIM TEN:**           <u>**Failure to administer adequate medical remedy.**</u>

200.   Plaintiff submitted Health Services Requests again between early May and May 29, 2010

stating that he was ill with aspiration of fluid in lungs and pneumonia. He asked that someone listen to his breathing.

201.     Plaintiff saw Nurse S. Peters on May 9, 08:30 with Sgt. Doreen Garrison in attendance. Although Plaintiff was wheezing badly, Nurse Peterson declared his lungs to be clear and advised him that he was abusing the system.

202.     At about 03:00 on May 29, Plaintiff woke violently after again aspirating fluid. This was an especially severe episode and Plaintiff could not cough the foreign matter out of his lungs. Plaintiff was coughing violently and struggling to breathe.

203.     Plaintiff's cellmate, Rick Beumer #24654, woke up and got down from his bunk to attempt to help. He asked Plaintiff if he wanted him to call for medical. Plaintiff told him that, from experience, no one would come.

204.     It became obvious to Mr. Beumer that Plaintiff was in trouble and he called the control bubble via the cell intercom, and told them, "My celly, Marshall is having trouble breathing, he needs help." When no one arrived 20 minuets later, he called again and told them, "Someone needs to get in here right now; he's in real bad shape."

205.     Plaintiff scribbled an HSR saying, "This is to keep you apprised of my condition. I am having trouble breathing; I can't get the fluid out of my lungs and am kind of blacking out & weak. This is a bad one – pneumonia."

206.     Officer Guenther finally arrived at the cell, made a cursory assessment of Plaintiff's condition, and said, "I'll get medical down here." Plaintiff said, "They'll just say to turn in an HSR." Guenther said, "I'll call [Jonner] Klingburg, he'll come."

207.     After a short time, Nurse Klingburg arrived at Plaintiff's cell and listened to his breathing using a stethoscope. He said, "You're in acute distress."

208.     Nurse Klingburg said he would bring him a dose of his prescribed Tylenol and Ibuprofen. Nurse Klingburg said he'd be right back, but did not return. About 45 minuets afterwards, someone called over the speaker and said, "Mr. Marshall, Dr. Coyle will see you today." However, Coyle never came nor was Plaintiff called out to see him.

209.     With Inmate Beumer's help, Plaintiff tried to file an "Emergency Grievance" hoping to

get help. This did no good and after Plaintiff returned to the prison from the hospital, the grievance was sent to Plaintiff marked by Vicki Smith "NON-EMERGENT".

210. Ms. Smith, Warden Michael Murphy, Warden Eddie Wilson as well as medical and prison officials were/or should have been well aware of the serious, emergent nature of the situation from past episodes, and to Plaintiff's knowledge whoever made this determination never made investigation into the emergency nature of Plaintiff's complaint.

211. At 20:30 Nurse Sick Call (NSC). Plaintiff saw Nurse Klingburg and Corporal Wilson. Plaintiff's breathing was distressed, Cpl. Wilson said, "We'll call Dr. Coyle and let you know what he says." At 22:00, Mr. Beumer asked the pod officer what they found out. He said he'd check. At 23:15, an Officer called over the speaker and said, "We're waiting for Coyle to call back."

212. The next day, 5/30/10, 01:00, Plaintiff was ill (severe chills and distressed breathing followed by burning fever and generally very, ill) and Rick Beumer called for help again, control answered, "The doctor isn't answering his phone."

213. At 04:15, an unknown nurse and Cpl. Wilson came to Plaintiff's cell and said, "We can't find Doctor Coyle." Plaintiff said this is just an assault. The nurse said, "Well, you might not have to worry about that anymore, Dr. Coyle won't be here much longer."

214. At 06:20, Plaintiff got to the speaker and pleaded to go to the hospital. He wrote an HSR asking, "Where is the doctor?" and saying that he had waited for Dr. Coyle for three days and needed to go to the hospital.

215. Later that evening, Corporal Umberger and Nurse DeHarrera helped Plaintiff to the infirmary, cell H1-#121. Plaintiff was given Albuterol breathing treatments, but his condition continued to deteriorate. Nurse Kate Jones said that they had been trying to get hold of Dr. Coyle all day, but he was not answering his phone. Nurse Jones said that Plaintiff's lungs sounded very bad and she would keep trying to reach him.

216. Much later, Nurse Jones said she was finally able to locate Dr. Coyle and that, "he left on holiday." (Memorial Day).

217. At some point that morning, Mr. Beumer contacted Plaintiff's mother, Linda K. Marshall, and informed her that Plaintiff was very ill and they had taken him to the hospital. Mrs. Marshall called the hospital but they refused to give her information. She then called the prison, spoke to the warden's secretary, and said the hospital would not tell her anything.

218. The only thing the secretary was interested in was who had told her that her son was in the hospital. The secretary then told Plaintiff's mother that he was in the infirmary. Mrs. Marshall told her, "You have got to help him; you people are killing that man!"

219. Plaintiff was taken to the emergency room at Carbon County Memorial Hospital on May 30, 2010 and admitted by Doctor Charles C. Young who said, "I'm admitting you; you have severe pneumonia." Plaintiff was immediately chained to a gurney while he struggled to breathe and hospital staff attempted to administer treatment. Plaintiff remained chained to the hospital bed in room 317 W while two armed officers stood guard. Officers told Plaintiff that being chained to the bed was the policy of the warden.

220. Mr. Beumer, the "unknown person" called Plaintiff's mother back three hours later and informed her that Plaintiff had been taken to the hospital emergency room and was admitted. Plaintiff's mother called the hospital again, but they still refused to give her information about her son. Later, someone else called her from the prison and demanded to know who had told her that her son was in the hospital. She declined to reveal who had told her in order to save the "unknown person" certain reprisal.

221. Dr. Young administered Demerol for Plaintiff's pain. It was the first and only time since before his arrest that Plaintiff had experienced any relief from his severe chronic pain.

222. On the evening of June 2, 2010, Dr. Young informed Plaintiff that, "The prison is strenuously requesting your return to the facility." Dr. Young seemed distressed. He indicated Plaintiff was not yet healthy enough to be released. However, the officers who guarded Plaintiff said, "We're short-handed and a lot of officers are working overtime; they didn't want to pay us to be here with you." Dr. Young reluctantly consented to Plaintiff's return after he said that prison authorities assured him that they could provide the same quality of care that Plaintiff was receiving at the hospital. Plaintiff was returned

to the prison infirmary unit, H1 - #116 and his pain medication was discontinued.

223.   Plaintiff returned to WSP on June 3, 2010. Dr. Coyle discontinued all pain medication and again, with malice, left Plaintiff to suffer intense pain. Although Plaintiff was still coughing badly and in the prison infirmary, even the cough syrup that had been prescribed by Dr. Young was also stopped, without substitution, as it contained Codeine.

224.   Plaintiff had been back in "H" Unit at WSP for one night. The next morning Dr. Coyle came up and asked, "Well, how are you doing'?" Plaintiff replied, "Not real great, why didn't you come to help me? Nurse Jones tried and tried to find you." Plaintiff told him that the nurses said he had gone on holiday. He just stood smirking at Plaintiff. Plaintiff said to him, "You have hurt me badly, and you just continue to do so." Dr. Coyle just shrugged and walked away.

225.   Plaintiff felt as if he was in another evil nightmare. He was depressed, felt lost, punished and abused.

**CLAIM ELEVEN:   <u>Failure to Render Adequate Medical Treatment</u>.**

226.   On October 22, 2008, Plaintiff was assaulted by inmate Brandon Herd and his nose was broken. Plaintiff was examined by medical personnel after the assault, and they made note of blood on Plaintiff's face.

227.   Plaintiff experienced difficulty breathing through his nose afterword, and asked many times from then on to have his nose fixed. On 9/12/09, he submitted an HSR stating the cause of the fracture to his nose and that the pain and difficulty breathing it caused had gotten steadily worse.

228.   Plaintiff requested to see an outside specialist. Nurse Preble responded, " Corizon  does not supply treatment for cosmetic, comfort, or convenience reasons. …discuss with provider."

229.   Plaintiff's nose was deformed with a deviated septum, and remained very painful for over two years. Plaintiff suffered from, difficulty breathing, humiliation, emotional distress, and depression from being hassled by roommates in prison and at the Therapeutic Center

in Casper for snoring and having frequent nose bleeds, etc.

230. Plaintiff's nose was X-rayed several months after the assault, and he was eventually taken to see Dr. Eugene P. Podrazic in Casper who recommended surgery. However, it was not until Dr. Ted Church at WMCI arranged for the operation. Plaintiff, after two years of pain and difficulty, was finally taken to Casper for the operation on August 5, 2010.

**CLAIM TWELVE:**   <u>**Failure to Administer Adequate Dental Care.**</u>

231. In mid December 2010, Plaintiff was examined Dr. Robert Byrd, DDS and Assistant Jacquie Probst after complaining of increasing tooth pain on both sides of his lower jaw. Dr. Byrd determined that Plaintiff required gum surgery and if not done, would probably develop into a dangerous condition. He said, "We'll get you back in between Christmas and New Years." Plaintiff was prescribed a mouth rinse three times a day for two weeks in preparation for surgery. However, the New Year came and went. Months passed without further contact with the dentist, and Plaintiff was simply put off.

232. In March 2011, now in worse pain, Plaintiff sent an HSR asking which "New Year" they meant. Plaintiff was re-examined by Dr. Byrd on March 19 and was again prescribed mouth rinse for two weeks in preparation for the surgery.

233. In September 2011, Plaintiff was still hurting badly but, although still not seen again by the dentist, was afraid to file a grievance and offending the very man that would cut on his mouth.

234. From the initial visit in December 2010, the pain on the lower molars on both sides of his mouth steadily grew worse. So much so, that Plaintiff could no longer brush his teeth, drink, and had trouble eating meals.

235. Plaintiff sent further HSRs requesting dental service on 6/24/2011, 8/7/2011, 8/30/2011 and 9/14/2011 stating that his teeth were very painful.

236. On September 13, 2011, Plaintiff spoke face to face with Unit Manager Molden and told her of the issue with the dental appointments, and the extreme pain he was having. She said she would check on it, but instead, did nothing.

237.   On September 28, 2011, almost ten months later, Dr. Byrd performed surgery on Plaintiff's right lower jaw. He said he would check it after a couple of weeks and then operate on the other side.

238.   On January 9 2012, thirteen months after the initial complaint of pain, continual requests and attempts to inform the dentist of re-occurring infection, difficulty chewing, swelling and pain, Plaintiff filed a grievance against HSA Jeff Shahan for blocking Plaintiff's access to dental and mental health care in retaliation for filing an ADA grievance.(*see* CLAIM 22). After speaking to Grievance Officer Eric Wiltanger about the retaliation, Dr. Byrd performed the remaining surgery.

**CLAIM THIRTEEN:**     **Failure to administer adequate medical remedy**

239.   As alleged throughout this complaint, Plaintiff was continually denied adequate medication for serious chronic pain that was documented in civilian records. Plaintiff was eventually prescribed Tramadol, a synthetic pain reliever, and though it had been tried and deemed ineffective by Plaintiff's pain specialist, Plaintiff took it for fear that in not doing so officials would deny any medication or treatment at all.

240.   Plaintiff's chronic pain syndrome is severe, sometimes like a knife sticking in his neck. His arms often go numb and ache, and a dull, sick pain radiates upward into his jaw and head. He also suffers lumbar back pain from days carrying large Drums in the Troopers Drum and Bugle Corps. The pain is continual and substantial. It requires strong narcotic medications for relief such as morphine that was found to be effective by competent, doctors who specialize in pain and conditions of the spine.

241.   The effects and side effects of Tramadol, as reported by WebMD, are identical to the natural narcotic drugs that are proven effective for this patient. There was no rational penological interest in denying Plaintiff adequate narcotic pain medications as nurses crush all such medicines, officers examine all inmates' mouths after taking *any* pills. While the WDOC presents a façade of being "narcotic free", other inmates with similar conditions *were* given long-term narcotic medications and specialized procedures.

242. The refusal of Prison Health Services and Corizon to provide adequate pain medication also had the effect of denying Plaintiff, an otherwise qualified individual with a disability, *meaningful benefit* of medical services and. restricted him in enjoying many program and services of the facility, *i.e.* sleeping, working, recreation, etc., without the burden of significant pain.

243. On 8/15/11, Plaintiff happened to speak to fellow inmate, Gary Knutson #20224. Inmate Knutson also has Degenerative Disk Disease and Osteoarthritis, and he was prescribed long-term Vicoden (a narcotic) for pain and eventually did have needed surgery in Scotts Bluff, NE. Many other inmates that Plaintiff encountered received narcotic pain medications: Mr. Rosacci, Charles Shamblen, Jamie Stanton, and others.

244. On October 19 2011, Dr. Snyder told Plaintiff, "You keep pushing my buttons on this pain medication thing. My bosses say you will not get narcotics in a correctional environment, and if you keep telling me that Tramadol doesn't work, I'll have to discontinue it and you'll suffer without anything." This supported Plaintiff's allegations that the medical contractor was deliberately indifferent to plaintiff's pain and suffering and discriminatory in the provision of helpful, necessary treatment.

245. On 5/2/11, Plaintiff sent an HSR advising he was experiencing withdrawal from Defendant's suddenly discontinuing Baclophen. Nothing at all was done. Plaintiff's DDD and pain syndrome is chronic; it gets steadily worse over time, never better. Yet, with intentional disregard for suffering and manufacturer's warning against it, Defendants repeatedly and abruptly discontinued medications, refused specialized treatment and steadily removed pain relievers over time to save themselves some money.

**CLAIM FOURTEEN:**     **Failure to administer adequate medical remedy**

246. Plaintiff's wrists were severely injured on May 17, 2007 when Sheriff's deputies got the key stuck in the handcuffs and, after a struggling, had to cut them off with bolt cutters.

247. After asking for help for many months, Dr. Kurt Johnson diagnosed Plaintiff's injuries as DeQuervain Tenosynovitis. He prescribed support braces for both wrists and injected

cortisone in the tendons and joints. This procedure was done several times.

248. Plaintiff relied on the judgment of prison medical officials to care for this serious injury appropriately. Prison doctors never ordered physical therapy or took any other steps to repair the injuries by way of simple surgical intervention. The pain intensified.

249. On April 19, 2012, Plaintiff submitted an HSR asking for what he presumed would be the last series of injections.

250. At a visit with Dr. Wakamatsu on April 17, the doctor became very nervous while preparing to inject Plaintiff's thumb joints. Plaintiff asked if he was uncomfortable performing the procedure and he replied that he was because he had never done it before. Dr. Wakamatsu said that he would refer to a medical book he had at his home and perform the injections in a week. However, a week later Wakamatsu told Plaintiff that cortisone injections are appropriate only for larger load bearing joints, like knees and ankles and would not be done.

251. Plaintiff investigated his illness in the prison law library. Then, along with authoritative information from: <u>AMA American Medical Association Concise Medical Encyclopedia</u>, by Martin S. Lipsky, MD, ©2006, ISBN-10: 0-375-72180-0; <u>Barron's Medical Guide</u>, by Michael A. Rothberg, MD, ©2006, ISBN-10: 0-7641-3463-9; and <u>Sports Health The Complete Book of Athletic Injuries</u>, by William Southmayd, MD, ©1981, ISBN: 0-8256-3205-6, Plaintiff via HSR asked the doctor for surgery.

252. These experts thus state the standard of care for treatment of DeQuervain Disease: If, after administrating cortisone injections, a couple of times the pain persists, surgery is required. Plaintiff requested medical to schedule surgery to repair his injured wrists. More frequent corticosteroid injections can cause permanent damage.

253. Dr. Wakamatsu, with Nurse Practitioner Jenny Sanderson in attendance, told Plaintiff that the only way he was going to get proper medical attention was to file a grievance. Plaintiff asked him to repeat this statement three times. Wakamatsu said, "You'll need to get the surgery when you get out." Plaintiff Later conveyed this to Warden Hargett who said he was going to check if this was so, and asked the name of the nurse that was there.