He did not get back to Plaintiff.

254. On May 14, 2012, Plaintiff was called to medical to see a Physical Therapist. He asked if Plaintiff was willing to have surgery, and then said, "Oh, but they're not willing to give it to you, right?" He told Plaintiff, "You can have them operated on when you get out."

255. The therapist told Plaintiff to find a rubber band, wrap it around his thumb and forefinger and stretch it. In addition, he said come to medical every day to "click" a ballpoint pen with both thumbs. This "Physical Therapy" was scheduled to last 90 days. Plaintiff was scheduled for release from confinement in 45 days.

256. Plaintiff alleges that it was apparent that Corizon is upmost concerned with making money than providing proper care in accordance with their contract that demands, "Contractor agrees to provide all… care, …according to constitutional, community and NCCHC Standards. They would do anything in lieu of providing surgery for Plaintiff in this instance. Corizon attempts to evade liability by *appearing* to provide *some care* to inmates even if that care is substandard and demonstratively ineffective.

**IN GENERAL**

257. Plaintiff has submitted supporting medical records at his own expense to medical officials many times, advising defendants of his serious medical needs and disabilities. This information was ignored. Plaintiff was often called untruthful, manipulative and drug seeking as records were missing, mismanaged or confused with decade old records from a decade old previous incarceration under #20349.

258. Despite the clear evidence of medical records, Drs. John Coyle and Kurt Samuel Johnson, et al, refused to provide adequate care for Plaintiff. Indifference and neglect is encouraged by the contractor, Corizon Health, Inc., which puts profit ahead of patient safety, and frequently tells inmates, "you can get that fixed when you get out."

259. Plaintiff filed "EMERGENCY" grievances on a number of occasions, hoping to get someone to help him quickly. Defendants CEOs (Murphy, Martin, Wilson), who make the decision as to which grievances are to be handled on an emergency basis, invariably responded that Plaintiff's need was "NON EMERGENT" in contradiction to the

definition in the policy below:

260. **WDOC Policy & Procedure #3.100** defines "<u>Emergency</u>" and "<u>Emergency Grievance</u>" as follows: **Emergency**: Any condition or situation where life, health, or safety may be threatened or where time frame considerations necessitate an immediate response or remedial action; and

261. **Emergency Grievance**: (For this policy only.) A grievance involving a problem which results from an unforeseen combination of circumstances, or the resulting state of those circumstances, and which calls for immediate action. If disposition of the grievance according to the regular time limits would subject the inmate to a substantial risk of personal injury, or cause other serious or irreparable harm to the inmate, then it will be considered an emergency.

262. Plaintiff asked Nurse Peters at WSP, "How does PHS define of "medical emergency?" She said, "When you're lying on the floor bleeding." She and Director of Nursing Dahlke both told Plaintiff he was "abusing the system" by trying to get someone to check his lung function when he told them he had aspirated fluid and was in evident danger.

263. On several occasions, Plaintiff experienced life-threatening emergencies from inhalation of matter and accumulation of fluid in his lungs and the resultant choking, respiratory distress, uncontrollable coughing, shaking, chills, aspiration pneumonia and severe pain. Plaintiff or his cellmates invariably called for help. Medical and prison officials were well aware of the dangers from Plaintiff's aspiration issues and deliberately and maliciously ignored them.

264. John Coyle, in deliberate disregard of his professional responsibilities to the second aspiration incident, left on Memorial Day holiday rather than attend to his patient, despite being informed by nurses and his personal experiential knowledge that there existed imminent peril to his patient's life.

265. Defendant Coyle demonstrated flagrant, intentional disregard so obviously meant to cause harm that even when Plaintiff told Coyle that he was harming him and leaving himself open to liability, he persisted in his deliberate showing of indifference to the

health and safety of Plaintiff saying, "go ahead and sue, others try it and they lose."

266. Time after time, in Plaintiff's dealings with WDOC officials and Corizon medical employees, he was told, "We do what we want and there's nothing you can do about it." Prison officials operated with an arrogant supposition of impunity in continually violating the rights of prisoners.

267. Shirley Haley, in changing Doctor's orders for Omeprazol from one capsule twice per day to one capsule once per day without informing him, denied plaintiff his right to informed consent. It was a serious infraction of rules of professional conduct, causing serious and permanent injury and disability to a patient. Officials preferred to cover-up Haley's actions, not allowing Ed Beason to give plaintiff a statement.

268. Health Service Requests are the only avenue to notify medical of medical issues and are put in place per their own rules. Plaintiff's requests often went unanswered for many days, if at all. The answer, "You have been scheduled." was commonly used by medical staff to placate Plaintiff while their consistent lack of expeditious attention to his serious medical needs drug on, often for weeks. In emergencies, medical staff invariably told Plaintiff, "Just submit an HSR."

269. The failure of personnel to responsibly maintain Plaintiff's records, take his complaints seriously, and respond in a timely manner demonstrate serious ministerial neglect, deliberate indifference to Plaintiff's serious medical needs, and was a very grievous error on the part of the Wyoming Department of Corrections and medical contractor, Corizon.

270. Defendants knowledge that Plaintiff was suffering and their failure to provide adequate medical care to him, showed an abuse of discretion by authorities in their treatment of Plaintiff and in denying his physical disabilities. In the years that Plaintiff has been disabled, he has never experienced so much pain, physically and mentally, because of such substandard medical care, discrimination and slanderous accusations of lying about his health issues, etc.

271. Prison official's deliberate indifference to Plaintiff's chronic pain, insulting and abusive remarks and leaving him to suffer life-threatening dangers left him emotionally drained

and feeling hopeless. Plaintiff still suffers permanent physical and emotional damage from the alleged abuses resulting in post-traumatic stress disorder.

272.   Defendants, Corizon Health, Wyoming Board of Probation and Parole; officials within WDOC had been notified by Plaintiff of the harmful conditions. They knew of and ignored substantial risk to Plaintiff's health and safety; they failed to act, exhibiting a conscious disregard of previously diagnosed, serious medical conditions.

273.   Defendants' failure to provide adequate treatment for Plaintiffs diagnosed Gastro-Esophageal Reflux Disease resulted in a life long handicap, irreparable damage to his larynx and throat. Plaintiff was a semi-professional singer and guitar player prior to his incarceration, but has been robbed of his avocation.

274.   Defendants' actions have destroyed Plaintiff's ability to earn supplemental income performing and singing. The defendants have deprived Plaintiff of the ability to perform and enjoy a life made a little more comfortable by earning some extra money from performing when he could. This has caused depression, fear of the future in the free world, emotional distress and loss of enjoyment of life.

275.   Defendants' deliberate indifference to Plaintiff's serious medical needs, caused Plaintiff to needlessly suffer pain and mental anguish for years, he continues to suffer from Barrett's esophagus and the dangers of aspiration pneumonia causing serious breathing distress and general pain throughout his body.

276.   Dr. Ted Church told Plaintiff, "I'm doing all for you that they'll let me. It's like operating with handcuffs on." Upon information and belief, Doctor Ted Church resigned in January 2011 out of frustration from his inability to practice professional, competent medicine under Corizon who required him to cease providing the quality of care that meets community standards for care as required by their own contract.

277.   Plaintiff asked several times over a period of two years to have surgery to repair his broken nose resulting from the assault of October 22, 2008. Neither Dr. John Coyle nor Dr. Kurt Samuel Johnson offered any option consultation concerning Plaintiff's broken nose even when asked, except to agree that it probably needed to be fixed. Corizon

delayed surgery on Plaintiff's nose for nearly two years until August 2010.

278.   If Shirley Haley had informed Plaintiff about her plan to alter Dr. Johnson's medical orders for Prilosec, he would have protested the decision for his safety. He could have stopped eating so he wouldn't get acid reflux and ask to consult again with Dr. Johnson. If Shirley Haley would have informed him, Plaintiff could have told her that taking Prilosec only once per day would not be sufficient to prevent him from becoming ill.

279.   Shirley Haley failed to provide Plaintiff with required information with deliberate indifference to his right to be informed of a certain course of treatment without regard to harming her patient. As it was a matter of record that Plaintiff became very ill without Prilosec, Shirley Haley should have considered the fact that Dr. Johnson's orders, as written, served a necessary medical purpose.

280.   Deliberate denial of proper medical attention described in these claims demonstrates extreme deliberate indifference to the legally and morally mandated care to which Plaintiff was entitled, evincive of a policy by pattern and custom of irreprehensible, unprofessional behavior contrary to that which the citizens of Wyoming have entrusted to corrections officials.

281.   Jacquie Probst, RN was responsible for the maintenance of Plaintiff's dental records and scheduling of appointments that Dr. Byrd ordered at WMCI. Whether it was deliberate or circumstantial, she failed to comply with the dentist's orders for expedient scheduling of surgery. Plaintiff's HSRs reminding "dental" of the pain, and requesting that she get him in. Plaintiff was left to suffer with tooth pain for months because of the actions of the dental department under Corizon that amounted to deliberate indifference.

282.   The sheer number of specific instances of neglect which the defendants insisted on ignoring, denying, and continuing courses of treatment that the doctor(s) knew were, ineffective, grossly inadequate or entailed substantial risk of serious harm to Plaintiff gives evidence that state officials did not care in the least about the well being of Plaintiff or the WDOC rehabilitative mission.

283.   Defendants named, as well as the other employees known and unknown of WDOC and

Corizon all had a statutory and constitutional duty to provide appropriate care for Plaintiff that meets modern accepted community standards for care, which by nature of his incarceration, he could not provide for himself. The Defendants failed to fulfill that duty and attempted to avoid liability by providing some minimal *pro forma* treatment.

284. On multiple occasions, the Defendants failed to meet their clearly established duty to provide care for Plaintiff. Prison Health Service's/Corizon Health's employees and physician's conduct departed from the accepted community standards of care resulting in the breach of that duty on several occasions closely related in time from February 6, 2008 to June 30, 2012. The departure from competent and professional performance of their duty demonstrates a level of grossly inadequate, unreasonable, torturous medical care as to shock the conscience of reasonable men, was intolerable to fundamental fairness, and was punishment far beyond the offense meriting incarceration.

285. Plaintiff continually tried to keep nurses, doctors and prison officials aware that he was suffering pain from his cervical vertebrae, spinal degeneration, and the injuries to his wrists, and that Tramadol was not effective in addressing this serious medical need. Plaintiff advised that Tramadol had been tried previously and found to be ineffective.

286. At a meeting in March 2012 with Dr. Wakamatsu, Warden Hargett, HSA Shahan and Nurse Liggett on the subject of controlling Plaintiff's pain symptoms, Wakamatsu *screamed* at Plaintiff saying, "There's a difference between civilian medical treatment and corrections treatment. DO YOU UNDERSTAND ME? DO YOU UNDERSTAND ME? Plaintiff told Wakamatsu not to patronize him and that he was a son-of-a-bitch.

287. The contract that Corizon Health has made with the WDOC states, "Contractor agrees to provide all medical, dental, vision, mental health, and special needs care, as well as necessary transition services such as medically necessary discharge planning and referral for inmates in WDOC facilities, ... as provided in this Contract and attachments hereto, according to constitutional, community and NCCHC Standards.

288. This is the position of Elizabeth M. Hoy, MHA, Health Policy Advisor to Governor Matt Mead who recently put it via e-mail to the daughter of inmate Rodney Gunderson

#17425, "[q]uality assurance procedures help ensure that inmates have access to timely, medically necessary, cost effective, quality care similar to <u>community standards for care</u>."

289.   Director R.O. Lampert's position on what is required of the WDOC to provide inmates in its custody, "[If] you are able to ambulate within the facility, attend meals, education areas, be out in the pods as well as utilize outside rec. areas." are over generalized, however, and fail to meet constitutional and community standards for healthcare.

290.   Dr. John Coyle and other prison doctors, at the direction of WDOC and Corizon administration, intentionally refused Plaintiff's requests for adequate pain medication. Dr. Johnson refused to approve any medication that adequately alleviated Plaintiff's suffering. Instead, Kurt Johnson, John Coyle and other defendants accused Plaintiff of drug seeking and manipulative behavior concerning his medical condition. Dr. Coyle accused Plaintiff of "drug seeking behavior." In plaintiff's medical record Coyle wrote, "[Inmate] can give the name of the medication he was taking, the dosage and the times he took it. This is concerning."

291.   The entire $40,756,150.08 PHS/Corizon contract contains only two references to pain: "**<u>Oral health program</u>: ii.** The oral health program shall provide the basic oral health needs of the inmate population through the diagnosis of existing oral conditions, <u>services for the relief of pain</u> and elimination of infection… The provision of these services shall be prioritized in a manner that approximates the following: **a.** <u>Emergency services for the relief of pain</u>, bleeding, infection, trauma, etc;"

292.   WDOC Policy and Procedures reference nothing related to clinical chronic or acute pain (except sudden chest pain) or the relief and proper management thereof.

293.   The WDOC and medical contractor maintain a policy by practice of deliberate indifference, in the blanket denial of FDA approved narcotic medication to inmates who suffer pain and other serious ailments; a practice far removed from constitutional, community standards of care and that serves no valid penological purpose.

**D.   CLAIMS BROUGHT UNDER UNITED STATES CONSTITUTION FOURTEENTH AMENDMENT; 42 USC § 1985; W.S. 6-5-301 CONSPIRACY, PERJURY AND DEFAMATION:**

**CLAIM FIFTEEN:   Denial of Equal Justice Under Law, Conspiracy to Deprive Civil Rights by Perjury Under Oath in an Administrative Proceeding.**
**SPECIFIC INSTANCE**

294.   On January 07, 2010, Plaintiff appeared before the Parole Board for the second time. The Board removed all earned and future good credit from due to the deliberate presentation of false information, under oath, by two Caseworkers Francis Foster and Pam Nichols who told the board, "We took Mr. Marshall to the ITU and he only lasted six hours." Plaintiff interjected, "Pam, I've never been to the ITU." Yet, Nichols persisted, "That's not the way *we* recollect it, Mr. Marshall." Plaintiff had not ever been to the ITU.

295.   Nicholls and Foster also told the board that Plaintiff had been arrested for 4th degree sexual assault on a four-year-old while intoxicated. Plaintiff's pre-sentence investigation reports no intoxication or alcohol involvement in relation to the alleged incident. Further, the false allegations were dismissed. Defendants demonstrated discriminatory conspiratorial animus in their slanderous remarks referencing a dismissed sexual offense with an alcohol connection in an obvious attempt to influence the Board's decision.

296.   Defendants' statements were nefarious attempts to slander Plaintiff because of these caseworkers' and officials' hostility and preconception that Plaintiff was pursuing legal action against the Department of Corrections.

297.   Prior to his parole board hearings in both 2009 and 2010, Plaintiff presented to case management a well thought-out and thorough parole plan. Plaintiff's plan included arrangements for future housing and listed several options for ongoing aftercare, etc. Nevertheless, as evinced by the statement of the Board on Plaintiff's Parole Denial paper, Nichols and Foster falsely told the board members that his parole plan was incomplete, for no reason other than spite.

298.  Plaintiff wrote Parole Board Director, Patrick Anderson asking for a rehearing based upon the false statements and failure of the board to follow their own established policies. Anderson granted the request, but Plaintiff was flattened regardless.

299.  After the initial hearing, Plaintiff asked Nichols if she "got that ITU business straitened out with the Board." She said she did. However, six weeks later Plaintiff received another letter from the Board saying that they had, "...discovered new and convincing evidence to justify the removal of good time; namely, refusal to attend the ITU."

300.  Plaintiff asked the records department for a copy of his disciplinary record and finally received it much too late to present at the rehearing. There were listed the two violations Plaintiff received for missing work due to illness from the denial of medication, (*see* CLAIM 8 and 9), creating a grievance form on a computer in an attempt to recover property missing for many months, and a general disciplinary charge for giving false information while at the ACC in Gillette. Plaintiff had never been to an ACC anywhere.

301.  Plaintiff received yet another subsequent letter from the Board. Mr. Anderson wrote that while the board originally flattened Plaintiff for failure to attend the ITU, they decided *after discovering that the caseworkers committed perjury* to flatten him for "multiple disciplinaries in 2009." These were the minor write-ups for missing work due to illness from the alteration of medication orders, missing property grievance at WHCC, and the erroneous false information charge at ACC where Plaintiff had never been.

302.  This false disciplinary information was relied on by the Board. It was presented to the Board by defendants with deliberate and discriminatory intent to deny Plaintiff an equal chance for timely release, and for no other reason but malice toward Plaintiff.

303.  For parole consideration, all inmates are presumed similarly situated. No other inmate suffered the kind of disparate treatment and inequitable animus as the Plaintiff as a class of one did here. Any reasonable official would have known that it was unlawful to treat Plaintiff differently under these circumstances.

304.  The Wyoming Board of Parole rescinded Plaintiff's earned good time and, therefore, early release date relying on erroneous information that could have been avoided should

Defendants made a simple change in policy to allow Plaintiff to participate in a form of treatment that accommodated his disabilities.

## IN GENERAL

305. WDOC Policy and Procedure 4.100 and The Wyoming Board of Parole Manual state that the inmate's caseworker is to meet with the inmate to make sure that all information presented to the Board is current and complete. This was not done in an honest, non-discriminatory fashion. If Ms. Nichols and Foster had not conspired to harm Plaintiff, or otherwise been deliberately indifferent in the performance in their duties, and had received proper training under R.O. Lampert, they would have met with Plaintiff prior to the hearing as required by Policy.

306. Francis Foster and Pam Nichols were responsible for presenting true, complete and accurate information to the Parole Board. (**WDOC Policy and Procedure 4.100; IV**. **Procedure: A. Parole Summary Reports; 15,e, i.;** "…The Caseworker will be expected to have complete, accurate and updated information on a summary update form to assist in this process prior to the correctional facility parole recommendation meeting."

307. Ron Schmitz was the B-Unit Manager at the time of this offense and consequently shares the responsibility of assuring true and correct information was presented to the Board. (**WDOC Policy and Procedure 4.100; Procedure: A. Parole summary reports; 1**. "Preparing an inmate for parole is a correctional facility process. Completion of an inmate's parole summary shall be considered a unit management function").

308. Plaintiff allows that perhaps one caseworker might make an honest error in statements made under oath. However, the fact that perjury was supported by not one, but both caseworkers together, and in concert with Unit Manager Ron Schmitz, gives evidence of conspiracy. Defendants, with knowledge and intent violated clearly established law of which these reasonable officers certainly knew deprived Plaintiff of equal consideration of parole and in the decision to remove earned goodtime credit in which plaintiff had a vested state created liberty interest.

309. If the defendants did their job, as reasonably assumed, they would have compiled

accurate information. As it was, Pam Nichols, Francis Foster and Ron Schmitz knowingly and with malice conspired together to present information to the Board of Parole, under oath, that they knew was untrue, slanderous and would have negative results in the parole hearing, requiring Plaintiff to spend more time imprisoned.

310. Caseworkers Nichols and Foster committed the crime of perjury for the purpose of depriving, either directly or indirectly, Plaintiff of the equal protection of the laws, or of equal privileges and immunities under the laws. Plaintiff suffered injury in that his reputation was slandered before the decision makers who denied him the benefit and privilege of parole.

311. Even if Ms. Nichols and Foster had *indeed* retracted their deceitful and damaging statements after the hearing was concluded, the damage had already been done causing the injury, which could not be rectified by any subsequent attempt at retraction.

312. The Board were obviously prejudiced by Nichols's and Foster's invidiously perjured discriminatory statements, and simply was willing to "flatten" Plaintiff for whatever reason they could come up with, factual or otherwise, and were not interested in the truth about missing records, or that they owed Plaintiff a lawful duty to accommodate his disabilities.

313. Board members knowingly relied on false information, and based their decisions on perjured testimony from Pam Nichols and Francis Foster. Weeks later they tried to come up with an alternate excuse for their decision,

314. The individual Board members had the requisite knowledge to affect the liberation of Plaintiff from conditions of incarceration that they knew, or should have known were clearly unconstitutional and violated clearly established statutory rights. As the ultimate decision making authority, the board created a liberty interest when they ordered Plaintiff "Parole upon completion of ITU."

315. The Board could have released Plaintiff, at least after his sentence had reached its full minimum sentence date, if not on his parole eligibility date. While Plaintiff had no constitutional right to parole, he had a statutory right to the equal opportunity to receive

66

the "benefit and service" of parole under the 14th Amendment and ADA, and a liberty interest in the good time already earned.

316.    Defendants could have escaped disability discrimination in this instance if reasonable accommodation would have been made in the <u>service</u> of the public entity to allow Plaintiff to receive the <u>benefit</u> of court-*recommended* substance abuse treatment, giving primary consideration to the request of the disabled inmate for IOP instead of ITU.

## E.    CLAIMS BROUGHT UNDER UNITED STATES CONSTITUTION FOURTEENTH AND EIGHTH AMENDMENT: DELIBERATE INDIFFERENCE TO THE MANAGEMENT OF INMATE RECORDS.

**CLAIM SIXTEEN: <u>Failure to Keep Accurate Medical and Institutional Records</u>.**

**<u>SPECIFIC INSTANCE</u>**

317.    Plaintiff transferred initially from WSP to WHCC on April 17, 2008. After being assigned to the kitchen, Plaintiff wrote to Assistant Warden Michael Pacheco explaining that he is disabled with chronic pain syndrome, and that he may have difficulty performing duties in this assignment. Caseworker Supervisor Linda Hunt responded, "No record of pain syndrome. 10lbs. lifting limit - January 2008, 6 weeks. Report to kitchen and begin work Sunday." Plaintiff responded that he was not in the prison system in January 2008, and thus began the lingering, nagging suspicion that <u>something was terribly wrong with his records</u>.

318.    As remedy requested for a grievance, #09-0655, Plaintiff asked that he be transferred to a minimum-security facility. Warden Tod Martin wrote in response to the appeal, that because of Plaintiff's "untruthfulness, manipulative behavior and failure to program while at both WHF and WHCC", he would "not be going to a minimum facility." <u>Plaintiff had never been to WHF</u> and Martin's other accusations were also false. Plaintiff had completed every program he could at WHCC. Again, the records were in error!

319.    Nonetheless, on 2/26, Plaintiff *was* after all transferred to the Honor Farm for nine days

prior to being then sent to CRC/TC in Casper for Intensive *Inpatient* Substance Abuse Treatment. (*Note,* When Plaintiff first arrived at CRC/TC, staff did not know who he was, or why he was there because they didn't have any records for him.)

320. Plaintiff was first transferred from WSP to WMCI on June 17, 2010. Prior to leaving WSP, he was reclassified to minimum security. However, upon arrival at WMCI, he was given a medium security (red) uniform and placed in the intake unit where a conflict arose with the higher security inmate with whom he was housed. Plaintiff told officers about the misclassification and conflict. He was sent to the "hole", segregation unit A-2.

321. On June 19, 2010, Plaintiff informed A-Unit Caseworker Jacquelyn Judd about the misclassification and that it may have been due to errors in his records. Judd accused Plaintiff of lying, saying, "I'm all about the truth. You need to start being truthful."

322. On June 22, Plaintiff was able to convince intake Case Team Leader Jay Muse to double check Plaintiff's classification. The next day Mr. Muse admitted Plaintiff was right and moved him to the minimum unit, D7. Plaintiff's WMCI intake I.D. photo was taken wearing a red (medium) uniform instead of green (minimum) uniform.

323. Plaintiff's property was often misplaced or lost for having someone else's number on the box, one time for seventeen months. May 21, 2009 to October, 2010.

324. False information was presented to the Parole Board in January 2010.

325. Plaintiff's records were sent to other facilities on several occasions.

326. While at CRC/TC on 5/08/2009, Plaintiff received the first of a series of three vaccinations for hepatitis B. On 7/17/09. The boosters were to given three months apart, Plaintiff wrote, and to remind medical that the second shot in the series was soon due.

327. Plaintiff received the following response from R. Moyer, RN on 9/2/09: "After closely reviewing copies of your medical records from TC, I cannot find any order for hepatitis vaccine, or any record that you received a shot of hepatitis vaccine. Please discuss this with Dr. Coyle the next time you see him." Dr. Coyle refused to discuss the issue at the next chronic care visit in September, but told Plaintiff that if he didn't "start being more truthful, bad things might happen to him."

328.  In October 2009, after struggling for three months with this confusion, Plaintiff contacted the Natrona County Health Department who sent a copy of the hepatitis B vaccination record dated 5/10/09. This information was reported on the internet at, https://iweb.state.wy.us/iweb_wy/vacc_record_report.jsp. There was no justification for not locating this information except for the fact medical was working from incomplete and inaccurate records. Plaintiff presented the vaccination record along with a note to Dr. John Coyle, via HSR to Nurse M. Preble.

329.  At a visit and discussion about damage to Plaintiff's throat with Dr. Coyle in September of 2009, Plaintiff could not readily recall which doctor had performed the initial EGD in 2006. After Dr. Coyle checked with one doctor whom Plaintiff mistakenly thought might have performed the EGD, Coyle again said that Plaintiff was dishonest and needed to be more truthful.

330.  Several weeks later, when speaking with a family member, Plaintiff was helped to recall that the doctor was R.A. Schlidt, MD. Plaintiff wrote for a copy of the EDG record, sent it to Dr. Coyle, and asked that he not call him a liar any longer.

331.  Plaintiff attended a visit with Dr. Snyder at WMCI on January 26, 2011. When the doctor needed to check his civilian records concerning Plaintiff's degenerative disk disease and chronic pain syndrome, again the records were nowhere to be found. Again, for about the fourth time, Plaintiff provided his own personal set of the records and they were copied by Nurse Tammie Howell. Now, they should have had four sets of these identical records.

332.  On 12/30/10, Plaintiff asked for a copy of the medical record reporting the results of the latest EGD done in 2008 while at WSP. Medical Records Manager Leslie Briggs responded, "… the only EGD found in your records is from November 2006… Please submit $.50 x 1 for a copy." The record she referred to was the one Plaintiff himself provided back on 2/24/10 because officials could find no record of it when the issue needed to be discussed.

333.  On February 7, 2011, Plaintiff filed yet another grievance in an attempt get a copy of

seemingly non-existent medical tests. Plaintiff was finally able to convince Health Services Administrator Jeff Shahan to "Please give me the benefit of the doubt and just check one more time" for the missing records that had caused Plaintiff much heartache and harm during the prior three years and 1 day.

334.   Two hours later, Mr. Shahan with Nurse Tammy Howell met Plaintiff in D1 Unit and said, "Mr. Marshall, you were right. We found a whole other set of your records on a shelf gathering dust. They were under the number #23049."

335.   For three years and one day, from Feb. 6, 2008 until Feb. 7, 2011 Plaintiff had suffered medical neglect, verbal abuse and physical pain and suffering because prison officials failed to professionally manage his institutional and medical records. With this new evidence, Plaintiff began the grievance and appeal process again. Prison officials still refused to accept any accountability for their indifference to the suffering it caused.

336.   Plaintiffs continually plead for someone to believe him that something was very wrong with his inmate records. Plaintiff's complaints were summarily dismissed. He suffered abuses and false accusations of lying and exaggerating his medical issues.

337.   Anne Cybulski-Sandlian, WDOC liaison for Corizon in Cheyenne, and Jeff Shahan came to see Plaintiff at 11:00 on 4/12/11 to discuss the grievance appeal #11.0066 about medical records and disability issues. In the grievance response, Ms. Sandlian and R.O. Lampert would not admit any wrongdoing in mishandling Plaintiff's medical records.

338.   Sometime in August of 2011, an announcement was made that Corizon was offering flu and hepatitis B vaccines. Because it had now been two years since his first vaccine at TC, Plaintiff wrote and asked if he needed to renew the initial hepatitis shot or just receive a booster. After much inquiry by Plaintiff and avoidance on the part of medical, the answer returned was, "… no record in any of your charts or the state web site of you ever having a hepatitis B vaccine."

339.   Even after the missing records were found, and Plaintiff giving medical a copy of the state website record, and all he'd been through, Plaintiff was still jeopardized as his medical records and information were evidently still seriously in error.

## IN GENERAL

340.   From the time Plaintiff initially arrived in the WDOC system on 2/6/08, as shown throughout this complaint, the defendants mishandled, mismanaged or misplaced Plaintiff's medical records. Even after the missing part of the records were located under Plaintiff's prior prison number on 2/7/11, three years and one day later, erroneous entries continued occur in Plaintiff's medical records.

341.   Defendants denied or missed doses of medication on many occasions, largely due to the mismanagement of Plaintiff's medical records, and Plaintiff was otherwise injured by the refusal of Corizon and WDOC staff to keep accurate and complete records (medical and institutional) and acknowledge Plaintiff's complaints in that regard. I.e. false information to Parole Board, erroneous housing assignments and classification, lost personal property for months, false entry on disciplinary summary presented to the parole Board, money erroneously paid to court assessments, etc, etc.

342.    Plaintiff contacted Corizon Administrator James Allen at WSP by letter on October 4, 2009 notifying him of medical neglect, and his belief that something was wrong with his medical records. This should have put Allen on alert, but he ignored the issue.

343.   Defendants had a duty to maintain complete and accurate records, both institutional and medical. Defendants failed to fulfill their duty creating the likelihood of disaster, causing physical, mental and emotional harm to Plaintiff.

344.   Complete and accurate medical records are critically important in any attempt to provide continuity of medical care. The breakdown in record keeping put Plaintiff at risk and caused unnecessary pain and suffering in violation of the eighth amendment.

345.   Defendants failed to prepare and maintain legible, complete written medical records that accurately describe the medical services rendered to Plaintiff, including patient's history, pertinent findings, examination results, test results, and all treatment provided.

**CLAIM SEVENTEEN: Failure to Keep Accurate Inmate Financial Records.**

## SPECIFIC INSTANCE

346. The Judgment and Sentence handed down for Plaintiff's instant offense, Criminal Docket No. 17359-C; 12/21/2007, ordered that he pay $100.00 to Crime Victims' Surcharge and $10.00 to the Court Automation fee, for a total of $110.00.

347. During Plaintiff's imprisonment, officials withheld a portion of his incentive pay from prison jobs for disbursement to the court to satisfy his obligation.

348. On February 18, 2009, Caseworker Pam Nichols came to Plaintiff's cell and handed him a document informing him that his incentive pay was to be deducted 35% to repay $510.00 on Criminal Docket No. 17359-C.

349. Plaintiff tried to explain that the amount was incorrect and she pointed out on the document that the business office had "...verified the amounts shown with the Clerk(s) of District Court," and said if Plaintiff refused to sign it, she would issue a conduct violation. Ms Nichols further strongly suggested that Plaintiff check the box stating, "I agree that I owe the amount...." Plaintiff, also at Ms. Nichols suggestion, agreed to allow $5.00 to be deducted and Ms. Nichols and he both signed the agreement. From then on, five dollars had been taken out of any and all monies paid to Plaintiff at all four facilities at which he was incarcerated, WSP, WMCI, WHCC, or CRC/TC, and throughout the first three years and two months of Plaintiff's imprisonment, Plaintiff had seen the amount owed to the court slowly decrease on his statements.

350. However, on April 20, 2011, Plaintiff was given another of these "Notification of money due..." by WMCI. This time, it said that Plaintiff owed $105.00 on Criminal Docket No. 17359-C; from 12/21/2007. Again, it contained the statement, "You should be aware that the amounts shown below have been verified with the Clerks of District Court..." Again, the original fees assessed on this docket were $110.00. Plaintiff was confused, stressed and could not imagine what officials were doing to him or what was going on.

351. The amounts *paid* to the court are reflected on monthly statement. Plaintiff received a monthly statement on April 4 that read the total Plaintiff owed for court fees was $47.13 and "miscellaneous assessments" was $60.12. Accompanying the notice of April 4 was a receipt (bill) showing that Plaintiff had a debt of $165.12. This was obviously the amount

shown on the new Notification of money due $105.00 left owed to the court, plus the amount of miscellaneous assessments $60.12... very confusing.

352.    As there had been continual mismanagement of Plaintiff's records by prison officials, Plaintiff became suspicious, wrote to the Clerk of Natrona County District Court, and asked how much had been paid on his obligation #17359-C . On 4/28/11, the court clerk responded that only $5.00 had been paid during the entire 3½ years by any of the facilities at which Plaintiff had been housed.

353.    Plaintiff began further frustrating investigation and filed still another grievance. Plaintiff discovered that the prison system had been sending payments to the court in satisfaction of Plaintiff's old prison number #20349 from eleven years before. This was further evidence that officials had been mismanaging Plaintiff's records. If he would not have been diligent in investigating this and similar problems, Plaintiff might have been in danger of court action against him for not making payments on these court assessments. This was enough to make a man crazy

### IN GENERAL

354.    Keeping accurate records is critical to prison/inmate management and medical care. Plaintiff frequently expressed concern to officials that it seemed they were confusing him with someone else or that something was wrong with his records. Plaintiff received verbal abuse and false accusations of manipulation and criminal thinking for his assertions that, in fact, turned out to be true. Lana Culver, Kathy Long, Harriett Carlson, all were charged with the responsibility of properly managing Plaintiff's financial obligations and financial records as he could not by reason of his incarceration do so.

355.    C.E. Carpenter in the WDOC Central Office was responsible for the overall conduct of inmate finances. He should have known over the course of more than three years that Plaintiff's court ordered obligations toward the current case were not being met despite the fact that inmates are required by Wyoming law to work.

356.    Kya Gallo, Melody Norris, Shawna Rettinghouse were responsible for the accurate maintenance of Plaintiff's institutional records. Debbie Leonard, as the person with

overall responsibility for inmate records, should have realized after three years that Plaintiff's records were in error, known of Plaintiff's complaints about the errors, and taken steps to prevent the harm it caused.

357. Susie Pillon, M. Dahlke, Nichole Taylor, Charlene Holtzman, Leslie Briggs at one time or another handled, worked with or were responsible for Plaintiff's medical records, but refused to give credence to Plaintiffs concerns.

358. Each of the above defendants was responsible for inmate records at one time or another. Plaintiff reasonably expected that at least one of them, being well trained, professional and diligent in their duties, should have realized the errors and mix-up in Plaintiff's records. Officials should have taken serious Plaintiff's concerns, which he continually conveyed to them either verbally or in writing. These officials should have assured the avoidance of administrative, financial and medical errors that harmed and injured Plaintiff. Defendants were deliberately indifferent to the egregious harm this incompetent ministerial neglect in record-management caused Plaintiff.

359. The mismanagement of Plaintiff's records, the indifference to his complaints have caused him to be denied prescribed medication and treatment on many occasions and caused severe emotional and physical distress. It has caused Plaintiff to be denied parole due to prejudicing the Parole Board toward him by false information given in reference to his PSI and institutional activity, resulting in his having to spend more time imprisoned under insufferable conditions.

360. If it had not been for his suspicion that Plaintiff's court fees had not been paid, Plaintiff feared he would face further court action against him when officials *did* release him. This caused Plaintiff to not sleep at night, break out in cold sweats and experience nightmares, and an overall sick feeling.

361. The WDOC obtained money by compulsion under color of right from Plaintiff that was to be paid to the Seventh District Court for Victims' Compensation and Court Automation fees on case number 17359-C. This money was not properly paid as portrayed to Plaintiff by officials who thereby committed the crime of extortion and

abuse of process.

**F.   CLAIMS BROUGHT UNDER THE AMERICANS WITH DISABILITIES ACT OF 1990, 42 U.S.C. §§ 12101 *et seq.*, REHABILITATION ACT OF 1973, 29 U.S.C. § 794, and U.S. CONSTITUTION EIGHTH and FOURTEENTH AMENDMENT.**

**CLAIM EIGHTEEN: Deprivation of Right to Equal Access and Discrimination in Accommodation.**

**SPECIFIC INSTANCES**

362.   From Plaintiff's inception into the WDOC on 2/6/08 until June of 2010, Plaintiff has frequently been required to sleep on a top bunk at the various WDOC facilities regardless of the fact he continually advised officials that he is disabled and unable to negotiate the upper bunk.

363.   Plaintiff fell into and suffered deep depression the entire time because of officials' obdurate refusal to accommodate his physical disabilities, their slander and administrative sanctions. (Write-ups, removal of goodtime, etc.)

364.   At WSP, there is no easy or proper access for climbing up to and down from the upper bunk. There is only one small step attached to the wall about 6"x 4" and about 36 inches from the floor. There is no handrail or any other assistive device for inmates, healthy or disabled to climb up onto the top bunk even if Plaintiff could grasp it with his injured hands. It was painful and dangerous every time to get into or out of bed.

365.   Plaintiff had many face-to-face conversations with staff requesting that he be assigned to a lower bunk because he feared falling due to his disabilities.

366.   Plaintiff submitted communication forms to officials at WSP on 8/21/08, 8/24/08, 12/3/08, 12/8/08, 12/12/08, 12/29/08, 12/30/08, 2/4/09, 6/21/09, 7/6/09, 8/2/09, 8/24/09, and also at WHCC on 11/13/09 and 11/30/09 informing them of Plaintiff's impairments. In addition, a communication was sent to Dr. Coyle on 5/19/10, reminding him that Plaintiff had been to the E.R. already for falling off the top bunk. All were disregarded and the requests for low bunk accommodation were denied, putting Plaintiff in danger of

future harm.

367.    Plaintiff filed an "EMERGENCY" grievance on 6/21/09, telling officials that he was at "immediate risk of injury by falling off the top bunk & need to be moved…" The grievance was marked "Non- Emergent" and rejected for failing to attempt to resolve at the lowest level.

368.    In answer to Plaintiff's requests to medical, they responded that it is up to the unit Manager; Unit Management said to write medical and back & forth, and back & forth with no results for two years. Neither Dr. Coyle, housing managers, nor any of the defendants could care less beyond a general list from the Oregon Department of Corrections stating arbitrary requirements for bottom bunk order that did not consider inmates with disabilities.

369.    Plaintiff filed a similar grievance on 7/8/09. Acting Warden Eddie Wilson answered on appeal, "Your situation is not unlike many other inmates in similar situations; however, at this time osteoarthritis does not qualify one for a bottom bunk restriction…." Plaintiff could not climb upon the bunk due to severe pain.

370.    In answer to Plaintiff's final grievance appeal to the Director Lampert, he reaffirmed Eddie Wilson's denial stating, "The department relies on the experience, expertise and training of the contracted medical providers to make medically sound decisions…" Mr. Lampert further backs Dr Coyle's assessment that Plaintiff does not meet established criteria for a bottom bunk order. Plaintiff's disabilities were given no case-by-case consideration as required by the ADA.

371.    Plaintiff attempted to utilize the ADA grievance process as per WDOC Policy and Procedure 1.30 and "Attachments A and B". However, the attachments referred to in the policy were missing from the information provided to inmates.

372.    Plaintiff wrote to the Grievance Officer (Pam Nichols) requesting an ADA Grievance Form per attachments A&B. The grievance officer wrote back and said, "I don't know what you're talking about." She would give Plaintiff no further guidance.

373.    Because his ability to grasp was impaired, Plaintiff was forced to leap from the table in

76

his cell hoping to land on the top bunk, or visa-versa. He pleaded for accommodation time and again, telling medical and prison management that he was in a dangerous situation, could not climb up or down on the top bunk, only to be denied an order for a bottom bunk or provided a means of access to the upper bunk. Thus, defendants demonstrated discriminatory animus toward Plaintiff's disabilities in continuing to deny accommodation and in the use of "established criteria" which tended to screen out many individuals with disabilities.

374. On August 22, 2009, Plaintiff being weak from untreated pneumonia, was fired from work and intentionally assigned to an upper bunk while the lower bunk was vacant, Plaintiff fell off the top bunk while attempting to get down for brunch and was taken unconscious by ambulance to the emergency room at Carbon County Memorial Hospital. Plaintiff's chronic pain has been much worse since the fall, and he suffers mentally from the abuse of those charged by law to provide for his safety.

375. On 6/23/10, Plaintiff sent form #320 to Assistant Warden Pacheco at WMCI asking for a meeting, telling him that although Plaintiff doesn't meet any one of the requirements on the list for a bottom bunk alone, his disabilities, taken together, necessitate having the order. That same day, Plaintiff also filed another grievance on the issue. It was resolved, "medical advised that you have been designated bottom bunk/bottom tier."

## CLAIM NINTEEN: Deprivation of Right to Accommodation in Prison Work Assignments.
### SPECIFIC INSTANCE

376. Plaintiff's wrists were severely injured by handcuffs on September 17, 2007 by deputies at the Natrona County Jail when the handcuff key became stuck in the handcuffs and could not be removed. The deputies used bolt cutters to cut them off, injuring the tendons of Plaintiff's wrists and rendering both wrists permanently disabled as prison medical refused proper care for them.

377. Plaintiff's wrists and thumb joints are constantly painful, he has difficulty writing without pain, lifting heavy things, or grasping. Doctor Johnson prescribed Plaintiff wrist braces

and regular cortisone injections in both wrist/thumb joints to improve mobility and reduce pain. Plaintiff continued to receive cortisone treatments periodically.

378.   Plaintiff's prison job at WSP in 2010 was, in part, to take two ten gallon water coolers down the kitchen twice per day to be filled with ice and brought back to the unit. As Plaintiff's wrists could not tolerate lifting the weight of the two full coolers, and he had an order for "no lifting over 10 lbs.", he had been using a utility cart assigned to the pod to accomplish the task. However, sometime in February 2010 an unknown officer removed the utility cart from the pod, which made the job of *carrying* the heavy jugs impossible because of Plaintiff's disabilities.

379.   Plaintiff could no longer accomplish his pod job. Although other inmates would sometimes take the jugs to be filled, Plaintiff was harassed by the others making him feel inadequate, alienated and humiliated.

380.   Plaintiff asked verbally and via communication forms and health service requests for officers to locate the cart and return it to the unit, and/or a medical order for accommodation for one, but his requests went unheeded, medical never responded at all.

381.   Plaintiff finally filed a *regular* institutional grievance on 2/17/10, stating clearly that he was handicapped, pleading that he get the cart back, and that carrying the jugs caused pain and that he need the cart to accomplish his job. This first grievance was rejected by grievance officer Vicki Smith as "Frivolous/ without merit", "A cart is not necessary for your job."

382.   On 3/11/10, Plaintiff filed yet another grievance clearly stating he required a cart to do his job due to his disability. It too was rejected as, "Frivolous/without merit." Vicki Smith stated that medical had not given any direction that Plaintiff needed accommodation. The need for accommodation was obvious to even a non-professional.

383.   Plaintiff requested information from the Law Library on how to file an ADA grievance according to **WDOC Policy and Procedure; AR 1-301** - <u>Attachment A&B</u>, but the librarian responded, "While they are referenced, the L.L. (law library) does not have access to them."

78

**CLAIM TWENTY:** <u>Deprivation of Right to Equal Access to Programs, Refusal to Accommodate Disabilities</u>.

<u>SPECIFIC INSTANCE</u>

384.   Judge Skavdahl sentenced Plaintiff to 21/2 to 5 years in prison with a "*recommendation*" for "ITU or *similar program*". At that time, Plaintiff did not know exactly what was involved or how strenuous the ITU or CRC/TC programs were.

385.   Arriving at the prison, Plaintiff discovered that the ITU and CRC/TC are *intensive inpatient* treatment programs. Plaintiff expressed concern to his Caseworker(s), that he might have problems with the residential treatment program because of his disabilities. Plaintiff explained for example: If he were unable to complete an assignment for not being able to complete a written assignment due to inability to write without pain, late for a morning group because of chronic pain, or needed to lie down during the day because Tramadol makes him very tired, he would be sanctioned and extra duty assigned. That in turn would perhaps lead to Plaintiff not being able to complete that extra duty and then assigned yet more sanctions and duties that he might not be able to complete either, and so on. That in turn would lead to harsher sanctions and so forth until Plaintiff gave up, became a target for hazing by other inmates, or staff expelled him for failure to program. This is precisely what happened at CRC/TC in Casper.

386.   Plaintiff has great difficulty resting his head or neck while sleeping due to the pain from DDD, he needs frequent rest periods where he must lie down to take the pressure off his spine, especially because he was denied adequate pain medication. It is against the rules of the TC and ITU to lie down and rest during programming hours and at least one other inmate, Mr. Clark, was expelled for doing so. No accommodation would be made for Plaintiff's disabilities as staff refused to acknowledge them and comply with the ADA.

387.   Plaintiff receives Social Security because he is unable to work due to his disabilities, but Plaintiff was sentenced to work at *hard labor*, as are all inmates. Plaintiff's "Pod Janitor" job consisted of light duty. However, "*Intensive Treatment*" is very analogous to work

79

outside of the prison context, is physically and mentally strenuous and is a major life's activity from which there is no respite.

388. Plaintiff was entitled to and otherwise qualified to receive the *benefit* of treatment that is a service of the WDOC and that the court recommended. Defendants had an obligation to make modifications to rules, policies, or practices that allowed Plaintiff reasonable accommodation to receive that *benefit* equally with any other inmate similarly situated.

389. Likewise, the Parole Board had a legal obligation to recognize that accommodation had been denied, making it impossible for plaintiff to fulfill their condition to receive early release on parole. If not for the Boards refusal to acknowledge federal disability laws, Plaintiff should have received early release as he otherwise met all eligibility criteria to receive the state created liberty interest in parole and retention of earned good time.

390. Plaintiff asked that accommodation be made and that he be allowed to fulfill the treatment obligation by completing the TACT program, [Treatment of Addiction and Criminal Thinking], which Plaintiff had applied to and been accepted to twice. Pam Nichols and Francis Foster refused Plaintiff's request, however, and sent him to the CRC/TC on March 6, 2009.

391. One can receive comparable benefits of substance abuse treatment in the less stressful and physically demanding TACT and IOP program. The therapeutic community environment is basically 24-7 and the TACT or Out Patient program offers some time to rest which is often needed by plaintiff to deal with debilitating Chronic Pain.

392. At CRC/TC in mid May, Plaintiff asked head nurse in charge of medical, Larissa Brinkerhoff, for help with trouble he was having because the anti-seizure medication Dr. Deis prescribed for pain made it difficult to think straight and concentrate and Plaintiff was making small mistakes and receiving many sanctions.

393. Nurse Brinkerhoff related to Plaintiff, that she told WDOC/TC Contract Monitor, John Ordiway that she was aware of Plaintiff's health issues and that, "You shouldn't come here because I knew we'd have problems with your health and you wouldn't be able to do the program." Nurse Brinkerhoff told Plaintiff, "They said they didn't care." Sam

Borbely as the Treatment Program Manager for WDOC, Ordiway should have advised him of this and, as these decisions are required by the ADA to be made on an individual case-by-case basis, he should have intervened to accommodate Plaintiff's disabilities.

394. Plaintiff requested that Nurse Brinkerhoff schedule a meeting between Plaintiff, Ordiway and her to answer why this was so and see if something could be worked out. Nurse Brinkerhoff notified Plaintiff that she had scheduled the meeting for the following Thursday Instead of the meeting, Plaintiff was locked in the hole the prior Wednesday and sent back to prison on May 29.

395. Plaintiff wrote to the Parole Board about having chronic and constant pain and his concern for what not being able to handle the TC/ITU programs would do to his opportunity for parole. Executive Director Patrick Anderson replied in a letter dated July 6, 2009, "I can't imagine what it is like to be in constant pain. In a situation like yours, the Board would expect that you *pursue* whatever institutional substance abuse programming may be available, TACT, NA/AA, doing so would be looked at favorably by the Board at your next parole hearing."

396. Thus, Executive Director Anderson, as speaker for the Board of Parole, offered a reasonable accommodation to the plaintiff for his disabilities in accordance with disability statues. Regatdless, WDOC staff denied accommodation to modify rules, policies and procedures and the Parole Board took away all Plaintiff's earned goodtime and forced him remain longer in prison. Plaintiff had a liberty interest in retaining the good time he had already earned.

397. Plaintiff did indeed "*pursue* [alternate] institutional substance abuse programming, applied for the TACT Program, and received a letter dated July 8, 2009 from Christa M. Maddock at WSP verifying that he had again been added to the waiting list. Plaintiff attended AA/NA as Anderson suggested and received a certificate of attendance from Officer Denise Neu. However, Caseworker Pam Nichols and WDOC officials would not make accommodation and enter Plaintiff into the TACT program.

398. Plaintiff continued to write to the Parole Board asking for their intervention and

assistance, but got none. Plaintiff went forward as best as he could, in an effort to demonstrate to the Board his desire to comply with the treatment recommendation of the court and participated in and completed all other required groups.

399.  Prior to being transferred to WMCI in 2010, Pam Nichols, Randy Baunach, John Coyle and other officials at WSP conducted a Multi-Disciplinary Team (MDT) meeting regarding Plaintiff's request for accommodation that they referred to as a 504 meeting.

400.  On 5/9/10, Plaintiff sent a #320 asking, what exactly *is* a "504"? C.W. Nichols with Unit Manager Joe Tiffany explained that the 504 meeting was to address Plaintiff's disabilities… to assist in being successful with treatment… a scribe, a computer …to complete assignments.

401.  At WMCI, Plaintiff was approached by Caseworkers Shawn Sitzman, Rob Branham and others who threatened further disciplinary action unless he agreed to attend the ITU.

402.  Plaintiff strongly argued again that his disabilities would interfere with his being successful in the ITU program. He again requested modification in policy to attend Intensive Outpatient Program (IOP), but still officials were indignant telling Plaintiff that there was no record of him being disabled and that he had to have diagnosis from the doctor in order to be considered as such. Plaintiff again tried to explain that there *is* a diagnosis of disability in his medical records but his statements were disregarded as false contentions. *Plaintiff's records were missing!*

403.  Although there were indeed computers in the ITU unit, there was no printer for inmate use to print out assignments, and Plaintiff's requests for a printer were given only cursory attention with no provision ever being made.

404.  Despite great difficulty in the *intensive* programs, attending all of the groups, physical exercises and sanctions, manual writing assignments and the "No lying down during the day" rule, Plaintiff demonstrated his willingness to participate in groups. He attempted participation in both programs, completed every assignment asked of him until the time of dismissal and was signed off as having done so by the various staff facilitators in and outside of the, Intensive Treatment programs.

405.   The ITU at WMCI was new, and as a result, staff had great difficulty getting a viable treatment program started. Thus, the program was restructured four separate times, with three different directors: James Jensen, Mike Rothwell and Mr. Jimenez, while Plaintiff was there and consequently, Plaintiff was forced to begin the program over from the start each time, making it seem futile, confusing and stressful, causing Plaintiff great anxiety.

406.   Plaintiff expressed concern to staff that there was no actual treatment in the ITU and that and his disabilities generally caused him difficulty keeping up. Plaintiff experienced extreme harassment and bullying from other inmates, (destroying his workbooks, calling Plaintiff *"TURD"* and other filthy names.) This caused Plaintiff great emotional distress, feeling as if he was caught in a loop of insanity, he fell into depression with feelings of alienation and displacency.

407.   Plaintiff had had enough. He was unable to get staff to look at the situation due to rules commanding the use of a communications "chain of command" thru the very same inmates to get to a message to staff. Plaintiff said in his *confidential* group one day that he didn't deserve being disrespected and called "turd" and said, "I just want us all to get along, but this *turd* would take your fucking head off and hand it to you." Mr. Stringer, who said that it was safe to express anything at all while in that group, dismissed Plaintiff from the program for threats and charged him with a conduct violation, dismissing him from the ITU.

408.   Plaintiff's disciplinary write-ups, virtually all of them, were proximately caused by medical and ministerial neglect and indifference to Plaintiff's disabilities as alleged elsewhere in this complaint. At Plaintiff's parole hearing in March of 2011, the board again denied the restoration of his earned goodtime.

409.   On January 10, 2012, Plaintiff went before the Parole Board for the final time hoping that the board would restore even as little as 150 days good time and simply allow Plaintiff to simply be finished with his debt to society and the abuse he had suffered.

410.   Despite the fact that Plaintiff had completed every group required of him and more, including most of the ITU groups, and was given a very good review from Case Worker

Davidson, the Board refused to grant Plaintiff release citing "insufficient effort and progress toward rehabilitation." This was based on a recommendation of "No Action" by the *facility* simply out of retaliation and failure to accommodate his disabilities.

411. If not for the Boards' failure to recognize that lawful accommodation had not been not granted, Plaintiff would have earned the benefit of parole, avoided further injury to his Constitutional rights and pain and suffering from lack of proper and adequate medical care.

412. Plaintiff told the 2012 Board members that he was previously offered the accommodation the TACT program by Executive Director Anderson, was accepted twice, but was never allowed that accommodation by prison officials. The board members did not seem to care or grasp the gravity of their decision that in denying Plaintiff an accommodation for his disability violated federal law. This further demonstrated the WDOC, R.O. Lampert and Attorney Dan Fetsco's failure to train these individuals in their legal obligations. The WDOC receives federal financial assistance for Re-entry services.

**CLAIM TWENTYONE:** <u>Deprivation of Reasonable Accommodation and Discrimination in Equal Access to Services.</u>
<u>SPECIFIC INSTANCE</u>

413. During his time at WMCI, Plaintiff spent much time in the Law Library doing research because there were no computers in pod B1 where he was housed. The computers in the Law Library, however, were designated for legal use only. \

414. Plaintiff has a documented impairment, diagnosed by Dr. Johnson as DeQuervain Tenosynovitis in both wrists. It significantly interferes with his ability to write manually without significant pain, because the pressure of holding the pen causes pain in the extensor and abductor tendons of the thumb and wrist.

415. Plaintiff met with Education Supervisor Konne Rife in February of 2011 and asked for an accommodation in this *service* to write a personal letter to his son, institutional papers, such as group assignments and grievances, etc. on the law library computers.

416. Ms. Rife denied the request after asking if Plaintiff had a "*specific statement and order* from the doctor of a 'disability' relating to his wrists." Rife told Plaintiff that he must have a specific statement and diagnoses of "Disability" from medical before being considered as having a disability. To the best of Plaintiff's knowledge, one had ever deemed it necessary to make a specific entry in Plaintiff's medical record stating that DeQuervain disease is a "disability" as it relates to the Plaintiff.

417. Ms. Rife claimed extensive knowledge and interest in disability rights. However, while she might have an interest, it was evident that she was quite ignorant of the actual application of the ADA. In fact, she was obviously altogether ignorant of the ADAA. Plaintiff advised that she could look up the statutes for herself, as they are available to everyone on the computer network.

418. On April 7, 2011, Plaintiff sent a communication to his caseworker Amber Davison requesting accommodation to allow him to write personal letters to his son on the computers in the Law Library. These are the only computers available for medium custody inmates in pods D1, 2 and 3 and documents can only be printed in the law library. However, similarly situated minimum and minimum restricted custody inmates in are allowed to print personal documents in the law library from computers located in their units. Ms. Davison responded that a Multi-Disciplinary Team (MDT) meeting would soon be held with education and medical to discuss the matter.

419. On April 12, 2011, the MDT meeting was held with Plaintiff and defendants Jeff Shahan, Neicole Molden, Marlena Miller, Heather Berglund, Amber Davison, Barbara Tuttle, Gabriel Ramirez, Drew Romero, and unknown others. CTL Berglund said, "We're here to discuss your request for permission to write letters on the computer. Plaintiff explained what his impairment is and how he came to be disabled. Plaintiff explained that it's very painful to try to write legibly or for any length of time. Plaintiff offered to pay for any copies of personal letters he wrote, but requested to print institutional documents that may be required of him at no charge.

420. Caseworker Davison said, "I don't have any trouble reading your communications so,

you're not disabled." HSA Jeff Shahan, while looking through Plaintiff's medical chart, responded, "You're not disabled." Plaintiff countered, I'm prescribed to wear braces and receive regular injections of cortisone in the joints of both wrists for pain." Shahan retorted, "Just because you get injections in your wrists doesn't mean you're disabled."

421.   It suddenly dawned on Plaintiff that some officials out of the 15 or so present that are required by policy to be part of an MDT, were conspicuously missing; Education Supervisor Rife, anyone from Mental Health, and the Doctor himself.

422.   Plaintiff asked Mr. Shahan if he is a medical doctor. He replied, "No, but I have the doctor's notes right here and it doesn't say you're disabled." Up until this point, there had been no real reason to specifically indicate the word "disabled" in the record as the medical evidence alone points to that actuality.

423.   Plaintiff took their statement as a denial of his request for accommodation and got up to leave. He asked, "Is that all this meeting was about?" They all nodded yes, and Plaintiff quietly left the room accompanied by Sergeant Ramirez.

424.   Plaintiff did not know or remember the names of all who were present at the MDT, but thought he might need to know. Plaintiff sent a communication to C.W. Amber Davison and asked her to give him the full names and tittles of all the officials who attended the MDT meeting. Barbara Tuttle, however, returned the form marked, "Request denied." Officials, including Unit Manager Branham refused to tell Plaintiff the names of these people who erroneously determined that Plaintiff is not disabled and denied accommodation for this significant impairment.

425.   Writing legibly and without pain is of central importance to Plaintiff's daily life activities and affects virtually every aspect of prison life. *i.e.* communicating with staff, ordering from canteen, completing laundry requests, haircut requests, money transfers, workbook assignments, grievances, etc., and maintaining correspondence with family and attorneys.

426.   Several weeks later, Plaintiff read a memo to inmate David Glover #26145 from Warden Murphy dated 5/27/11 saying, "Mr. Glover, you are permitted to know who is sitting in on your MDT and what their job titles are…" There was a cc: to C.W. Supervisor

Branham.

427.   Plaintiff has only been able to send generic cards with his signature scribbled on them to his son during the period alleged. This caused extreme depression and anxiety for Plaintiff and worry that his only son might think he didn't care enough to write a letter.

428.   On April 18, at a visit with Doctor Snyder, he told Plaintiff, "I never said that you're not disabled in my notes, and I have no problem with your request."

429.   Plaintiff requested to be given the determination of the MDT team in writing. He received an answer from the medical department that read, "The MDT team determined that no accommodation is indicated at this time."

430.   In May of 2011, Plaintiff wrote to the medical department and asked, "Does PHS consider Robert O. Marshall a disabled person?" Plaintiff received the answer, "Having a disability is not synonymous with being disabled. - Good question."

431.   In reviewing the grievance and appeal, Warden Murphy decided to, "go with the doctor's decision" and deny Plaintiff's grievance, violating his disability rights under the ADA.

432.   As Plaintiff had now been to both the Honor Farm and the Forestry Camp, he knew first hand that there was no disability access to the chapel at either facility. Warden Hargett had altered the facilities at WHCC in 2010, moving the chapel from a ground floor building that was handicapped accessible to an area above the maintenance shop where the only access was via tall fire escape stairs. Plaintiff has a lower tier order

433.   Access to the chapel is mandatory, at least at WHCC for orientation meetings. In addition, access to chapel is of major importance to Plaintiff's religious beliefs. Plaintiff therefore sent a communication to Housing Manager Barbara Tuttle requesting that he not be sent to either facility again.

434.   Plaintiff was soon to reclassify again to minimum custody. He would have liked, along with everyone else, to progress to a minimum custody environment with more freedom of movement, etc. Defendants discriminated against Plaintiff as a class of one in their intentional non-compliance with ADA and Wyoming statutory standards in facilities access and violated his right to freedom of religious exercise, equal protection, and

disability rights.

435.   In response to Plaintiff's inquiries to both WHCC and WHF in May 2012, officials wrote that they were not yet in compliance with ADA accessibility standards.

**CLAIM TWENTYTWO:** <u>**Retaliation for Exercising First Amendment Right to Petition the Government for Redress in ADA and Section 504 Grievance.**</u>

436.   On May 26, 2011, Plaintiff filed an institutional grievance alleging that the officials had violated Plaintiff's rights under the ADA, and have continually done so since 2/6/08. Plaintiff typed a separate attachment explaining that defendants had abused their discretion in denying his request for accommodation.

437.   On May 6, 2011, Grievance Manager Scott Leever answered that he had referred the matter to the Unit Manager, Neicole Molden. Ms. Molden answered, "Inmate would need medical to determine he has some sort of disability. At this current time, medical reports no disability and… needs no special accommodation. There is no display of violations of ADA for these special accommodations."

438.   In addition, Mr. Leever wrote, "I also spoke with Mr. Shahan. He informed me that there is no record of a disability for your hands and will not approve for these special accommodations." Plaintiff's grievance was denied.

439.   On 6/7/11, Plaintiff appealed the decision to the warden in accordance with policy. However, a response to the appeal was not done within the time allowed. Plaintiff, therefore, appealed to the Director, WDOC.

440.   On Wednesday May 13, Acting Grievance Manager, Erick Wiltanger, met Plaintiff in the hallway and explained that the answer was "on the warden's desk" and that he had not forwarded the appeal to the director as per policy. He asked if Plaintiff would agree to wait for the warden to answer. Plaintiff agreed.

441.   On May 14, Erick Wiltanger and Jeff Shahan both came to Plaintiff's cell and said that they had scheduled an appointment with Regional Health Services Director, Kurt Samuel Johnson, M.D., to evaluate Plaintiff before an answer to Plaintiff's grievance appeal would be written.

442.   At this encounter, Shahan again told Plaintiff that there was no documentation concerning him having a disability. Plaintiff pointed out that there were in fact two forms of documentation attached to the grievance that clearly showed Plaintiff had been approved for accommodation in the past. One was a copy of the Form #320 explaining that the MDT/504 meeting consisting of John Coyle, MD, Pam Nicholls, Randy Baunach, and Dr. Woods, *et al.* at WSP in 2010 was to arrange accommodation to write his programming group assignments on a computer when they demanded Plaintiff participate in the ITU at WMCI.

443.   When it was convenient for the defendants, they were amenable to accommodating plaintiff's disabilities. When it did not suit their agenda defendants denied accommodation, retaliated, and discriminated against him.

444.   Attached to the grievance was also a "STATE OF WYOMING DUTY/SPECIAL NEEDS ORDER written by Tammy Howell, LPN per Dr. Snyder on April 06, 2011 (six days prior to the MDT meeting) clearly stating, among other accommodations, "Keyboard posture technology for writing." This Special Needs Order was pursuant to Plaintiff's request for documentation for such accommodations that were approved by Doctor Snyder on 4/5/11.

445.   Therefore, indeed a record was or should have been in the medical records that Plaintiff has an impairment that substantially limits his ability to write without significant pain as well as other manual dexterity related tasks. Prison officials considered Plaintiff disabled in his wrists finding he required accommodation in light duty work assignments and writing assignments in the ITU, thus meeting the definition of disability of the ADA and Amendments Act of 2008. Mr. Shahan became very irate, yelling, "That's not valid, that's no good!" The document had been authorized and ordered by Dr. Snyder April 05, 2011.

446.   The next day, Mr. Wiltanger returned and said that the warden was now "on board" with Plaintiff's request, but was waiting to see what Doctor Johnson said. Mr. Wiltanger said, "I want to apologize for yesterday on behalf of DOC, but I won't apologize for medical."

Plaintiff accepted his apology and shook Mr. Wiltanger's hand. Mr. Wiltanger asked Plaintiff if he would agree to a further extension of time and Plaintiff agreed.

447.   On this same day, Plaintiff received notice that he was required to attend "Victim's Impact" group and given a 91-page workbook, Victim's Impact: Listen and Learn, containing exercises that he would be required to fill out by hand. Plaintiff argued that he had already taken Victim's Awareness while in the ITU and that he could not manually answer the questions. Unit Manager Molden along with Caseworkers Judd and Davison ordered that Plaintiff to attend this group regardless or face punishment.

448.   Plaintiff wrote to the Caseworkers and said that without proper medical care, he might have difficulty completing the written assignments or attending some groups, Ms. Judd replied that if he missed a group, "something will have to happen to you."

449.   On May 19, 2011 at 13:00, the pod officer told Plaintiff to get to medical right away, and Plaintiff complied. However, Plaintiff waited two hours and 45 minuets to see Doctor Johnson. The visit was hurried and lasted only 15 minuets because count time was at 16:00. Plaintiff had accumulated several issues to discuss that he had submitted HSRs about over the prior three months that were simply ignored.

450.   At the visit with Dr. Johnson, Plaintiff was strongly reminded of the time constraint now limited by the 16:00 count fast approaching. Plaintiff told Johnson of the disabilities accommodation issue. To the issue of accommodation for disabilities Johnson said, "I'm not going to do DOC's job." Plaintiff said, "That is the problem I continually run into. DOC tells me that it's medical's responsibility, and medical tells me that it's DOC's decision." As was with the issue of the order for a bottom bunk, neither entity would take responsibility for assuring proper accommodations were made, and shifted the responsibility back and forth with no one being accountable to the ADA and CFR rules.

451.   While looking at his chart, Dr. Johnson remarked, "Your blood pressure's good." Plaintiff told Dr. Johnson, "I'm in pain, and I need help." Johnson responded, "You don't look like you're in pain." Plaintiff told Johnson that there is no objective component to pain. To which he responded, "Yes there is, high blood pressure." Plaintiff was taking

three blood pressure medications that lowered his blood pressure. Medical providers often told Plaintiff to try and just act up beat in lieu of prescribing adequate pain medication.

452.    There are often predators in the prison environment. If they perceive you as having a weakness, often they will accost you. Plaintiff learned to adapt and modify his behavior and outward persona to mask any apparent weakness, from pain and his impairments the best that he could by smiling, joking, laughing, etc. This led defendants to infer that Plaintiff must not be in pain.

453.    On the subject of not receiving Baclofen for pain, Plaintiff told Dr. Johnson that he had waited for weeks for the Baclophen order to be straightened out and finally filed a grievance. Plaintiff asked if he could have even a milder narcotic, Tylenol #3 for instance. Johnson replied, "Tylenol #3 is too strong for your condition." (Plaintiff's civilian records clearly demonstrate the need for stronger narcotic medications). Johnson presented an attitude of deliberate indifference to his patient's documented severe pain.

454.    Dr. Johnson added, "Baclophen is not medically indicated for your condition. I'll let that expire" Prison doctors, Ted Church, Dr. Snyder and Physician's Assistant Sue Martin all had prescribed Baclophen for Plaintiff's condition.

455.    Baclophen is non-formulary, and requires approval from the Regional Health Services Director when prescribed. Dr. Johnson himself *was* the Regional Health Services Director and approved Baclophen for plaintiff's condition in the first place, and every subsequent order thereafter. Now, immediately after Plaintiff filed an ADA grievance, he and Jeff Shahan suddenly decided, "it is not medically indicated." This led Plaintiff to inquire, "Where's Doctor Snyder, the current doctor?" Doctor Johnson and his assistant seemed to freeze. Several seconds passed and Johnson said, "I'm the doctor today." (*Dr. Snyder had quit*).

456.    Other than performing a prostate examination, Dr. Johnson performed no other examination of Plaintiff's neck, wrists or lungs or any physical examination whatsoever before discontinuing medication and determining further treatment is "Not medically

indicated."

457.   Dr. Johnson himself initially prescribed Tylenol and Ibuprofen as Keep On Person medications to supplement prescription drugs for Plaintiff's pain issues. New inmate pay reforms had made it very difficult for Plaintiff to pay for those medications from the canteen as was now required by Corizon, and Dr. Johnson now refused to renew the KOP order. This was also frustrating and in turn caused mental distress as well.

458.   An HSR answered on 5/27/11 by Nurse D. Courtney concerning Plaintiff's request for injections in his wrists said, "You will be notified when to come to medical regarding... injections."

459.   After Plaintiff filed the ADA grievance, and the visit of July 19, Dr. Johnson denied Plaintiffs written requests for further treatment for Cortisone injections in his wrists, which Johnson himself first initiated in 2008. He also denied the medial nerve block for pain due to his Cervical Disk Disease that was recommended by Dr. Noratsky in 2006, and shown in Plaintiff's records. After Plaintiff filed the ADA grievance on 8/10/11, and subsequent doctor's visit, Johnson wrote that these necessary procedures for the alleviation of severe pain were suddenly somehow "not medically indicated."

460.   In September of 2011, Plaintiff asked for a copy of the record of the visit of July 19. The diagnosis by Dr. Johnson in the record simply states "GERD". he failed to indicate anything under the category **"Concerns/Questions, Problem."** None of Plaintiff's expressed concerns were documented.

461.   Plaintiff asked via HSR to be scheduled for surgery because the pain in his neck was so bad. C. Holtzman responded, "There is no indication for surgery at this time." Surgery had been recommended by Dr. Noratsky.

462.   Continued requests to the dentist to complete the surgery on the left side gums, as well as a damaged crown, that Dr. Byrd also said needed fixed went ignored after filing the ADA grievance. Not until November 12, 2012, despite many requests, the remaining dental surgery has not been done. Plaintiff's mouth is very painful and swollen.

463.   After the MDT meeting in 5/12/11, Plaintiff sent an HSR asking to see mental health, and

he requested another visit on 9/11/11. Plaintiff's Health Service Requests went unanswered. Plaintiff had never before been denied a visit with a mental health professional until he filed the ADA grievance.

464. On 5/5/2011, Plaintiff sent a Health Service Request to Corizon advising that if he could not get adequate treatment for relief of pain in his neck and wrists, it might interfere with his ability to work, program, etc. Kristine Liggett, RN answered, "Your chronic pain issues are being addressed through your chronic care medications. You will not be given a lay-in for these issues (Plaintiff never asked for a lay-in). You are expected to program as per your DOC obligations."

465. On 7/1/11, Plaintiff spoke with Inmate Cory Brainerd #25236. He said that he had been approved for "shots in his neck" for vertebrae problems and pain. It became evident that Plaintiff was being further discriminated against in medical services also.

466. On 8/8/11, Plaintiff received an answer to the final appeal in his grievance for denial of accommodation. WDOC Assistant Director Steve Lindley answered, "Inmates have access to computers to prepare personal letters and other general correspondence within their housing units. "You maintain that your wrists have been injured therefore this is a reasonable request." (*Note: Other than the Law Library, the only computers for inmate use were located in the ITU, Pods D-4 & 5, and general population pods D-6 & 7. There were NO computers in Plaintiff's housing unit, Pod D-1 at the time.*) Assistant Director Lindley (WDOC) deemed the accommodation reasonable, apparently until it came to making modification in rules or practices as required by federal law.

467. Mr. Lindley Further states contradicting himself, "Medical has not Notified the WDOC that you are disabled or that you require any accommodation. In fact, they deny that you are disabled or in need of an accommodation. I agree with their assessment."

468. On 8/16/11, Plaintiff made a request to Medical for "permission/order for an extra blanket to use as a neck support pillow…, or a therapeutic pillow" in an effort to find some relief from cervical pain. As usual, Plaintiff was told to contact DOC. On 8/19/11, Plaintiff sent a similar request to the Unit Manager who responded, "Medical needs to

CIVIL Rights Complaint

inform us that you need an extra blanket for this issue. As far as the pillow if medical says you need it, they must provide it for you." On 8/23 /11, Plaintiff restated his request to medical who responded, "Mr. Marshall, refer to the [previous HSR], extra blankets and pillows are DOC issues. Please contact them." This is the same passing the buck, as in response to Plaintiff's request for a low bunk accommodation, and officials simply refused to accommodate any of plaintiff's disabilities.

469. In addition, deliberate indifference to serious dental care (see claim thirteen) occurred after plaintiff filed this grievance also. After still more HSRs to Dental, plaintiff was not seen until 13 months after it was recommended by the dentist, Dr. Byrd.

470. Further, Plaintiff made two HSR requests for Mental Health consultation on 7/17/11 and 9/11/11 both after filing the ADA/RA grievance were likewise ignored for weeks until Mr. Hill finally came to see Plaintiff and apologized that the HSRs for mental health consultation had *somehow* been misplaced.

471. All subsequent HSR requests for medical treatment regarding plaintiff's wrists and/or neck were denied. However, on 9/28/1 Plaintiff received a print out of suggestions for isometric "neck strain exercises" from *someone* in medical. Plaintiff replied with thanks for the effort, but that he simply could not perform the exercises due to pain in the cervical vertebrae. It is too painful to put that kind of pressure on the neck.

472. On October 16, 2011 Plaintiff sent a communication form #320 to medical asking for "something" to show officers explaining that he cannot eat as quickly as other inmates, on occasion, because of his impaired ability to swallow, and that sometimes he gets hassled for being last to finish.

473. On October 17, HSA Jeff Shahan showed and discussed with Lt. Spence the HSRs – medical and mental health.  Lt. Spence called Plaintiff over and taunted, "your grievance didn't fly. You wanted 30 minuets to eat instead of 20 and you're not going to get it." Plaintiff explained that he never filed a grievance or asked for any extra time, but only something to show officers if questioned about the difficulty he has finishing on time. Plaintiff felt violated that his mental health request was discussed with the officer.

474.   As to the #320 Communication Jeff Shahan answered, "I have discussed this with security staff and your medical provider. Currently you are provided with 20 minuets to eat your meals. This time is appropriate even with your medical condition. Please use this time wisely!"

475.   Plaintiff was left feeling very anxious and depressed and sent an HSR to Mental Health clearly asking to see the "nurse" (counselor), explaining that he was distressed because he was often hassled by officers for being slow to finish eating.

476.   The HSR to see Mental Health was returned by HSA Shahan with the comment, "Please see HSR dated 10/16/11 [see ¶ 468] for your response." Shahan blocked Plaintiff's contact with a mental health counselor, continuing his retaliation.

477.   On October 19, Plaintiff saw Dr. Snyder and told him that his left wrist hurt badly. Contrary to Kurt Johnson and Jeff Shahan's retaliatory rejection of treatment for this issue, Dr. Snyder deemed the injections were indeed necessary and said scheduled Plaintiff to return in two weeks. Dr. Snyder called Plaintiff to medical on November 2, 2011 and administered the requested injections in his left wrist demonstrating that but for defendant's retaliatory animus, the denial of this necessary procedure and Plaintiff's subsequent suffering would not have happened.

478.   The deadline for the answer to Plaintiff's final grievance appeal for ADA retaliation to Director R.O. Lampert was soon approaching on Nov. 14, 2011. Abruptly on Oct. 27, 2011, Plaintiff received another "Duty/Special Needs Order" stating, "Discontinue wedge pillow and special function keyboard, - Per Dr. Snyder."

479.   Special needs orders are ordinarily rewritten only once per year. Medical had just issued one granting those accommodations, approving "wedge pillow" and "keyboard assistive technology." It was attached to the grievance of April of 2011. Johnson and Shahan were plainly retaliating against Plaintiff, through Dr. Snyder, who, at the visit just days before, while discussing the issue at length, mentioned nothing about any intention to discontinue Plaintiff's wedge pillow or other disability aids.

480.   On October 31, Plaintiff received the answer from Director Lampert denying his

grievance appeal. The response said in part to ask Plaintiff's caseworker for the "proper form" to request accommodation.

481. Plaintiff wrote to several staff persons asking for the "proper form." Caseworker Davidson, HSA Jeff Shahan and Law Librarian Carol Riley. Ms. Riley telephoned WDOC Policy and Planning Manager Brian Farmer in Cheyenne, who in turn said he would get back with her. Farmer never returned her call with the information, and no other official knew anything about what turned out to be a non-existent procedure or "proper form" to make a formal request for disability accommodation.

482. In R.O. Lampert's response denying Plaintiff's ADA retaliation grievance, he avoided virtually all mention of retaliation, or the failure of the WDOC to adhere to established ADA procedures.

483. *Note*: On December 26, 2011, Plaintiff was told by Nurse Morell that Dr. Snyder was no longer working at WMCI, and a new doctor would be at WMCI on January 3. Upon information and belief, Dr. Snyder was, as was Dr. Church disgruntled with Corizon for the way they required them to practice substandard medicine to save money.

484. Plaintiff submitted two more HSRs directed to Mental Health dated 11/20/11, and 11/29/11. These were never answered at all, and Plaintiff did not see a mental health provider. However, in response to Plaintiff's complaint in a Form #320 Communication to Corizon saying, "... quit blocking my access to health services," The response was, "Seen in mental health on 11/23/11 and 11/30/11; 9/28/11 Dr. Byrd responded to [inmate]." That answer was not the truth, and those records were manufactured. Plaintiff never saw anyone from Mental Health and never received anything from the Dr. Byrd on 9/28/11.

485. On November 22, 2012, Plaintiff sent yet another communication form to medical disputing the contention that he was seen by Mental Health in response to his HSRs of 11/23 and 11/30. HSA Shahan finally responded on January 9, 2012, "Mr. Marshall, it is in your chart that you were seen by Joanne Severs on these dates."

486. Except for once passing in the hallway, Plaintiff did not see Ms. Severs or otherwise

afforded an opportunity to consult with Mental Health as requested. Plaintiff felt frustration and anger.

487.    A few weeks later outside pod 7, Ms. Severs advised Plaintiff to write to Sam Borbely about the discrimination, and asked, "Can I consider this our visit?" Plaintiff acquiesced.

488.    Plaintiff sent requests to get copies of Ms. Sever's case notes for the supposed visits on 11/23 and 11/30. After a lengthy wait, the copies were delivered. One note describes, "Mr. Marshall stated that he is fed up with the other inmates…" Plaintiff has never said this to a mental health worker, and the two visits recorded on the case notes never took place.

489.    Then on January 11, 2012, Plaintiff spoke face to face with Joanne Severs in the sally port of Pod 7. Several other inmates were present, and she said, "Do you want to know the truth, Mr. Marshall? I lied on my record entries because my memory is so terrible, I can't remember who I saw."

490.    Plaintiffs sent two #320s to medical complaining of the false information, but never received and answer to either one from anyone.

491.    Visits with the doctor for chronic care are normally scheduled every three months. On 1/11/12, Plaintiff saw Dr. Johnson. Johnson asked Plaintiff, "When did you first get emphysema?" Plaintiff answered that his breathing difficulties result from collapsed lungs in 1999.

492.    Johnson left the room and returned a minute later. He told Plaintiff, "Your x-rays are normal. I'm discontinuing your inhaler." Plaintiff explained that he really needed it, especially after aspirating fluid, because of Barrett's disease. Plaintiff has viewed his chest x-rays and, in fact, they are not normal. The chest x-rays show significant scarring and slight emphysema from the double pneumothorax in 1999.

493.    The scaring decreases elasticity of Plaintiff's lungs, and he feel as if he is not getting enough oxygen. Plaintiff advised Johnson that the inhaler helps him breath on these occasions. Johnson replied, "We don't care. As long as you can put on your shirt and brush your teeth, that's all we need to do." An argument ensued and Johnson said," If you

have trouble breathing, come to medical and have a nurse check you breathing. Plaintiff told Johnson, "Sir, they won't allow me to just walk in." Johnson replied, "they do it all the time." It is a known fact that inmates can NOT just "come to medical".

494.   The next day, Plaintiff was called back to his unit from them library. Nurse Green came to the pod and told Plaintiff, "Dr. Johnson sent me down here to confiscate your inhaler."

495.   in the middle of the night on 1/22/12, Plaintiff aspirated fluid and did have trouble breathing, and, of course, he had no inhaler to dilate his lungs. At 07:30 Plaintiff attempted to go in to medical to be checked, but was disallowed entry by Officer Burleigh who advised Plaintiff, "We'll have someone get back with you soon." No one ever "got back" with Plaintiff.

496.   Ironically, Plaintiff was called again to medical on 1/27/12 for another chronic care visit. This time with the latest doctor, Dr. Wakamatsu, who, after a short exam, returned Plaintiff's inhaler and other items demonstrating that they are in fact needed and the fact that but for Johnson and Shahan's retaliation, Plaintiff's medical appliances would not have been confiscated from him in the first place, causing him to struggle to breathe.

497.   In yet another twist, on 2/10/12, Plaintiff was called to another meeting with Warden Hargett, Dr. Wakamatsu, Jeff Shahan, Nurse Kristine Liggett and Eric Wiltanger to discuss Plaintiff's recommendation from the neurosurgeon for a medial block injection in his neck to relieve pain.

498.   The Doctor and Mr. Shahan told plaintiff, "Well, you're not in pain," They said that the procedure would not be done in disregard of the recommendation. Dr. Wakamatsu said, "Doctors on the street only care about the money. They only recommend those procedures to keep you coming back and keep charging you more." Plaintiff, strenuously, alleges that it is Corizon that puts money before inmate safety.

## IN GENERAL

499.   Plaintiff is a Qualified Individual with a Disability as defined by 42 USCS § 12131(2). Plaintiff receives Supplemental Security Income for total permanently disability, and suffers from several impairments that substantially limit many major life activities:

Degenerative Disk Disease, Chronic Pain Syndrome, Gastro-esophageal Reflux Disease, Chronic Obstruction Pulmonary Disease, and DeQuervain Tenosynovitis. These impairments are diagnosed and have been treated by medical doctors; They are documented in Plaintiff's civilian and institutional medical records.

500. These painful physical impairments significantly limit plaintiff's life activities, in the following ways to include, but not merely: swallowing, reaching, lifting, sleeping, standing, twisting, daily hygiene, bending, speaking, breathing, concentrating, writing, manual dexterity and working.

501. Defendants had been provided with information that Plaintiff is disabled from the time he entered the WDOC system by Plaintiff presenting Social Security documents and copies civilian medical records that Plaintiff provided on multiple occasions, or that were obtained by PHS through release(s) of information.

502. Defendants should have accessed the medical records if it not for the fact that they had inadequately administered and misplaced Plaintiff's records demonstrating that they were deliberately indifferent by dismissing Plaintiff's complaints that "*something* is very wrong with my records." Plaintiff was forced by these circumstances strenuously and continually made defendants aware of his disabilities and need for accommodation.

503. Title II requires accommodations by public entities in all of its "services, programs, or activities." 42 U.S.C. § 12132.

504. Defendants' denial of accommodation for using a computer to write letters to his family has caused lack of contact and estrangement with his son, and has caused Plaintiff and his family to suffer emotional pain and mental suffering.

505. Defendants have a duty to check a patient's records before making medically pertinent decisions. Therefore, they knew of, or should have known of Plaintiff's serious medical needs and impairments through examination his medical records, if available, and because Plaintiff was injured and became disabled in a fall at work while imprisoned at the Wyoming Honor Farm on May 4, 2001. A workplace accident that was settled by Wyoming Workforce Services, Division of Workers' Compensation. Dr. John Coyle was

Medical Director under Correctional Medical Services (Now Corizon) at that time also.

506.   Michael Bennett, Program Manager at WHCC, on the erroneous advice of medical defendants there, denied Plaintiff's disabled wrists and assigned him a job rolling silverware that a layman would know was not medically suited to accommodate his impairment. Failure to accept work assignment is a conduct violation. Policy and Procedure #1.103 states, "...Refusal of such inmates to accept available work assignments is subject to disciplinary action and should be considered in awards of good time credits."

507.   Pam Nichols, Vicki Smith and Unit Manager Tiffany at WSP knew Plaintiff was unable to carry a heavy ice jug as per the 10 lb. lifting limit restriction in Plaintiff's medical record and the impairment to his wrists and nevertheless, denied him a cart to accomplish his job, causing pain to his wrists and animosity of other inmates toward him. Defendants rejected his grievances and concealed and obstructed his access to Disability accommodation request and Grievance Procedures.

508.   WDOC Policy #1.301 states that there is supposed to be an ADA grievance procedure in place, and to reference "Attachment A & B". Plaintiff wrote the Grievance Officer, Vicki Smith, and asked for an ADA Grievance Form and Procedure instructions as the "Attachments A and B" referred to in the policy aren't included. The grievance officer responded, "I don't know what you're talking about." Another time simply said, "It's on the computer." The information on the computer was incorrect or incomplete, and was no help to anyone.

509.   The policy read, "28 CFR 35 § 107 requires that public entities with fifty (50) or more employees adopt a grievance procedure to protect qualified individuals with disabilities from discrimination on the basis of disability in the services, programs or activities that they provide." Plaintiff asked officials, but was denied information instructing him of the ADA grievance procedure that this poster referenced.

510.   Not until January 2011, however, did Ms. Powell, mailroom worker at WMCI, post a notice: "**American with Disabilities Act** – **NOTICE**" It explains a procedure of filing a

complaint within <u>20 days</u> of the incident. This was the first time in four years even a clue as to any ADA grievance procedure was made available to inmates. However, Plaintiff found, through his own investigation, that this information is related to Title I and has no relevance to prison inmates or prisoner employment.

511.  Plaintiff, In lieu of no proper information from staff, sent a complaint by way of letter to Anne Cybulski-Sandlian, and to the Disability Rights Section of the Dep't. Of Justice in February and again in April 2011. No effective resolution was realized from either.

512.  The ADA has been law since 1990, and the WDOC has never had a policy implementing the law as applied to the people it imprisons. Despite Policy and Planning manager's assertion that a policy was forth coming, as of this writing in May 2012, the Department has no Policy bringing its facilities into compliance with the ADA or facilitating procedures regarding inmates with disabilities to request reasonable accommodation.

513.  Defendants deprived Plaintiff of equal opportunity to receive the benefit of court recommended (optional) alcohol and drug treatment by simple and reasonable accommodation in alternative, similar treatment programming, thereby excluding him from the *implied* state created *liberty* interest of "parole upon completion" based solely on the fact that Plaintiff is disabled and could not successfully participate in <u>intensive residential</u> treatment.

514.  Plaintiff, on his own accord and the recommendation of Parole Board Patrick Anderson, requested on two separate occasions the readily available alternative programming that would satisfy the *recommendation* of the sentencing court for "ITU or similar program", namely the TACT program, which would in no way fundamentally alter the program or the assessment process. WDOC officials denied the seriousness of Plaintiff's medical issues as PHS and WDOC defendants had mismanaged his institutional records.

515.  Sam Borbely, Shawn Sitzman, Rob Branham, Neicole Molden, Pam Nicholls, Randy Baunach, as well as Dr. John Coyle, Dr. Kurt Johnson, James Allen, Jeff Shahan and the other defendant officials intentionally and continually refused to recognize and accommodate Plaintiff's disabilities, demonstrating discrimination and gross deliberate

101

indifference to Plaintiff's disabilities and serious medical needs. Defendants refused to enroll him in the alternative TACT program; assign him a safe place to sleep; accommodate his impairment to writing and performing manual dexterity tasks, and denied reasonable access to medical programs, *i.e.* adequate medication for debilitating pain recommended surgery and physical therapy, rather than just *"some treatment"* for pain and medical conditions.

516. Members of the Parole Board were, or should have been, aware that Plaintiff is disabled by way of correspondence with the Board through Executive Director Patrick Anderson. Board members should have been told and recognized that Plaintiff had twice tried to comply with the instructions for accommodation from Mr. Anderson to, "[T]ake advantage of …TACT, NA/AA", but was denied this legal accommodation by WDOC staff. They should have allowed Plaintiff to retain earned goodtime and his liberty interest in early release. Plaintiff was denied timely re-entry into society solely by reason of his disability.

517. There is an implied WDOC policy by practice, and liberty interest in "parole upon completion of ITU" that discriminated against Plaintiff who could not successfully complete such a program solely by reason of his disability,.

518. Additionally, the Board expressly imparted a reasonable expectation of "Parole upon Completion of ITU" in the 2010 document denying parole. This, and threats by the defendants, motivated Plaintiff to keep trying even though his disabilities made it impossibly difficult.

519. As evidenced by its very name, the *Intensive* Treatment Unit, as structured, becomes in and of itself a "daily life's activity." Like work, Plaintiff's disabilities significantly impair his ability to successfully participate.

520. The significant issues that Plaintiff's impairments present in the intensive treatment environment are that one limitation often leads to a cascading series of problems. For example, if Plaintiff had difficulty manually writing an assignment or workbook and could not timely complete it, it could lead to sanctions such as extra duty performing

102

manual labor like cleaning the pod, etc. If Plaintiff had difficulty performing that task, it would lead to yet further sanctions. If Plaintiff still could not complete the mounting punishments, he would begin to suffer bullying and hazing by other inmates that would cause feelings of alienation, etc. This is precisely what Plaintiff suffered at CRC/TC and the ITU.

521. The Wyoming Board of Parole, itself a public entity, thereby violated Plaintiff's right to reasonable accommodation or modification to rules, policies, or practices under the ADA through Section 504 of the Rehabilitation Act. The Board members and prison officials are obligated to "give primary consideration to the request of the disabled individual as to determining what type of auxiliary aid and service is necessary."

522. Prison officials previously acknowledged and regarded Plaintiff as disabled, but disregarded the dangers of denying accommodation for his disabilities, forcing him to participate in an *intensive residential* treatment environment in deliberate indifference to Plaintiff's objections and the advice of the medical practitioner at CRC/TC in Casper.

523. The ADA prohibits prison officials from barring access to facilities to handicapped persons, and requires reasonable accommodations to provide disabled persons equal opportunity in programs and services.

524. None of the accommodations that Plaintiff requested in the preceding claims would have imposed any imaginable undue hardship on the public accommodation / entity, Corizon or the WDOC in general.

525. **WDOC Policy and Procedure #4.102, X states, "7. Special Needs Offenders.** Offenders with special needs require different assessments, accommodations, and specialized planning. The correctional case manager/agent coordinates the correctional case plan to <u>accommodate all necessary aspects of the treatment plan</u>, which is normally created by licensed professionals when available.

526. **Policy #4.102** further defines "Special Needs Offenders", **X.** Special Needs Offenders: Offenders whose mental and/or physical condition may require special accommodation by staff. Special needs offenders may include, but not be limited to offenders who are

emotionally disturbed, mentally ill, <u>physically handicapped</u>, <u>chronically ill</u>, learning disabled, drug/alcohol addicts, or who have intellectual or developmental disabilities.

527. Defendants at the MDT meeting of 5/12/11, none of whom was a licensed medical professional, made a clear abuse of discretion by their unqualified medical decision to make such determination, even if their determination was relevant to the requirement of law to provide accommodation.

528. Plaintiff was an Inmate Worker with a disability, employed in light duty by the WDOC at all of its respective facilities, and was otherwise qualified to receive the benefits of prison programs. Prison officials failed to make reasonable accommodations to the known physical limitations of an otherwise qualified individual, denying him equal access to a safe environment free from infliction of unnecessary pain and discomfort.

529. Plaintiff sent his disability complaints to Anne Cybulski-Sandlian, the ADA Coordinator, on two occasions as instructed by the ADA Grievance Procedure that was eventually posted, but did not hear anything in return until a third letter garnered a response on Dec. 29, 2011.

530. Cybulski told plaintiff he is not a qualified individual and his required groups require no writing. To the contrary, <u>every</u> group requires the completion of workbooks, papers, etc., and almost everything in the prison context requires a hand written document or form that makes the ability to write without pain a task that is of central importance in the prison environment. Accordingly, Plaintiff is similarly situated with other prisoners, and an otherwise qualified individual with a disability.

531. Non-discrimination under disability statutes apply to Corizon Health as a Private Entity under Title III, as well as the WDOC a Public Entity under Title II of the ADA and Rehabilitation Act for entities that receive federal financial funding for their programs.

532. The circumstances and chronology of events demonstrating retaliation: **1.** Plaintiff proved HSA Shahan was mistaken in his assertion that there was no documentation of Plaintiff having an impairment, and he became enraged. **2.** Plaintiff's comment to Dr. Johnson that he was left no choice but to pursue legal action for failure to accommodate his

disabilities, was closely related in time to adverse actions by officials. The removal of Plaintiff's inhaler, wedge pillow and braces; the denial of needed cortisone injections in his wrists and failure to prescribe additional pain medication; the denial of mental health consultations and refusal to answer communications regarding false entries in Plaintiff's mental health records were all meant to do harm and punish Plaintiff for exercising his First Amendment right to petition the government for redress of grievances.

533.   Despite clear documentation that plaintiff is disabled already in Plaintiff's records and also attached to the ADA grievance, Shahan brought in Dr. Johnson very soon after he filed his "disability accommodation" grievance in an attempt to repudiate the documented evidence of Plaintiff's impairments, deny Plaintiff adequate medications, and request for accommodation is clearly retaliation toward Plaintiff for filing general and ADA/RA grievances thereby subjecting Plaintiff to cruel and unusual punishment by blatant deliberate indifference to his pain, suffering and disabilities, violating Plaintiff's rights under the Eighth and Fourteenth Amendments and federal disability statutes.

534.   Plaintiff wrote and asked Warden Murphy why it is that the inmates in two other pods were allowed the privilege of computers in the pod and to print their personal documents from the law library printer, and yet denied Plaintiff a disability accommodation to do the same. Unit Manager Molden answered in Murphy's stead, "…computer use is a privilege." However, Plaintiff used the law library computers frequently for legal research, and was medium security when using computers when he was in the ITU. He only asked for accommodation to compose a legible letter to his son.

535.   **WDOC Policy and Procedure #3.403 Inmate Rights Nondiscrimination towards Inmates** states, "WDOC policies, procedures, and practices shall be enacted in a fair and equitable manner that ensures no form of unlawful discrimination takes place against inmates in correctional facilities. **All programs, services, and institutional privileges shall be offered on a nondiscriminatory basis**." R.O. Lampert and his staff make regular visits to WMCI and should have been aware of the locations of computers in the facility. Lampert knew that Plaintiff did not have pod access to this service, but played it

off as providing equal access in his grievance appeal response.

536. Plaintiff is (**1**) a handicapped person within the meaning of the ADA and Rehab. Act; (**2**) he is otherwise qualified for the benefits provided by the WDOC and Corizon Health; and (**3**) defendants discriminated against him on account of his disabilities.

537. Plaintiff is considered and documented an individual with a disability by the Social Security Administration, civilian doctors and WDOC officials. Plaintiff clearly met the definition of such as prescribed by the ADA and Amendments Act of 2008. Dr. Johnson's retaliatory opinion had no bearing on the obligation of prison officials to make requested accommodations for Plaintiff's disabilities as a matter of law. The actions of the defendants were retaliation for Plaintiff exercising his First Amendment right to petition the government for redress of grievances.

538. The failure of Corizon to provide meaningful, adequate pain relief and treatment for Plaintiff's documented chronic pain syndrome, is a violation of his Eighth Amendment right to be free from conditions that impose cruel and unusual punishment, his Fourteenth Amendment right against discrimination and retaliation. Plaintiff's medical records clearly demonstrate serious physical conditions and illnesses that he has a medically determinable physical impairment. The opinion of Dr. Johnson or Corizon Health has no bearing on the federal law defining a disability.

539. The retaliatory failure to treat Plaintiff's serious medical needs is more than a difference of opinion that rises above simple negligence, when considering the medical diagnosis and recommendations for treatment in Plaintiff's civilian records, and serves no penological interest in any event.

540. The refusal of Corizon to provide adequate pain medication and treatment for DDD, and required treatment for DeQuervain Disease effectively denied Plaintiff access to medical services preventing him from enjoying many services of the facility without having to endure pain, *i.e.* writing grievances, communications, commissary orders, recreation, etc. This violated the prohibition of cruel and unusual punishment and the ADA as well.

541. The ADA has been federal law for over twenty years. The State of Wyoming,

Department of Corrections and Division of Prisons has never adopted a Policy and Procedure implementing the law in its prison system.

542. Ongoing multiple instances of disability discrimination resulting in manifold violations of law is evidence of the failure of WDOC administrators and individual Wardens along with defendants Allen, Shahan and Richard Hallworth (Corizon) to implement Policy and adequately train employees in disability law and regulations to avoid harming disabled inmates under their charge.

543. The simple and clear fact is that defendants all the way up the chain of command through Corizon Health and the WDOC itself have denied Plaintiff accommodation for his disabilities to the point that he was severely injured hospitalized falling from his bunk.

544. Plaintiff suffered humiliation, discrimination, retaliation, physical pain and suffering and was forced to spend more time in prison under cruel and unusual conditions in violation of the Eighth and Fourteenth Amendments.

## VII. CLAIM AND PRAYER FOR RELIEF

**Plaintiff re-alleges and incorporates by reference Paragraphs 1-544, specifically and generally and pleads:**

545. The State of Wyoming, WDOC, Prison officials, Corizon Health and officials, the Wyoming Board of Probation and Parole and officials' actions, as presented in these claims, are prohibited by the Constitutions of the United States, Wyoming, and applicable Federal and State statutes.

546. Wyo. Constitution Article 1, § 15- "Wyoming Penal Code to be Humane." Plaintiff was entitled by law to confinement in an environment which does not result in his degeneration, or which threatens his mental and physical well-being. He was sent to prison to pay a debt to society for his crime, not for the torturous punishment and discrimination to which he was subjected. Plaintiff was intentionally treated differently from others similarly situated and there was no rational basis for the difference in treatment.

547.  Plaintiff alleges that all of the above injuries and violations of his Constitutional Rights are evidence of retaliation predicated upon the Defendants' belief that Plaintiff was contemplating the filing of a Federal § 1983 suit after the OCS spraying and torturous segregation of Oct. 22, 2008 and the filing of an ADA grievance May 26, 2011.

548.  The malicious actions of the Defendants violated Plaintiff's lawful rights, have left him permanently injured, further disabled, in severe pain and emotionally scarred. Plaintiff now suffers from depression, is distrusting and frightened of administrative officials and most inmates. He suffers from stress, nightmares, feeling alienated, inability to sleep and think straight, interact with others, and memory repression. Plaintiff suffers from Post Traumatic Stress Disorder that he never experienced before being subjected to the dysfunction, apathy, maliciousness, and ineptitude of the WDOC and Corizon.

549.  As to any issues of pain in all of the above-alleged situations, officials demonstrated complete deliberate indifference to the emotional and physical suffering that pain causes, tortuously and intentionally inflicting and perpetuating pain and emotional distress.

550.  Plaintiff completed all programming required of him by case management despite the inability to keep up in the *intensive* environment of the TC/ITU. Plaintiff worked a small job in the housing unit, dusting or doing what ever his disabilities would allow. Nonetheless, he was warehoused for no penological purpose but for obdurate punishment, retaliation and oppression.

551.  The systematic deficiencies in record keeping, alleged in this complaint, made Plaintiff's life a living hell; full of fear, alienation, intimidation, frustration, helplessness and anguish with physical and emotional pain and suffering for half a decade of his life.

552.  The Wyoming DOC and Prison Health Services, Inc./Corizon Health are liable for the violation of Plaintiff's rights under the Americans with Disabilities Act and the Rehabilitation Act because it hires the officials who harmed Plaintiff.

553.  Plaintiff's claims for money damages against the state under Title II and III of the ADA, and section 504 of the Rehabilitation Act are based on conduct that additionally and independently violated the Fourteenth and Eighth Amendment's guarantees against cruel

and unusual punishment abrogating 11th Amendment sovereign immunity.

554.   The defendants caused serious harm to the Plaintiff, and intentionally and calculatedly violated state and federal law with no regret for so doing.

555.   Plaintiff tried diligently, in the face denials and accusations from prison officials, to keep the Defendant officials, employees and supervisors of the WDOC, Corizon, and the Board of Parole advised of the abuses he was experiencing, and pleading for help.

556.   From June 25, 2008 in the A-dorm lobby at WHCC on, Plaintiff communicated to Director R.O. Lampert face to face, in letters and through grievances that he is permanently/totally disabled, he was in pain, was not being provided proper medical care, and that he felt something was wrong with his records.

557.   Plaintiff's pleas and subsequent letters and conversations with the defendants were more than enough to advise these Defendants of constitutional violations and prompt more than cursory investigation, availed nothing but avoidance of the issues or dismissals out of hand.

558.   Director Lampert, Dan Shannon, James Allen, Sam Borbely, Wardens and other defendants, all the way down the chain of command failed to take serious, investigate or take steps to rectify the problems in Plaintiffs' complaints that gave them requisite knowledge, and made them personally responsible for covering-up the alleged violations that caused continuous harm to the Plaintiff, and others.

559.   In every one of the allegations put forth in this complaint, Plaintiff attempted through proper institutional channels to get relief for the harms being done. Defendants, in the face of clearly established laws and statutes of this state and nation, denied, disavowed, covered up, and lied about their culpability in answers to grievances, ignored the harm and continued to violate those laws with some sort of supposed impunity. Saying, "Go ahead and sue us, we have more lawyers and more money than you." (*R.O. Lampert*)

560.   The gross deliberate indifference to Plaintiff's disabilities, disregarding clearly established law defining and applying the laws regarding "Persons with Disabilities"; cruel conditions imposed on Plaintiff from loss of records, denial of equal protection of

the laws, abuse of procedure in discipline; molestation on account of his mode of religious expression; false information to the Parole Board and the resulting extension of time in prison under abusive conditions; deliberate indifference to serious medical needs; lack of medical treatment and accommodations for disabilities; psychological abuse of being slandered, called untruthful, drug seeking and manipulative by officials when desperately trying to rectify the problem of his mismanaged records, etc., independently violated the civil rights of Plaintiff under the First, Fourth, Eighth, Ninth and Fourteenth Amendments to the U.S. Constitution and federal and state statutes.

561.   The factual allegations put forth in this Civil Rights complaint, taken together, show a broad and continual pattern of discrimination toward Plaintiff as a class-of-one, and that the totality of the conditions of his incarceration were repugnant and amounted to nothing less than abusive and irrational punishment by the state, with callousness and disregard for Plaintiff's rights wholly unrelated to any legitimate state activity, causing physical and emotional injuries that rise above abuses that can be considered de minimis.

562.   Taken in totality, the actions of state actors shown herein are an illustration of torture by the State and imprisonment that is offensive to the conscience of humanity. Defendants have grossly ignored their mandate to provide a safe, habilitative environment, and have forced on Plaintiff abuses capable of destroying an individuals psyche and hope for successful re-entry into society in direct disregard for WDOC own Vision and Mission Statement.

563.   Plaintiff's request for damages for the Constitutional and statutory violations that have caused serious injury to Plaintiff has merit and is not adverse to the public interest because the citizens of Wyoming and the United States have a vested public interest in protecting the civil rights of all persons under the Constitution and laws.

564.   Defendants' pattern of disregard for Constitutional and statutorily guaranteed rights of *everyone* is worthy of significant compensation in and of itself. In the interest of justice and good conscience Plaintiff should be awarded the full panoply of remedies available.

**WHEREFORE, Plaintiff respectfully prays this court enter judgment granting:**

565.   A declaratory judgment under 28 USCS § 2201 and Rule 57- Fed. R. Civ. P. proclaiming that the acts and omissions described herein violated Plaintiff's rights under the Constitution and Laws of the United States of America and the State of Wyoming;

566.   Compensatory and Punitive damages, and all other permissible relief and allowable Attorney's Costs and Fees against Defendants, jointly and severally, as appropriately awarded under 42 USCS § 1983 and applicable federal and state statutes in the amount determined by the jury to be fair, equitable and in the interest of justice.

567.   Trial by jury is therefore demanded on all issues triable to a jury.

## VERIFICATION AND AFFIDAVIT

**COMES NOW THE PLAINTIFF** Robert Owen Marshall III having read the forgoing CIVIL RIGHTS COMPLAINT and I, being duly Advised and Sworn according to the law, swear that it is true and correct. I hereby swear under Penalty of Perjury that the matters alleged herein are true. As to matters alleged on information and belief, I believe them to be true.

**EXECUTED** at TORRINGTON, Wyoming this 13TH day of JUNE 2012.

STATE OF WYOMING
COUNTY OF GOSHEN   } SS

_____
R.O. Marshall III

## CERTIFICATE OF NOTARY

**THE FORGOING CIVIL RIGHTS COMPLAINT** is Sworn and Signed before me this: 13TH day of JUNE 2012 at Torrington, Wyoming.

_____            5-14-2014
Signature of Notary                              Commission Expires

111